**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| MARICULTURA DEL NORTE, | ) | |
| S. DE R.L. DE C.V. | ) | |
| Emiliano Zapata S/N | ) | |
| Manzana I-51, Lote 151 | ) | |
| El Sauzal de Rodriguez | ) | |
| Ensenada, BC 22760 | ) | |
| Mexico | ) | |
| | ) | |
| and | ) | |
| | ) | Case No. 1:14-cv-10143 (CM) |
| SERVAX BLEU, S. DE R.L. DE C.V. | ) | |
| Emiliano Zapata S/N | ) | |
| Manzana I-51, Lote 151 | ) | |
| El Sauzal de Rodriguez | ) | |
| Ensenada, BC 22760 | ) | |
| Mexico | ) | |
| | ) | |
| Plaintiffs, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | |
| WORLDBUSINESS CAPITAL, INC. | ) | |
| One State Street, Suite 2350 | ) | |
| Hartford, CT   06103 | ) | |
| | ) | |
| OVERSEAS PRIVATE INVESTMENT | ) | |
| CORPORATION | ) | |
| 1100 New York Avenue, N.W. | ) | |
| Washington, D.C.   20527 | ) | |
| | ) | |
| UMAMI SUSTAINABLE SEAFOOD, INC. | ) | |
| 1230 Columbia Street Suite 440 | ) | |
| San Diego, CA   92101 | ) | |
| | ) | |
| CRAIG A. TASHJIAN | ) | |
| 39 South Virginia Court | ) | |
| Englewood Cliffs, NJ   07632 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERRA CAPITAL MANAGEMENT, LLC | ) | |
| 1185 Avenue of the Americas | ) | |
| 18th Floor | ) | |
| New York, NY   10036 | ) | |

1

```
                                              )
        Defendants.                           )
_____          )
```

## COMPLAINT

Plaintiffs, Maricultura del Norte, S. de R.L. de C.V. ("Marnor") and Servax Bleu, S. de R.L. de C.V. ("Servax"), by their undersigned counsel and for their Complaint against Defendants WorldBusiness Capital, Inc. ("WBC"), Overseas Private Investment Corporation ("OPIC"), Umami Sustainable Seafood, Inc. ("Umami"), Craig A. Tashjian ("Tashjian"), and Amerra Capital Management, LLC ("Amerra"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, breach of the implied duty of good faith and fair dealing, tortious interference with contractual relations, conversion, breach of fiduciary duty, fraudulent concealment, fraud, and violations of the Sherman Act, 15 U.S.C. § 1.

## THE PARTIES

2.      Plaintiff Marnor is a privately-held Mexican company engaged in aquaculture and fishing operations off the coast of Baja California, Mexico under a government concession. Marnor's principal place of business is located at Emiliano Zapata S/N, Mz. I-51 Lote 151, El Sauzal de Rodriguez, C.P. 22760, Ensenada, Baja California, Mexico.

3.      Plaintiff Servax is a privately-held Mexican Company engaged in extended-cycle fish farming and export operations.  Servax's principal place of business is located at Emiliano Zapata S/N, Mz. I-51 Lote 151, El Sauzal de Rodriguez, C.P. 22760, Ensenada, Baja California, Mexico.

4.      Defendant WBC is a privately-held Delaware commercial finance company that specializes in U.S. loans to foreign small and midsize businesses engaged in international trade with some form of "U.S. affiliation."   WBC's principal place of business is located at One State

Street, Suite 2350, Hartford, Connecticut 06103.

5.      Defendant OPIC is the development finance agency of the United States government.   OPIC's principal offices are located at 1100 New York Avenue, Washington, D.C. 20527.

6.      Defendant Umami is a publicly-traded Nevada company with operations that fish for and farm Bluefin Tuna off the coast of Baja California, Mexico.   Umami's principal place of business is located at 1230 Columbia Street, Suite 440, San Diego, California 92101.

7.      Defendant Tashjian is an individual and a Managing Director of Amerra. Tashjian is a citizen of New Jersey who resides at 39 South Virginia Court, Englewood Cliffs, New Jersey 07632.

8.      Defendant Amerra is a privately-held Delaware principal investment firm focusing on investments in agriculture.   Amerra's principal place of business is located at 1185 Avenue of the Americas, 18th Floor, New York, NY 10036.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiffs' claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the laws of the United States; 28 U.S.C. § 1346(b)(1), because this action involves claims against an agency of the United States for money damages resulting from injury or loss of property under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred; and 28 U.S.C. § 1332 because there is complete diversity of citizenship as between the Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000.

10.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391 (b) and (c) because defendants reside, transact business, are

found, or have agents in this district, and because a substantial part of events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.   Additionally, venue is proper in this judicial district because certain contracts at issue in this action designate this judicial district as the stipulated venue for adjudication of the parties' disputes.

11.     Defendants' actions have substantially impaired Plaintiffs' exports of Bluefin Tuna into the United States thereby impacting United States import trade and commerce. Additionally, Defendants' anticompetitive conduct by excluding competition in the Bluefin Tuna market in the United States and limiting Plaintiffs' ability to export Bluefin Tuna into the United States had a direct, substantial and reasonably foreseeable effect on United States commerce.

## FACTUAL BACKGROUND

### I.     Bluefin Tuna

12.     Bluefin Tuna is commonly regarded as the highest quality and most desirable species for sushi and sashimi consumption, and has become the centerpiece of upscale sushi and sashimi dining.

13.     Bluefin Tuna itself is comprised of three distinct species: Atlantic Bluefin Tuna, which are found in the Mediterranean Sea and the western and eastern Atlantic Ocean; Pacific Bluefin Tuna, which are found in the northern Pacific Ocean; and Southern Bluefin Tuna, which are found in the southern hemisphere waters of the world's oceans.   Each of the three Bluefin Tuna species has its own distinct geographic distribution, migratory patterns and sustainability profile.

14.     Bluefin Tuna is a gourmet product and a rare commodity. It is significantly differentiated from other types of tuna, and exhibits low cross-price elasticity of demand with other types of tuna.   For instance, a single Pacific Bluefin Tuna fetched a jaw-dropping $1.76

4

million at a January 2013 fish auction in Tokyo, Japan.[1]

15.     The amount of each species of Bluefin Tuna caught in the wild has declined significantly since the 1960s, primarily due to overfishing and the introduction of catch quotas and other regulations.  Bluefin Tuna catches declined from 143,200 metric tons in 1961 to 49,096 metric tons in 2010.[2]

16.     While supplies have diminished, consumer demand for Bluefin Tuna has substantially exceeded available wild catch supply.   Although the demand for Bluefin Tuna was, for decades, overwhelmingly Japanese, as the popularity and demand for high-end sushi has globalized, new demand has emerged and grown, including in the United States.  This has resulted in overfishing that has reduced the Bluefin Tuna population even further.

17.     Bluefin Tuna fishing has been constrained primarily through setting environmentally-sound quota levels, increasing quota enforcement and enforcement against illegal fishing of Bluefin Tuna.   In addition, other conservation measures, such as more stringent licensing and registration requirements, tighter documentation and traceability restrictions, and shortened allowable fishing seasons, have been implemented in various parts of the world to help conserve the wild Bluefin Tuna population. For example, the International Commission for the Conservation of Atlantic Tunas ("ICCAT") only allows Bluefin Tuna to be offloaded at designated, regulated ports and requires official monitors aboard fishing boats, and the Inter-American Tropical Tuna Commission ("IATTC") sets limits on commercial catches of Bluefin Tuna.[3]

18.     As a result of the sustained periods of overfishing and the relatively recent

---

[1] http://www.nytimes.com/2013/01/06/world/asia/new-high-for-tuna-at-tokyo-fish-sale.html

[2] "Global Tuna Nominal Catches," http://www.fao.org/fishery/statistics/tuna-catches/en

[3] The most recent IATTC resolution reduced Pacific Bluefin Tuna capture in the Americas (from

regulatory response, the supply of Bluefin Tuna caught in the wild has been severely constrained and is expected to remain so for the foreseeable future.

19.    The large supply and demand imbalance for Bluefin Tuna has intensified interest in Bluefin Tuna farming as a potential solution for the strong demand for the product and the desire to conserve the species over the long term.

20.    Farming seafood species, or "aquaculture," has emerged as a bridge between increasing demand for seafood and the natural constraints on the amount of fish that can be caught in the wild.  Over the past two decades, the increase in the demand for seafood has largely been addressed through the rapid growth of aquaculture as the level of wild catch has leveled off, according to the Food and Agricultural Organization of the United Nations, or FAO.

21.    Before the 1990s, conventional Bluefin Tuna fishing methods made it impossible to keep bulk amounts of Bluefin Tuna alive after being caught.

22.    In the early 1990s, the emergence of purse seine fishing vessels, which surround schools of Bluefin Tuna, enabled their live capture and transport back to farms for further growth prior to harvesting. Historically, Bluefin Tuna farming occurred between the spring, when the fish were caught, and the winter.  These short-term Bluefin Tuna farms are generally able to increase the "biomass" of the catch – i.e., the size of the fish – during this period by up to 50 percent.

23.    Extended-cycle Bluefin Tuna farms have successfully created more than ten times the biomass on their farms compared to catch weights, which significantly reduces the strain on the Bluefin Tuna population in the wild over the longer term.

24.    In order to farm Bluefin Tuna at commercial scale over one or more winters, extended-cycle farmers need the ability to catch (or purchase) live Bluefin Tuna, ample input

Canada to Chile) to its lowest level in history: 3,500 tons for the 2015 season.

quotas, and farming concessions in protected natural environments with key technical characteristics (including adequate space and depth, multi-directional currents and favorable water quality).

## II.     Marnor and Sevax's Operations

25.     Marnor was a pioneer in the field of Bluefin Tuna aquaculture off the coast of Baja California, Mexico, beginning operations in the 1990s.

26.     Marnor's operations require it to locate, catch and tow Bluefin Tuna to farm sites (now operated by Servax) using highly specialized processes and techniques.

27.     Marnor's fleet, comprised of 22 vessels, is key to its (and now Servax's) operations because those vessels are used to locate, catch, tow, feed and harvest the Bluefin Tuna.

28.     Until 2012, Marnor's Bluefin Tuna exports had focused almost exclusively on Japan.

29.     In the Spring and early Summer of 2012, Marnor began negotiations with non-party Grupo Altex ("Altex"), a large agro-industrial organization, to expand and improve its Bluefin Tuna operations through a new Altex affiliate – Servax.

30.     Servax, through its affiliation with Altex, brought with it decades of experience and expertise in the development of new markets for food products, primarily in the United States and Europe.

31.     Through their affiliation, Marnor and Servax sought to increase production capacity and exports to new markets, especially the United States.

32.     The joint venture included multiple agreements pursuant to which Marnor and Servax would begin joint operations until Marnor was able to free its assets of all liens and encumbrances, at which point Servax would acquire substantially all of those assets.

7

33.    Servax made initial expenditures of approximately $4 million in connection with the joint venture.

34.    Marnor, buttressed by its joint venture with Servax, is Umami's leading competitor in the farming and export of Pacific Bluefin Tuna.

35.    Marnor's (and Umami's) Bluefin Tuna capture operations are regulated and limited by international standards and caps that are set on a season-by-season basis to preserve the species.

36.    Those standards define the amount of Bluefin Tuna that may be captured on a regional basis, therefore defining the universe of Bluefin Tuna over which Marnor and Umami will compete in a given season.

37.    The seasonal quotas are far lower than the actual volume of Bluefin Tuna that Marnor and Umami are operationally capable of capturing.

38.    Therefore, if one of these entities is unable to operate and capture Bluefin Tuna at any time during the season, the other will reap an immediate benefit.

39.    Moreover, Bluefin Tuna capture worldwide is subject to similar decreasing quotas, so there are no alternative sources to replace any decrease in supply of Bluefin Tuna to the United States from Mexico.

40.    Until 2012, Marnor and Umami's annual yields were consistent season after season.

41.    Since joining forces, Marnor and Servax have targeted and been responsible for 50% of the Mexican exports of Bluefin Tuna to the United States.  Umami exports the remaining 50%.

42.    Bluefin Tuna imports into the United States from Mexico represent over 35% of the total Bluefin Tuna market in the United States.

43.     Marnor and Servax also have developed plans to increase their Bluefin Tuna exports to and market presence in the United States.

44.     The price of Bluefin Tuna in the United States is approximately 50% higher than the price in Japan due to the limited availability of this luxury gourmet product and because of geographic factors (including proximity to the coast and cost of import) that reduce cross-price elasticity of demand between Bluefin Tuna sold in the United States and Bluefin Tuna sold in Japan.

45.     A reduction in the number of suppliers of Bluefin Tuna to the United States would result in higher prices.

**III.    Tashjian and Amerra Learn of the Servax/Marnor Joint Venture**

46.     Tashjian, now Managing Director at Amerra, met the principals of Servax more than a decade ago, during the time Tashjian worked for Societe Generale.

47.     During his time at Societe Generale, Tashjian handled financing for multiple Altex-backed ventures around the world.

48.     During the course and as a result of Altex's relationship with Societe Generale, Tashjian became familiar with Altex's reputation and position as a global market leader in the food products industry, and developed a relationship with its principals.

49.     In May of 2012, Tashjian, now at Amerra, acted as Amerra's liaison with Altex in negotiating potential financing for another Altex-backed joint venture.

50.     As part of the underwriting process for that venture – which involved multiple in-person meetings and exchanges of confidential documentation and data – Amerra signed a Confidentiality Agreement, which precluded it from using any non-public underwriting information (a) for its own benefit; (b) for the benefit of any third party; or (c) to the disclosing party's detriment.

9

51. During one of their in-person meetings in May 2012, under the auspices of the Confidential Disclosure Agreement, Tashjian learned that Altex was negotiating with Marnor and in the process of creating Servax to expand and develop international markets for Bluefin Tuna.

52. At the meeting, Tashjian represented that Amerra had ample knowledge and experience in the Bluefin Tuna market, and asked for the opportunity to make a financing proposal for the project.

53. On or about September 5, 2012, Servax made an in-person presentation at Amerra's New York offices and provided Amerra detailed confidential legal, corporate, and marketing information, as well as financial projections for Servax's joint venture with Marnor.

54. Servax relied on Amerra's express and implied assurances of confidentiality in making these disclosures.

55. The confidential information Servax supplied Amerra during the meeting was sufficiently detailed for Amerra to underwrite two financing facilities for Servax's joint venture with Marnor.

56. Tashjian wrote to Servax later that same day, noting that the project held much potential, and stating that Amerra would be interested in financing Servax's Bluefin Tuna business ventures.

57. In that same email, Tashjian provided Servax with Amerra's proposed term sheet for a revolving credit line and long-term loan.

58. Consistent with Servax and Amerra's dealings and understanding with respect to information exchanged between them in the underwriting process, the proposed term sheet was labeled confidential and provided that its terms could not be disclosed to any third parties.

59. Servax considered the proposal, but ultimately declined Amerra's offer to finance

the project.

## IV.    The WBC Credit Agreement and Mortgages

60.    On or about December 16, 2005, Marnor and WBC entered into a Credit Agreement whereby WBC agreed to lend Marnor up to $9.9 million to expand and operate its aquaculture business.  A true and correct copy of the Credit Agreement is attached as Exhibit "A."

61.    The loan was guaranteed by OPIC, the U.S. Government's development finance institution (Ex. A), and secured by preferred fleet and ship mortgages on Marnor's vessels.  True and correct copies of the First Preferred Mexican Fleet Mortgage from Marnor in favor of WBC and the Second Preferred Mexican Ship Mortgage from Marnor in favor of WBC, both dated December 16, 2005, are attached hereto as Exhibits "B" and "C," respectively.

62.    Pursuant to the Mortgages, Marnor retained the right to cure any default.

63.    Over the course of several years, Marnor drew on and repaid its line of credit.

64.    Although it continued to pay interest through 2012, by March of 2010, Marnor technically was in default under the Credit Agreement, owing WBC $5.2 million in principal.

65.    Marnor's joint venture with Servax was intended, among other things, to provide Marnor the financial resources necessary to pay off its debt to WBC.

66.    Upon information and belief, WBC never sought to collect on OPIC's guarantee.

## V.    Marnor/Servax's Initial Attempts to Cure the Default

67.    On August 1, 2012, Philippe Charat, a principal of Marnor, wrote to Leslie Galbraith, Executive Vice President and Chief Financial Officer of WBC, to advise her of the joint venture with Servax and inquire about a future relationship with the new venture.  A true and correct copy of Mr. Charat's correspondence to Ms. Galbraith is attached hereto as Exhibit "D."

68.     On August 20, 2012, Jose Carlos Gonzalez, Finance Vice President of Altex and now Vice President of Servax, wrote to Ms. Galbraith to advise her of the joint venture with Marnor.   A true and correct copy of Mr. Gonzalez's correspondence to Ms. Galbraith is attached hereto as Exhibit "E."

69.     Mr. Gonzalez also requested a meeting with WBC to discuss the status of WBC's loan to Marnor and discuss a possible future relationship.

70.     WBC contacted Mr. Charat, who confirmed the accuracy of Mr. Gonzalez's email and explained the terms of the joint venture agreements.

71.     Specifically, Mr. Charat explained that resolution of Marnor's default was a material term of the joint venture agreement.

72.     On August 25, 2012 Ms. Galbraith wrote to Mr. Charat and advised that he should no longer contact WBC directly, but should deal instead with Jose Alfonso Abizaid, an attorney for WBC.   A true and correct copy of Ms. Galbraith's August 25, 2012 email is attached as Exhibit "F."

73.     On August 27, 2012, OPIC wrote to Marnor and advised that "OPIC is involved in all actions taken by [WBC] with respect to the Loan, and works with [WBC] in its collection efforts."[4]   A true and correct copy of OPIC's letter is attached hereto as Exhibit "G."

74.     Despite her earlier instruction to not engage with WBC directly, on August 28, 2012, Ms. Galbraith wrote to Mr. Charat requesting written authorization to speak with Mr. Gonzalez, and advising that WBC and OPIC were amenable to speaking with Mr. Gonzalez provided any discussion "contemplate[d] full and prompt payment of the Loan."   A true and correct copy of an email chain containing Ms. Galbraith's email is attached hereto as Exhibit

---

[4] All references to WBC concerning its actions vis-à-vis Marnor therefore also refer to OPIC.

"H."

75.     Mr. Charat responded authorizing Ms. Galbraith to discuss the status of the loan with Mr. Gonzalez.   Ex. H.

76.     In his email, Mr. Charat also advised that Mr. Gonzalez would be in New York "and would be delighted to meet with [Ms. Galbraith] **to settle this issue**."   Ex. H (emphasis supplied).

77.     That same day, Ms. Galbraith wrote back to Mr. Gonzalez, acknowledging her conversation with Marnor and WBC's knowledge of the joint venture.   A true and correct copy of Ms. Galbraith's correspondence is attached hereto as Exhibit "I."

78.     In so doing, Ms. Galbraith recognized Servax's interest in seeing Marnor's loan repaid.

79.     In her correspondence, Ms. Galbraith advised Mr. Gonzalez that Maricultura was in default under the credit agreement, and advised that OPIC and WBC were seeking recovery through foreclosure.   Nevertheless, consistent with Marnor's absolute legal right to cure any defaults, Ms. Galbraith explained that "OPIC and WBC are willing to discuss any proposal that includes prompt payment in full of the outstanding loan balance." *See* Ex. I.

## VI.     Foreclosure Proceedings

80.     On August 28, 2012, the same day WBC first responded to Mr. Gonzalez's email, Marnor was served with process in a special maritime foreclosure action filed by WBC in Mexico.

81.     As part of the foreclosure action, WBC requested that Marnor's entire fleet be arrested and prevented from leaving port during the proceedings.

82.     As a result of Mexican procedural rules, the Mexican court ordered the arrest of the vessels for the duration of the proceedings before Marnor was served with process.

83.   WBC also designated, paid and controlled the receiver appointed to ensure that the vessels were maintained in proper working condition.

84.   After being served with process and advised of the arrest, Marnor had but five days to answer the complaint and, under Mexican law, could assert only a limited number of defenses known at that time.   Moreover, because Mexican law does not permit amendment of pleadings, Marnor could not amend its answer or add counterclaims after the initial pleadings were closed.

85.   Marnor, through Mexican counsel, immediately contacted WBC to attempt to resolve the claim, but received no response from WBC's Mexican counsel.

86.   Shortly thereafter, Marnor moved to have the vessels released and offered to guarantee the release through any means necessary in an effort to continue its operations and, thus, the ability to generate income to repay the debt.

87.   In fact, Marnor obtained (from Servax) $5.2 million in cash which it placed in escrow to guarantee WBC's claim.

88.   In other words, Marnor offered to doubly protect WBC's interests: the lender's claim would be secured by cash in escrow plus the existing mortgage on Marnor's fleet.

89.   WBC had the ability to release Marnor's fleet under these conditions and allow Marnor and Servax to operate and generate income from their Bluefin Tuna business.

90.   WBC nevertheless opposed Marnor's request to release the vessels (while keeping the mortgage in place) and secure the debt with cash, insisting instead that the vessels remain under arrest and idle.

91.   Therefore, WBC exercised (and, as explained below, until February 2013 continued to exercise) absolute control over Marnor's business, and refused to allow Marnor and Servax to operate their Bluefin Tuna enterprise, or even engage in conversations with Marnor

and Servax representatives, without any basis or justification.

92.     Marnor and Servax have been unable to use Marnor's fleet in their operations for over two years.

93.     Since 2012, in an effort to mitigate damages, Servax has been forced to contract the services of third parties to provide it and Marnor capacity to capture Bluefin Tuna at a cost of millions of dollars per season.

**VII.   Marnor and Servax Continue Their Attempts to Cure the Default with WBC**

94.     Throughout the months of September and October of 2012, while foreclosure proceedings were underway, Marnor and Servax representatives attempted to speak to Ms. Galbraith, as well as Mr. Brett Silvers, WBC's President and Chief Executive Officer, on a nearly daily basis in an effort to arrange for full and immediate payment of the outstanding debt, including any and all additional sums due and owing pursuant to the financing documents, and the release of the vessels.

95.     WBC refused to answer Marnor and Servax's phone calls, and did not respond to their messages.

96.     Marnor and Servax's counsel also attempted to discuss payment with WBC's counsel in the foreclosure action.

97.     WBC's Mexican counsel, however, refused to discuss payment with Marnor or Servax.

98.     On October 19, 2012, Fernando Elias-Calles, a Mexican attorney for Altex and Servax, was able to reach Ms. Galbraith.

99.     During a telephone call, Mr. Elias-Calles again explained the terms of the joint venture – including the fact that repayment of Marnor's debt to WBC and cancellation of the mortgages was a material term of the joint venture agreement – and reiterated the joint venturers'

desire to discuss the status of and resolve Marnor's outstanding debt to WBC. A true and correct copy of Mr. Elias-Calles' email to Leslie Galbraith summarizing their conversation is attached hereto as Exhibit "J."

100. Mr. Elias-Calles explained that WBC's Mexican counsel refused to discuss payment, which he noted "is clearly odd," and asked for contact information for WBC's U.S. counsel to discuss payment. *See* Ex. J.

101. The only response to Mr. Elias-Calles' email was a telephone call from Guy Morley, WBC's U.S. counsel, in which Mr. Morley stated that Mr. Elias-Calles was prohibited from contacting his client under U.S. rules of professional conduct.

102. Mr. Elias-Calles explained that, as Mexican counsel, he was not subject to restrictions on contacting WBC directly.

103. Rather than engaging in adversarial posturing, however, Mr. Elias-Calles reiterated to Mr. Morley that Servax, as Marnor's joint venturer, simply wished to repay the loan in full, together with any and all additional amounts as may have been due and owing.

104. Neither WBC nor Mr. Morley responded in substance to Mr. Elias-Calles' requests for a pay-off figure that Servax/Marnor could tender in order to cure the default, pay off the loan and thereby obtain release of Marnor's fleet.

105. Based on the lack of response, on November 9, 2012, Mr. Charat wrote to WBC exercising Marnor's right to pay the debt in full, and requesting a final statement on Marnor's account. A true and correct copy of Mr. Charat's correspondence to WBC is attached hereto as Exhibit "K."

106. As explained by Mr. Charat, the Mortgages provide as follows:

> TWENTIETH: (a) If at any time after an Event of Default and prior to the sale of the Vessels by the Mortgagee or prior to completion on any foreclosure proceeding the Mortgagor offers completely to

cure all Events of Default and pay all expenses, advances and damages to the Mortgagee consequent on such Events of Default, with interest at the Late Payment Rate, the Mortgagee shall accept such offer and payment and restore the Mortgagor to its former position, but such action shall not affect any subsequent Event of Default or impair any rights consequent thereon. This section shall not be deemed to impair or restrict the right of redemption which the Mortgagor may have under statute or by order or decree of a court of law.

(b) At any time after any Event of Default and prior to the actual sale of the Vessels by the Mortgagee or prior to completion of any foreclosure proceedings the Mortgagor may pay the total Obligations hereby secured including any interest accrued thereon to the date of such payment and pay all expenses incurred by the Mortgagor's obligations under the Credit Agreement, the Promissory Note and under this Mortgage. The Mortgagor's right to so redeem the Vessels shall be exercised in a timely manner so as to permit the actual payment of the Obligations hereby secured prior to the sale or foreclosure of the Vessels as proposed or initiated by the Mortgagee.

Ex. B.

107.    At the time, Marnor and Servax estimated that Marnor's debt to WBC, including principal, interest and fees, amounted to approximately $6.5 million.

108.    On November 13, 2012, Mr. Silvers of WBC responded to Marnor's letter.  A true and correct copy of WBC's letter to Marnor is attached as Exhibit "L."

109.    In Mr. Silver's letter, WBC took the position that Marnor had "not [given] formal notice under the Credit Agreement, under any of the Financing Documents nor in connection with the pending Mortgage foreclosure action brought by the Lender against the Borrower in the Federal Courts of Ensenada, Mexico."  *See* Ex L.

110.    Despite acknowledging that Marnor had the right to repay the loan, WBC refused to provide a statement on Marnor's account.  *See* Ex. L.

111.    Instead, Mr. Silvers wrote that Marnor could have made that request through Mexican counsel, notwithstanding that Marnor's counsel previously had attempted to do so

without receiving the courtesy of a response.   *See* Ex. L.

112.   In light of WBC's refusal to deal directly, Marnor and Servax continued their attempts to engage with WBC's Mexican counsel for more than a month, again without success.

113.   On January 10, 2013, Mr. Charat reached Ms. Galbraith on her mobile telephone, explained the exigency of the circumstances (as the continued arrest of the vessels was threatening Marnor and Servax's viability as going concerns), and requested an appointment so that Marnor and Servax – through Messrs. Charat and Gonzalez – could come to WBC's offices in Connecticut in person with a check to pay off the full balance of the loan.   A true and correct copy of the email memorializing that conversation is attached as Exhibit "M."

114.   Ms. Galbraith advised that WBC would provide the contact information for U.S. counsel to resolve the matter.   *See* Ex. M.

115.   Despite its commitment to doing so, WBC never identified the proper contact for payment in the United States.   *See* Ex. M.

116.   Faced with WBC's continued unresponsiveness, on January 11, 2012, Mr. Charat wrote to Mr. Silvers and Ms. Galbraith yet again:

> Dear Brett and Leslie,
>
> We are making a straight forward effort to pay off our debt to you next week. I thought that in that […] spirit you would have forwarded the information that is needed to contact your U.S. attorney as you requested.
>
> Do you have a legal impediment in receiving the funds from us to totally clear our obligation to you?
>
> Do you have an agenda unknown to us that impedes you from clearing our debt to you?
>
> I again repeat that expediency is of the utmost importance and is self evident.

*See* Ex. M.

117.   On January 12, 2012, Ms. Galbraith advised Mr. Charat to contact WBC's counsel in Mexico.   *See* Ex. M.

118.   After repeated attempts, on January 15, 2013, Mr. Alonso Vega, an attorney representing Marnor in the foreclosure action, finally was able to speak to Attorney Abizaid, WBC's counsel in Baja California, and requested that Mr. Abizaid speak with Mr. Elias-Calles to discuss resolution of the outstanding debt.

119.   Mr. Vega also requested that WBC provide a statement of account in order to arrange for payment of the outstanding debt.

120.   Despite having committed to doing so, Mr. Abizaid did not provide the account information requested, prompting Mr. Elias-Calles to contact Ms. Galbraith yet again to request a calculation of Marnor's debt.  A true and correct copy of Mr. Elias-Calles' January 18, 2013 email to Ms. Galbraith is attached as Exhibit "N."

121.   On January 25, 2013, Mr. Abizaid wrote to Mr. Elias-Calles and advised that his clients were reluctant to provide Mr. Elias-Calles any information on the claim without formal documentation to support his authority to speak and act on behalf of Marnor.

122.   Surprisingly, Mr. Abizaid's email stated that the matter could be easily resolved if Marnor simply admitted all claims in the complaint and paid the liquidated debt – even though Marnor had repeatedly requested, but had been denied, a statement of account, and notwithstanding Marnor's indisputable contractual right to make payment and WBC's indisputable obligation to accept tender of such payment and duty of good faith and fair dealing to reveal the amount that WBC contended was required to pay off Marnor's obligations in full.

123.   In an effort to expedite discussions, on January 26, 2012, Mr. Elias-Calles committed to obtaining a formal power of attorney from Marnor, and requested that Mr. Abizaid provide him with a statement of Marnor's account and meet with him in the coming days to

effectuate payment.

124. On January 29, 2013, Mr. Elias-Calles provided Mr. Abizaid a copy of his power of attorney and reiterated his request for a meeting.

125. Finally, Mr. Abizaid offered to meet with Messrs. Elias-Calles and Gonzalez in February 2013.

126. Messrs. Elias-Calles and Gonzalez traveled from Mexico City to Mexicali to meet with Mr. Abizaid in early February 2013.

127. When they arrived at his offices, however, Mr. Abizaid, purportedly acting on behalf of WBC, stated that he had been instructed to not speak with Marnor and Servax regarding payment at all.

128. Shortly thereafter, however, Mr. Abizaid demanded $7.9 million to extinguish Marnor's debt to WBC – an amount that included a purported $1.5 million in attorney and custodian fees and costs (most of which were incurred, if at all, after Marnor and Servax offered to repay the debt in full), and was 20% greater than Marnor and Servax's estimations of the actual debt.

129. Unbeknownst to Marnor and Servax, however, by the time Mr. Abizaid met with Mr. Elias-Calles, WBC had assigned its rights and causes of action to Umami, Marnor and Servax's principal competitor in the Bluefin Tuna market.

**VIII.  WBC Assigns the Credit Agreement to Umami**

130. On or about February 8, 2013, WBC and Umami – through Mr. Abizaid and Timothy Fitzpatrick, then-Chief Financial Officer and now Chief Executive Officer of Umami – filed an assignment agreement with the Mexican court, whereby WBC assigned all rights, obligations and causes of action under the Credit Agreement and Mortgages to Umami.  A true and correct copy of the assignment agreement is attached hereto as Exhibit "O."

131.    Marnor was not served with a copy of the assignment agreement until one week after the assignment was filed with the Mexican court.

132.    Marnor received service of the assignment within a day or two after receiving Mr. Abizaid's demand.  Notably, at the time he met with Messrs. Elias-Calles and Gonzalez, and later when he made the $7.9 million demand, Abizaid failed to disclose the assignment, instead purporting to act and demand payment on WBC's behalf.

133.    WBC assigned its rights to Umami despite Marnor and Servax's commitment to pay the full balance of the debt, after repeatedly and unjustifiably refusing to provide Marnor and Servax with a statement of Marnor's account, and after refusing to discuss payment directly for almost six months.

134.    During the time it negotiated with Umami, and certainly by the time of the assignment, WBC was on actual notice of the fact that Umami was a competitor of Marnor.

135.    Indeed, in the assignment itself, Umami declared that its corporate purpose is "the operation and commercialization of sea products and food, either in their country or abroad." *See* Ex. O.

136.    Additionally, WBC had actual or constructive knowledge that Umami competed directly with Marnor because Umami's SEC disclosures state so expressly.

137.    Having litigated the issue already when Marnor sought to replace the seized vessels for cash in escrow, WBC knew that the plaintiff in the foreclosure action had the ability to decide whether or not to release Marnor's arrested fleet.

138.    Therefore, in negotiating and ultimately assigning all of its rights and causes of action against Marnor to Umami, WBC was fully aware that it was transferring absolute control of Marnor's assets to Marnor and Servax's competitor, facilitating Umami's ability to oust Marnor and Servax from the market.

139.    Prior to February 8, 2013, when directing Marnor and Servax to discuss payment with others, WBC never disclosed to Marnor or Servax that it was considering or negotiating an assignment and transfer of WBC's rights and causes of action under the Credit Agreement and Mortgages to any third parties, much less an assignment to Marnor/Servax's main competitor.

140.    In fact, in encouraging Marnor and Servax to discuss and arrange for payment through counsel between August of 2012 and February of 2013 (while refusing to provide a statement of Marnor's account), WBC affirmatively and knowingly concealed the fact that WBC was negotiating an assignment, had committed to assigning, or had already assigned, all of its rights and causes of action against Marnor to Marnor and Servax's main competitor, Umami, and planned to transfer absolute control of Marnor's assets – and therefore Marnor and Servax's Bluefin Tuna operations – to Umami.

141.    WBC's assignment to Umami was effected with reckless disregard of Marnor's rights and interests, and resulted in multi-million-dollar losses to Marnor and Servax.

IX.    **Amerra Invests in Umami**

142.    On or about August 26, 2011, Umami entered into a credit agreement with Amerra.

143.    Upon information and belief, the Amerra credit facility was negotiated in, and is subject to the laws of, New York.

144.    The credit agreement was designed to enable Umami to repay other outstanding debt and provide working capital for growth and reinforcement of infrastructure of Umami's Mexican facility.

145.    The Amerra credit agreement provided for a credit facility secured by Umami's assets and holdings.

146.    Amerra, in turn, included the Umami facility in one or more of its privately-placed

funds.

147.    As of the Summer of 2012, Umami had drawn down the entire credit facility and was unable to repay Amerra, placing it in default.

148.    At the time, WBC's Credit Agreement, the Mortgages, and the details of the foreclosure proceedings were not a matter of public record.

149.    Amerra, however, was fully aware of WBC's Credit Agreement, the Mortgages, and the details of the foreclosure proceedings because they were disclosed in confidence and detail during Amerra's meetings with Servax in New York, as averred in Paragraphs 46-58 above.

150.    Upon information and belief, Tashjian and Amerra informed Umami of the existence and status of Marnor's debt to WBC.

151.    Upon information and belief, Umami and Amerra, through Tashjian, considered and discussed the possibility of acquiring, and ultimately agreed to acquire, WBC's rights and causes of action against Marnor as a means to oust Marnor and Servax from the Bluefin Tuna market, with the goal of thus eradicating competition in the Bluefin Tuna market in the United States, to the ends of (a) increasing the price of Bluefin Tuna to United States consumers, (b) increasing Umami's share of the Bluefin Tuna market and its control of the price thereof at the expense of Marnor and Servax's share, (c) removing or limiting Marnor and Servax as a source of downward pressure on the prices paid by United States consumers of Bluefin Tuna, and (d) increasing Umami's profits (and thus its ability to repay Amerra).

152.    Upon information and belief, in developing their anticompetitive strategy, Amerra and Umami shared and relied on confidential corporate, financial and marketing information concerning Servax, which Servax supplied to Amerra under assurances of confidentiality in the course of underwriting the proposed financing facilities for Servax's joint venture with Marnor.

153.    This agreed plan between Amerra and Umami was attractive to Amerra because its goal of increasing the prices paid for Bluefin Tuna would also increase the value of Amerra's investment in Umami.

154.    Upon information and belief, at some point between June and December 2012, Amerra offered to increase Umami's line of credit through an amendment to the credit facility – despite Umami's default and acknowledged inability to repay the original credit facility – in order to fund Umami's acquisition of WBC's rights and causes of action against Marnor, a step in furtherance of their illegal conspiracy that made no economic sense except that it served the goal of excluding Marnor and Servax from the relevant market.

155.    In exchange, Amerra demanded that the loan be secured by a 100% interest in Umami's Mexican operations (which generate between 70% and 100% of Umami's total revenues, according to Umami's own SEC filings), and a controlling seat on Umami's (and/or Umami's Mexican operation's) Board of Directors.

156.    Upon information and belief, as part of their agreement, Umami conveyed to Amerra a direct ownership interest in Umami's Mexican operations.

157.    Pursuant to the terms of their agreement, Amerra became an investor and interested stakeholder in Umami.

158.    Umami and Amerra designed the amended credit agreement that made Amerra an investor in Umami pursuant to the illegal conspiracy in restraint of trade between Umami and Amerra for the clearly anticompetitive purpose of gaining control over the price of Bluefin Tuna in the United States by insulating Umami from competition by Marnor and Servax.

159.    Further, since 2012, Amerra has continued to increase Umami's credit facility despite Umami's financial underperformance to protect its investment in Umami and increase Umami's ability to expand its market share at the expense and through the exclusion of Marnor

and Servax.

160.    Amerra's investment in Umami through the terms of the credit facility represents a conscious commitment to a common scheme between Umami and Amerra designed to achieve an unlawful objective: to restrain trade and commerce in the United States market for Bluefin Tuna.

161.    The amended credit facility was intended to, and did, benefit Umami and Amerra solely by unlawfully harming Marnor and Servax's joint venture by restricting its ability to capture and farm Bluefin Tuna and raising Marnor and Servax's costs, thereby impairing Marnor and Servax's ability to compete in and bring increased competition to the Bluefin Tuna market.

162.    Upon information and belief, Umami began negotiating with WBC for the acquisition of the rights and causes of action under the Credit Agreement and the mortgages in or about the Summer of 2012, if not earlier.

163.    Umami used the confidential information supplied by Tashjian and Amerra, and the funds advanced by Amerra to acquire WBC's rights and causes of action and exclude or restrict Marnor and Servax from the Bluefin Tuna market, or raise their costs of doing business.

164.    Upon information and belief, WBC received payment for the assignment directly from Amerra.

165.    As a result of the transaction and illegal conspiracy between Umami and Amerra, Amerra and Tashjian have exercised control over Umami's strategic decisions, including all aspects of Umami's Mexican Bluefin Tuna operations.

X.    **Marnor and Servax's Attempts to Pay Umami**

166.    Upon learning of the assignment to WBC in February 2013, Marnor and Servax contacted Mr. Abizaid (who, they learned, had also been engaged by and represented Umami since at least November 2012) in an effort to pay off the debt.

25

167.    Mr. Abizaid responded and conveyed a demand from his client in California: Mr. Fitzpatrick of Umami had instructed him to demand the payment of $9 million to release Marnor from its debt and recover its fleet, and would not compromise on that number.

168.    Despite the gross inflation of the sums owed under the Credit Agreement, the looming threat of letting a Bluefin Tuna season pass without the ability to capture and then farm Bluefin Tuna led Marnor and Servax to agree to pay that sum.

169.    In March 2013, Servax requested a meeting with Umami to repay Marnor's debt and arrange for the conclusion of the foreclosure proceedings, to ensure the release of Marnor's fleet.

170.    After several exchanges due to scheduling conflicts, the meeting was set to take place on April 8, 2013.

171.    Less than a week before the meeting was scheduled to take place, however, Mr. Fitzpatrick called Mr. Gonzalez from California to advise that the meeting would be pointless, as Umami had decided that it had no interest in accepting payment and had decided it would be best served by retaining Marnor's vessels.

172.    Umami thus admitted that its goal, in concert with Amerra, was simply to exclude or restrict Marnor and Servax from the relevant market, and raise their costs.  That Umami would sacrifice a repayment far higher than the face value of the debt obligation shows the true, predatory intent of the conspiracy.

## XI.    Marnor and Servax's Operations Are Disrupted

173.    The Bluefin Tuna fishing season off the coast of Baja California, Mexico generally takes place during the months of May through August.

174.    Bluefin Tuna operations require the use of purse seiners and tugs to capture and transport the fish from the open waters to coastal farming sites for further growing.

175.    These vessels are specially tailored to the capture and transport of Bluefin Tuna.

176.    Transport of the Bluefin Tuna catch is a slow process that can take many weeks to complete, with speeds of the transport rarely exceeding one nautical mile per hour to ensure that the Bluefin Tuna arrives at farming sites in the best possible condition.

177.    Both Servax and Umami operate under Mexican government concessions that limit the amount of Bluefin Tuna they can capture in a given season.  Servax has a concession for 2,000 tons, while Umami's Mexican operation has or leases a concession for 3,200 tons.

178.    If a Bluefin Tuna operation – particularly one the size of Marnor/Servax's or Umami's – loses its fleet and has to contract for services with a third party, the process will result in an interruption of its activities and lead to a disruption in the supply of fish in the market at least until the operation is able to identify and contract with a lessor to provide these services, or purchases a new fleet.

179.    Most fishing service providers have longstanding, long-term contractual engagements that limit the number of vessels available for lease in the event of exigencies shortly before or during the capture season.

180.    The small supply of replacement vessels also makes emergency services more expensive than those provided under longstanding long-term contracts, raising the costs of doing business to the fishing and farming operations that are forced to utilize them.

181.    Because they were willing to pay off the entire balance of Marnor's debt – and far more – to release Marnor's vessels in time for the 2013 capture season, Marnor and Servax had no reason to seek service providers that could replace their fleet before April 2013.

182.    In April 2013, when Umami advised it would refuse to accept payment under any set of circumstances, Servax undertook efforts to identify potential fishing service providers for the 2013 season.

183.    Servax was only able to identify a limited number of service providers at that point in the year, and those services came at a premium.

184.    In previous seasons, while Marnor's fleet was in operation, Marnor alone could capture up to 2,000 tons of Bluefin Tuna in a season.

185.    In the early Summer of 2012, before the vessels were seized and arrested, Marnor and Servax captured approximately 1,200 tons.  Umami captured approximately 2,800 tons during the 2012 season.

186.    In stark contrast, during the entire 2013 season, Marnor and Servax captured only 40 tons of Bluefin Tuna, while Umami captured 2,800 tons, solely as a result of the successful, illegal conspiracy between Umami and Amerra to obtain and retain Marnor and Servax's fleet and thereby restrain trade in the United States market for Bluefin Tuna.

187.    Even in 2014, when Marnor and Servax had more lead-up time to engage fishing service providers, Marnor and Servax were only able to contract for enough resources to capture 800 tons during the entire season, while Umami captured its full capacity of 3,200 tons of Bluefin Tuna.  This, too, was solely as a result of the successful, illegal conspiracy between Umami and Amerra to obtain and retain Marnor and Servax's fleet and thereby restrain trade in the United States market for Bluefin Tuna.

188.    Servax has been forced to expend approximately $5 million to service providers to replace Marnor's vessels since March 2013, raising its costs of doing business.

189.    Additionally, Marnor and Servax's diminished operational capacity has resulted in losses exceeding $10 million in the 2013 season alone.  Marnor and Servax's losses as a result of its diminished operational capacity in the 2014 season are also in the millions of dollars.

**XII.   Umami and Amerra Mishandle and Misappropriate Marnor's Vessels**

190.   Ever since WBC assigned the Credit Agreement and Mortgages to Umami, Umami has been charged with the upkeep of Marnor's arrested fleet, and was obligated to maintain the vessels in proper functioning condition.

191.   Umami, however, has allowed most of the vessels – with the exception of one ship – to deteriorate, many to the point of obsolescence.

192.   The sole vessel that has been scrupulously maintained is a ship known as Buenaventura V, which looked as depicted in the following photographs when it was seized in August 2012:





193.    Umami, however, has more than just maintained the Buenaventura V; Umami has commissioned (and Amerra has funded) upgrades and modifications to the vessel (including painting it in Umami's colors) and has begun using it in fishing and farming operations, as can be seen in these recent photographs, despite the fact that the vessel still belongs to Marnor:



Buenaventura V docked (9/2014)



Buenaventura V operating (11/2014)



Buenaventura V operating with Umami crew (11/2014)

194.    For reference purposes only, the following photograph depicts one of Umami's Mexican vessels, the Isabel III, bearing the same black-white-maroon pattern as the unlawfully refurbished and repurposed Buenaventura V:



195.    Marnor has never been asked for approval and has never approved the refurbishing, repainting or use of the Buenaventura V by any third party since its fleet was arrested in August 2012.

## XIII.    Relevant Market and Market Power

196.    The relevant product market in this case is Bluefin Tuna.

197.    Bluefin Tuna is highly differentiated from other types of tuna because of its perceived superior quality.    This differentiation is shown by the absence of cross-price elasticity of demand between Bluefin Tuna and other types of tuna.    Pricing of Bluefin Tuna is not affected by the prices of other types of tuna.

198.    The relevant geographic market is the United States of America.    Prices of Bluefin Tuna imported into other countries are not affected by prices paid by consumers in the United States.    Prices paid by consumers in the United States are not affected by prices paid in other countries.    A small but significant increase in the price of Bluefin Tuna sold in the United States would not cause consumers in the United States to procure Bluefin Tuna from other

countries.

199.    A small but significant non-transitory price increase to Bluefin Tuna would not cause, and has never caused, substantial numbers of consumers to switch from Bluefin Tuna to other types of tuna.

200.    Bluefin Tuna does not exhibit significant positive cross elasticity of demand with respect to price with any other type of tuna or fish.

201.    Only the presence in the market of other sellers of Bluefin Tuna can render Umami unable to profitably raise or maintain its pricing for Bluefin Tuna without losing substantial sales.  Competition from other sellers of Bluefin Tuna into the United States is the only real source of price discipline for Bluefin Tuna.

202.    When operating at full capacity, Marnor, and later Marnor and Servax, were able to discipline prices of Bluefin Tuna sold into the United States.  Marnor and Servax serve as an important source of price discipline for Bluefin Tuna.  Since Marnor and Servax's restriction from the market due to Umami and Amerra's conspiracy, Marnor and Servax cannot serve their important competitive role, and prices of Bluefin Tuna sold into the United States have consequently risen.

203.    Umami has had, and exercised, the power to exclude and restrict competition to Bluefin Tuna sold into the United States by and through the conspiracy complained of herein.

204.    Umami, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to high costs of entry and expansion.

205.    During the period relevant to this case, Umami was able to profitably raise and maintain the price of Bluefin Tuna well above the competitive levels that Marnor and Servax's unrestricted ability to operate would have produced.

**XIV.   Antitrust Injury and Other Cognizable Harm**

206.   Umami and Amerra's conspiratorial conduct as described above significantly excluded and foreclosed competition by interfering with Marnor and Servax's participation and ability to conduct business freely in the United States Bluefin Tuna market, and was a material cause of substantial harm to, and foreclosed competition in, the relevant market.

207.   Umami and Amerra's agreements and actions by impairing competition in the Bluefin Tuna market have increased prices above the level that would have existed had Marnor and Servax not been significantly excluded and foreclosed from participating in the Bluefin Tuna market.

208.   But for Umami and Amerra's conspiracy to exclude and restrict Marnor and Servax from the relevant market and raise their costs, competition would increase, and prices for Bluefin Tuna sold in the United States would fall.

209.   Defendants' violations of § 1 of the Sherman Act, and of state law, as described herein, are a material cause of injury to Marnor and Servax's business and property, in the nature of lost profits and the diminished capital value of Marnor and Servax's business.  Specifically, the agreements have materially limited Marnor and Servax's ability to capture, farm, and export Bluefin Tuna into the United States, raised their costs, and therefore caused them to enjoy fewer sales and lower profits.

210.   By significantly impairing and foreclosing Marnor and Servax's ability to compete in the Bluefin Tuna market, Umami and Amerra impaired competition in the Bluefin Tuna market leading to increased prices for Bluefin Tuna.   Thus, Umami and Amerra's unlawful conduct deprived Marnor, Servax, and the consuming public of the benefits of competition that the antitrust laws were designed to protect.

211.   But for the conspiracy, Marnor and Servax would have enjoyed far greater sales

34

through increased competition caused by their unimpeded participation in the relevant market. Indeed, prior to the conspiracy, Marnor and Servax's exports and sales of Bluefin Tuna in the United States were growing at high rates due to lower prices and a strategic marketing and sales plan (a plan disclosed to Amerra under breached assurances of confidentiality).  But, after Umami and Amerra's conspiracy in restraint of trade began, Marnor and Servax's sales of Bluefin Tuna have slowed, thereby significantly affecting both Marnor and Servax's business and competition in the Bluefin Tuna market.

212.   As a consequence, Marnor and Servax have sustained substantial losses and damage to their business and property in the form of lost profits and/or lost going concern value, the exact amount of which will be the subject of proof at trial.

213.   Umami and Amerra's conspiracy occurred in and affected interstate commerce, as well as import commerce to the United States.

## COUNT I

## BREACH OF CONTRACT

### (Against WBC and Umami)

214.   Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

215.   At all relevant times, WBC acted in its own behalf and on behalf of OPIC.

216.   On or about December 16, 2005, Marnor and WBC entered into a Credit Agreement whereby WBC agreed to lend Marnor up to $9.9 million to expand and operate its aquaculture business.   Ex. A.

217.   From its inception, the Credit Agreement was guaranteed by OPIC.   Ex. A.

218.   On that same date, Marnor and WBC entered into a First Preferred Mexican Fleet Mortgage from Marnor in favor of WBC and a Second Preferred Mexican Ship Mortgage from

Marnor in favor of WBC.   Exs. B and C.

219.    The Credit Agreement and the Mortgages are valid contracts.

220.    Each of the parties signed the Credit Agreement and the Mortgages and consented to their respective terms.

221.    WBC made funds available to Marnor under the auspices of these agreements.

222.    Marnor defaulted under the Credit Agreement.

223.    As a result of the default, WBC began foreclosure proceedings under the Mortgages.

224.    Pursuant to the Credit Agreement and the Mortgages, Marnor had the right to make, and WBC the obligation to accept, payment in full and release Marnor's arrested vessels.

225.    Marnor and Servax attempted to cure the default by effecting payment in full to WBC, and requested a statement of Marnor's account to do so.

226.    WBC refused to provide a statement of Marnor's account, accept payment in full, and release Marnor's vessels.

227.    WBC's refusal to provide a statement of Marnor's account, accept payment in full, and release Marnor's vessels is in violation of the Credit Agreement and the Mortgages.

228.    WBC then assigned all rights and obligations under Credit Agreement and Mortgages to Umami.

229.    Marnor and Servax attempted to cure the default by effecting payment in full to Umami, and requested a statement of Marnor's account to do so.

230.    Umami demanded the payment of $9 million to extinguish Marnor's liability.

231.    Umami's demand of $9 million fails to conform to the terms of, and is in violation of, the Credit Agreement.

232.    Marnor, under duress, agreed to pay the $9 million Umami demanded in order to

regain possession and control of its vessels and continue its operations.

233.    Umami then refused to accept the agreed-to $9 million, and stated that it intended to take Marnor's vessels, instead.

234.    Umami's refusal to accept the $9 million constitutes a breach of the express terms of the Credit Agreement and the Mortgages.

235.    WBC and Umami knew that the vessels were indispensable for Marnor to operate its Bluefin Tuna business.

236.    WBC and Umami's breaches of the express terms of the Credit Agreement and the Mortgages are unlawful and have caused Marnor damages in an amount to be determined at trial, plus interest.

## COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against WBC and Umami)

237.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

238.    Under New York law, every contract imposes upon the contracting parties the duty of good faith and fair dealing pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

239.    The implied covenant of good faith and fair dealing inherent in every contract includes an implied undertaking on the part of each party that it will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.  A party breaches the covenant of good faith and fair dealing when a party to a contract acts in a manner that, whether or not expressly forbidden by any contractual provision, would deprive the

other party of the right to receive the benefits under the agreement.

240. At all relevant times, WBC acted in its own behalf and on behalf of OPIC.

241. Marnor had the right to make, and WBC the obligation to accept, payment in full of Marnor's debt and obtain the release Marnor's arrested vessels.

242. Marnor and Servax attempted to cure the default by effecting payment in full to WBC, and requested a statement of Marnor's account to do so.

243. WBC refused to provide a statement of Marnor's account, accept payment in full, and release Marnor's vessels.

244. WBC's refusal to provide a statement of Marnor's account, accept payment in full, and release Marnor's vessels is a breach of WBC and OPIC's implied duty of good faith and fair dealing.

245. Upon information and belief, WBC refused to provide a statement of Marnor's account, accept payment in full, and release Marnor's vessels because it was in the process of negotiating or closing on the assignment of its rights, obligations and causes of action under the Credit Agreement and Mortgages to Umami.

246. WBC knew that Umami was Marnor and Servax's main competitor.

247. WBC then assigned all rights and obligations under the Credit Agreement and Mortgages to Umami.

248. WBC knew, or should have known, that Umami acquired the rights, obligations and causes of action under the Credit Agreement and Mortgages to gain an unfair and unlawful competitive advantage against Marnor.

249. WBC's assignment of the Credit Agreement and Mortgages to Umami was a breach of WBC's implied duty of good faith and fair dealing.

250. After Umami was assigned the Credit Agreement and Mortgages, Marnor and

Servax attempted to cure the default by effecting payment in full to Umami, and requested a statement of Marnor's account to do so.

251.    Umami demanded the payment of $9 million to extinguish Marnor's liability.

252.    Umami intentionally miscalculated and inflated the sum of Marnor's debt.

253.    Umami's demand of $9 million is a breach of Umami's implied duty of good faith and fair dealing.

254.    Marnor, under duress, agreed to pay the $9 million Umami demanded in order to regain possession and control of its vessels and continue its operations.

255.    Umami then refused to accept the demanded $9 million, and stated that it intended to retain Marnor's vessels, instead.

256.    Umami's refusal to accept the $9 million constitutes a breach of Umami's implied duty of good faith and fair dealing.

257.    WBC and Umami knew that the vessels were indispensable for Marnor to operate its Bluefin Tuna business, and that Marnor would be excluded from the Bluefin Tuna market without them.

258.    WBC's refusal to accept full payment because it was negotiating the assignment of the Credit Agreement and Mortgages to Marnor's main competitor, and Umami's refusal to accept payment to keep its competitor out of the market constitute anticompetitive conduct and a disingenuous and dishonest failure to carry out WBC's and Umami's obligations under the contracts with Marnor.

259.    WBC, OPIC, and Umami's breaches of their implied duty of good faith and fair dealing are unlawful and have caused Marnor damages in an amount to be determined at trial, plus interest.

## COUNT III

## BREACH OF CONTRACT- BREACH OF CONFIDENTIALITY

### (Against Tashjian and Amerra)

260.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

261.    On or about April 20, 2012, Amerra, through Managing Director Nancy Obler, executed a Confidentiality Agreement to protect information supplied it by Altex and an unrelated joint venturer.

262.    Pursuant to the Confidentiality Agreement, Amerra agreed to not use any confidential information for its own benefit, for the benefit of any third party, or to the detriment of the disclosing party.

263.    The Confidentiality Agreement is a valid and enforceable contract.

264.    Upon information and belief, the terms of the Confidentiality Agreement are also part of Amerra's underwriting policies and/or guidelines.

265.    Amerra's underwriting policies and/or guidelines are binding on Tashjian and Amerra and are intended to inure to the benefit of prospective borrowers, including Servax.

266.    On or about May 30, 2012, during a meeting with Altex under the auspices of the Confidentiality Agreement, Tashjian and Amerra learned of the Marnor/Servax joint venture.

267.    During and after that meeting, Tashjian and Amerra expressed an interest in financing the Marnor/Servax joint venture.

268.    During and after that meeting, Tashjian encouraged Servax to meet with Amerra to discuss the project in detail and allow Amerra to make a financing proposal for the Marnor/Servax Bluefin Tuna venture.

269.    In reliance on the Confidentiality Agreement, Servax shared confidential

information with Tashjian and Amerra concerning its corporate structure, the underlying circumstances and agreements forming the basis of the Marnor/Servax relationship, financial projections, and marketing strategy for the Marnor/Servax joint venture.

270.    The confidential information Servax shared with Amerra included details concerning Marnor's debt to WBC, the seized fleet, and Servax's intention to fund repayment to WBC and free the vessels of all liens as part of the joint venture.

271.    The information Servax provided Amerra was not a matter of public record.

272.    Despite their contractual obligation to refrain from doing so, Tashjian and Amerra used confidential information supplied by Servax for their own benefit.

273.    Tashjian and Amerra's use of Servax's confidential information for Tashjian and Amerra's benefit is a breach of the express terms of the Confidentiality Agreement.

274.    Despite their contractual obligation to refrain from doing so, Tashjian and Amerra disclosed confidential information supplied by Servax to Umami, a third party, for the benefit of Umami and Amerra.

275.    Tashjian and Amerra's use of Servax's confidential information for Umami's benefit is a breach of the express terms of the Confidentiality Agreement.

276.    Despite their contractual obligation to refrain from doing so, Tashjian and Amerra used confidential information supplied by Servax to the detriment of Servax.

277.    Tashjian and Amerra's use of Servax's confidential information to the detriment of Servax is a breach of the terms of the Confidentiality Agreement.

278.    Tashjian and Amerra's breaches of the terms of the Confidentiality Agreement and Amerra's own underwriting policies and/or guidelines are unlawful and have caused Servax damages in an amount to be determined at trial, plus interest.

279.    Tashjian and Amerra's breaches of the terms of the Confidentiality Agreement

and Amerra's own underwriting policies and/or guidelines were malicious, intentional and deliberate, in bad faith, and willfully and wantonly disregarded the rights of Servax, meriting the imposition of additional sanctions.

<u>**COUNT IV**</u>

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND/OR PROSPECTIVE ECONOMIC ADVANTAGE**

**(Against WBC, OPIC, Umami, Tashjian and Amerra)**

280.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

281.    Marnor and Servax established a joint venture through multiple contracts to develop a Bluefin Tuna aquaculture operation off the coast of Baja California, Mexico, for export to the United States and Japan.

282.    The agreements called for the extinguishment of all liens and encumbrances on Marnor's assets.

283.    These agreements were valid and recognized by Marnor and Servax.

284.    Mr. Charat, Marnor's principal, and Mr. Elias-Calles, on behalf of Servax, advised Ms. Galbraith of WBC of the joint venture and the terms of Marnor's agreements with Servax.

285.    At all relevant times, WBC acted in its own behalf and on behalf of OPIC.

286.    WBC and OPIC were fully aware of the existence of the joint venture, the contracts and their terms.

287.    Servax (through Mr. Gonzalez) held multiple conversations with Umami and Amerra (through Messrs. Fitzpatrick and Tashjian, respectively), in which they discussed the details of Marnor and Servax's joint venture and the underlying contracts.

288.    Therefore, Umami, Tashjian and Amerra have at all relevant times been aware of the existence of contractual relationships between Marnor and Servax and the terms thereof.

289.    Marnor and Servax offered to pay Marnor's outstanding debt in full to cure Marnor's default and extinguish Marnor's obligations under the Credit Agreement and the Mortgages.

290.    WBC, OPIC, Umami, Tashjian and Amerra refused to accept payment in full and extinguish Marnor's debt, the mortgage on Marnor's fleet, or release Marnor's seized vessels.

291.    WBC, OPIC, Umami, Tashjian and Amerra knowingly, unlawfully, unjustifiably and without privilege, and for improper and illegal purposes caused the breach and/or interfered with the performance of the contracts between Marnor and Servax by refusing to accept payment in full for Marnor's debt, allowing Marnor to cure its default and extinguishing the debt, and releasing Marnor's vessels from the seizure and the Mortgages.

292.    WBC, OPIC, Umami, Tashjian and Amerra's refusal to allow Marnor to cure its default and extinguish the debt, and release Marnor's vessels from the seizure and the Mortgages resulted in a disruption of Marnor and Servax's joint venture by causing breaches of Marnor and Servax's underlying contracts and disrupting the performance of Marnor and Servax's obligations thereunder.

293.    Servax and Marnor suffered and continue to suffer substantial economic losses as a result of WBC, OPIC, Umami and Amerra's tortious conduct in an amount to be determined at trial, plus interest.

## COUNT V

### CONVERSION

**(Against Umami, Tashjian and Amerra)**

294.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph

as though set forth at length herein.

295.   Marnor owns the vessels that Umami currently holds under arrest.

296.   Marnor has offered to pay its debt in full and demanded the return of its vessels.

297.   Although the vessels were originally seized legally, Umami has unlawfully and unjustifiably refused to accept payment in full of Marnor's debt and release and return the vessels to Marnor, their rightful owner.

298.   Umami, with the consent of Tashjian and Amerra, and using funds supplied by Amerra specifically for that purpose, has altered the Buenaventura V, one of Marnor's vessels, by refurbishing and painting it in Umami's fleet colors without Marnor's (or anyone else's) authorization.

299.   Despite Marnor's offer to pay off the entire debt and its demand that the vessels be released, Umami has used and, upon information and belief, continues to use the Buenaventura V in its own fishing and farming operations.

300.   Neither Marnor, nor anyone else, authorized Umami, Tashjian or Amerra to modify or use any vessels that are part of Marnor's fleet.

301.    Marnor and Servax have suffered and continue to suffer substantial economic losses and harm as a result of Umami, Tashjian and Amerra's tortious conduct in an amount to be determined at trial, plus interest.

302.   Additionally, Umami has been unjustly enriched through the unlawful use of the Buenaventura V, entitling Marnor and Servax to restitution.

## COUNT VI

### BREACH OF FIDUCIARY DUTY

### (Against WBC and OPIC)

303.   Marnor and Servax hereby incorporate each preceding and subsequent paragraph

as though set forth at length herein.

304.    At all relevant times, WBC acted in its own behalf and on behalf of OPIC.

305.    WBC caused Marnor's fleet to be seized and arrested in the foreclosure proceedings.

306.    WBC designated and controlled the individual who acted as the custodian for the arrested vessels.

307.    WBC also became vested with exclusive authority to release those vessels to Marnor.

308.    Marnor and Servax offered to cure Marnor's default by paying the entire outstanding balance of Marnor's loan in order to achieve the release of the vessels and conclude Marnor's business with WBC.

309.    WBC and OPIC had a contractual obligation to accept payment.

310.    WBC nevertheless refused to deal with Marnor and Servax, and prevented Marnor from regaining possession of its fleet.

311.    Moreover, Marnor offered to replace the seized vessel for a cash deposit in escrow, without affecting the mortgage, in order to regain the ability to operate its business.

312.    WBC opposed the substitution of the seized vessels for a cash deposit.

313.    WBC thus acquired plenary control of Marnor's assets and operations outside of a conventional business relationship.

314.    In so doing, WBC and OPIC gained control and responsibility over Marnor's business, creating a fiduciary duty on the part of WBC and OPIC to Marnor.

315.    WBC was duty-bound to act in the best interest of Marnor by ensuring and preserving the integrity of Marnor's fleet.

316.    WBC was duty-bound to act in the best interest of Marnor by avoiding any act that

would prejudice Marnor's viability as a going concern.

317.    WBC also breached these duties by concealing that it was deflecting Marnor and Servax's effort to cure Marnor's default and repay the loan because WBC was negotiating the assignment of the Credit Agreement and Mortgages to Umami.

318.    WBC also breached these duties by assigning to Umami the Credit Agreement and Mortgages, effectively handing control over Marnor's assets and business operations to Marnor's main competitor.

319.    WBC's breaches of its fiduciary duties to Marnor have caused Marnor to suffer substantial economic losses and harm in an amount to be determined at trial, plus interest.

320.    WBC and OPIC's breaches of their fiduciary duties were intentional and deliberate, and willfully and wantonly disregarded the rights of Marnor, meriting the imposition of punitive damages.

**COUNT VII**

**BREACH OF FIDUCIARY DUTY**

**(Against Umami)**

321.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

322.    Upon acquiring the Credit Agreement and the Mortgages through WBC's assignment, Umami stepped in the shoes of WBC as Marnor's fiduciary.

323.    Upon acquiring the Credit Agreement and the Mortgages through WBC's assignment, Umami designated and controlled the individual who acted as the custodian for the arrested vessels.

324.    Umami became duty-bound to act in the best interest of Marnor by ensuring and preserving the integrity of Marnor's fleet.

325.    Umami became duty-bound to act in the best interest of Marnor by avoiding any act that would prejudice Marnor's viability as a going concern.

326.    Umami breached these duties by excluding Marnor from the Bluefin Tuna market.

327.    Umami breached these duties by allowing most of Marnor's fleet to deteriorate to the point of obsolescence.

328.    Umami breached these duties by misappropriating the Buenaventura V for its own use and benefit.

329.    Umami's breaches of its fiduciary duties to Marnor have caused Marnor to suffer substantial economic losses and harm in an amount to be determined at trial, plus interest.

330.    Umami's breaches of its fiduciary duties were intentional and deliberate, anticompetitive, and willfully and wantonly disregarded the rights of Marnor, meriting the imposition of punitive damages.

## COUNT VIII

## FRAUDULENT CONCEALMENT

### (Against WBC and OPIC)

331.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

332.    At all relevant times, WBC acted in its own behalf and on behalf of OPIC.

333.    Beginning in August of 2012, and continuing through February of 2013, WBC represented that it had legal and financial interest and standing to seek repayment of Marnor's debt.

334.    During this timeframe, however, WBC was actively negotiating the assignment of its rights, obligations and causes of action to Umami, Marnor and Servax's main competitor.

335.    WBC never disclosed to Marnor or Servax that it was negotiating an assignment

47

of, or had reached an agreement to assign the Credit Agreement and the Mortgages to Umami.

336.    WBC therefore possessed superior knowledge, not readily available to Marnor and Servax, concerning the identity of the real party in interest: Umami.

337.    Marnor and Servax believed that WBC – ostensibly, a commercial bank without ulterior motives – was the proper party in interest with respect to the Credit Agreement and Mortgages.

338.    Marnor and Servax had no reason to believe that WBC had improper and unlawful ulterior motives beyond its legitimate interest in receiving full repayment.

339.    Marnor and Servax relied on WBC's representations that it was the proper party in interest in attempting to repay the balance of Marnor's account, conclude the lending transaction, and obtain a release of the vessels and cancellation of the Mortgages.

340.    In reliance on their belief that WBC was the proper party in interest, and would discharge its obligations in good faith, Marnor and Servax took no steps to find replacement vessels to operate their Bluefin Tuna operations during the 2013 capture season.

341.    WBC knew that Marnor and Servax were acting on the basis of mistaken knowledge when they attempted to repay Marnor's debt and obtain the release of the arrested vessels.

342.    WBC's silence as to its intention to assign the Credit Agreement and Mortgages to Marnor and Servax's main competitor, and its sporadic communications with Marnor and Servax concerning payment, were intended to deceive Marnor and Servax in order to conclude negotiations with Umami and effect the assignment.

343.    WBC's conduct began before, and continued throughout the time it acted as a fiduciary – under New York and Mexican law – to Marnor.

344.    If Marnor and Servax had known that WBC was intending on assigning or had

assigned the Credit Agreement and the Mortgages to Umami, Marnor and Servax would have taken steps to find replacement vessels to operate their Bluefin Tuna operations during the 2013 capture season.

345.    WBC's fraudulent concealment of the assignment to Umami has caused Marnor and Servax to suffer substantial economic losses and harm in an amount to be determined at trial, plus interest.

346.    WBC's silence in the face of a duty to disclose was intentional and deliberate, and sought to achieve an anticompetitive result injuring the public, meriting the imposition of punitive damages.

**COUNT IX**

**FRAUD**

**(Against Tashjian and Amerra)**

347.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

348.    On or about May 30, 2012, Tashjian, purportedly on behalf of Amerra, met with the principals of Servax to discuss potential financing for a different transaction.

349.    The May 30, 2012 meeting was subject to a Confidentiality Agreement, whereby Amerra agreed to not use any information learned during the meeting for its own benefit, for the benefit of any third party, or to the detriment of the party disclosing information.

350.    During the May 30, 2012 meeting, Tashjian and Amerra learned of the impending Marnor/Servax Bluefin Tuna joint venture.

351.    During that same meeting, Tashjian represented to Servax's principals that Amerra had ample experience in the Bluefin Tuna market.

352.    At the time, Amerra had invested millions of dollars in Umami.

353.    Upon information and belief, Tashjian viewed the impending Marnor/Servax joint venture as a threat to Amerra's investment in Umami.

354.    During the meeting, Servax's principals informed Tashjian of the manner and terms under which they intended to finance the Marnor/Servax joint venture.

355.    Tashjian knew then that Amerra would be unable to match the terms under which Servax's principals intended to finance the Marnor/Servax joint venture.

356.    Therefore, Tashjian knew that any financing proposal by Amerra would almost certainly be rejected.

357.    Tashjian, however, requested that Servax's principals give Amerra the opportunity to finance the impending Marnor/Servax Bluefin Tuna venture.

358.    Within a week of the May 30, 2012 meeting, Tashjian wrote a follow-up note to Servax's principals, reiterating that "I'm quite interested in Maricultura also…"

359.    Relying on Tashjian and Amerra's assurances of confidentiality, and their longtime relationship with Tashjian, Servax's principals made several disclosures of confidential information leading up to a meeting in New York on September 5, 2012.

360.    On September 5, 2012, Servax made a presentation to Tashjian and Amerra in Amerra's offices in New York.

361.    During the September 5, 2012 meeting, Servax disclosed confidential corporate, contractual, marketing and financial information concerning the Marnor/Servax joint venture, including Marnor's liabilities and the pending foreclosure action by WBC.

362.    The assurances of confidentiality were material, in that Servax would not have disclosed sensitive information to Tashjian and Amerra but for Tashjian and Amerra's assurances of confidentiality.

363.    Based on the long relationship with Tashjian, and the terms of the Confidential

Disclosure Agreement, Servax was justified in relying on the fact that Amerra would not use Servax's confidential information for its own benefit, for the benefit of third parties (including Umami), or to the detriment of Servax.

364.    Within hours of the September 5, 2012 meeting, Tashjian emailed Servax a confidential proposed term sheet to finance the Marnor/Servax Bluefin Tuna venture.

365.    Upon information and belief, the confidential proposed term sheet was drafted in advance of the meeting with Servax.

366.    Upon information and belief, Tashjian knew that Amerra's proposal could not match the terms of the financing Servax already had in place.

367.    Upon information and belief, from the outset, Tashjian and Amerra knew they would not honor their commitment to confidentiality with respect to the information supplied by Servax.

368.    Upon information and belief, the entire confidential underwriting process was a ruse to procure sensitive corporate, legal, marketing, and financial information about Umami's main competitor.

369.    Tashjian and Amerra disclosed Servax's confidential information to Umami, Servax's main competitor.

370.    Tashjian and Amerra's disclosure of Servax's confidential information was malicious and intended to harm Servax.

371.    Indeed, as a result of those disclosures, Umami and Amerra conspired to acquire and ultimately did acquire the rights and causes of action under the Credit Agreement and Mortgages from WBC, and intentionally impaired Servax's ability to conduct its business.

372.    By relying on Tashjian and Amerra's false assurances of confidentiality, Servax has suffered substantial economic losses and harm in an amount to be determined at trial, plus

interest.

## COUNT X

### CONSPIRACY TO RESTRAIN TRADE IN VIOLATION
### OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

#### (Against Umami, Tashjian and Amerra)

373.    Marnor and Servax hereby incorporate each preceding and subsequent paragraph as though set forth at length herein.

374.    Umami is a major participant in the relevant product and geographic market.

375.    As prices for Bluefin Tuna increased in 2011 and 2012, Umami saw the need and opportunity to increase its market presence and power through the exclusion of its competitors.

376.    Umami derives the vast majority of its product and revenues from its Mexican operation.

377.    Marnor and Servax were and are Umami's main competitors for Bluefin Tuna.

378.    Marnor/Servax and Umami compete every season over a limited universe of Bluefin Tuna, the volumes of which are established and fixed by seasonal international standards.

379.    Eliminating its main competition in Mexico – Marnor and Servax – would increase Umami's ability to gain profits from and raise prices of Bluefin Tuna sold in the United States, allowing it to control prices for a scarce resource over which cross-price elasticity of demand with respect to other types of tuna and fish is low or absent.

380.    On information and belief, at some point between June and December of 2012, Amerra and Umami conspired to exclude Marnor and Servax from the relevant market.

381.    Amerra and Tashjian informed Umami that Marnor had defaulted on a credit facility with WBC.

382.    In or about that same time, Amerra and Tashjian also informed Umami that

Marnor's credit facility was secured by a mortgage over substantially all of Marnor's assets, and that Marnor's fleet had been seized in foreclosure proceedings in Mexico.

383. Upon information and belief, in the Summer or Fall of 2012, Umami and Amerra negotiated an amendment to its then-existing credit facility – which was also in default.

384. Upon information and belief, Amerra, Tashjian and Umami discussed the possibility that Amerra invest in Umami by increasing Umami's line of credit to enable Umami to acquire WBC's rights against Marnor.

385. Amerra, Tashjian and Umami considered the possibility, and ultimately agreed, that Amerra fund Umami's acquisition of WBC's rights to seize and control Marnor's fleet for the anticompetitive purpose of preventing Marnor and Servax from competing with Umami and offering Umami greater market domination and control.

386. In exchange, Amerra would require that Umami give Amerra decision-making authority on its Board of Directors (or the Board of Directors of Umami's Mexican operation).

387. Amerra, Tashjian and Umami agreed on these terms and the conspiracy in restraint of trade was thereby formed. Several steps in furtherance of the conspiracy were then taken.

388. Amerra increased Umami's credit facility to allow it to acquire WBC's rights and causes of action against Marnor.

389. Amerra also took over decision-making authority for Umami's Mexican operations.

390. Umami then acquired WBC's rights, and prevented Marnor from recovering its fleet.

391. Amerra continues to have decision-making authority on Umami's Mexican operations, including the authority to decide on Umami's Bluefin Tuna export activities to the

United States.

392.    Upon information and belief, Amerra controls all expenditures relating to Umami, including those related to Umami's Mexican operations.

393.    Marnor and Servax were, are, and intend to continue being sellers of Bluefin Tuna into the United States market.

394.    The timing of Umami and Amerra's agreement was critical, as stocks and quotas for Bluefish Tuna capture have dropped consistently for the past several years.

395.    Upon information and belief, since its agreement with Amerra, Umami has materially increased its Bluefin Tuna exports into the United States market.

396.    Umami is now in a position to control, and has been able to control, the market price for Bluefin Tuna in the United States, which is higher than it would have been absent the successful conspiracy complained of herein.

397.    Marnor and Servax were the direct target of Umami and Amerra's conspiracy.

398.    Though ready and willing to do so, Marnor and Servax have been limited from effectively competing in the United States Bluefin Tuna market for three consecutive years.

399.    Therefore, Umami and Amerra's agreement has reallocated most of Marnor and Servax's previous share of the Bluefin Tuna market to Umami during the time that Marnor was unable to effectively compete in the Bluefin Tuna market due to its vessels being held by its competitor Umami, thereby restricting competition in, decreasing the amount of, and increasing the prices for Bluefin Tuna available in the United States market.

400.    Umami and Amerra's agreement constitutes a contract and/or conspiracy that substantially, unreasonably, and unduly restrains trade in the relevant market, and harmed competition in the Bluefin Tuna market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, thereby harming Marnor and Servax.

401.   Umami and Amerra's agreement covers a sufficiently substantial percentage of the relevant market to harm competition.

402.   Umami and Amerra are per se liable for the creation, maintenance, and enforcement of their agreement.

403.   Alternatively, Umami and Amerra are liable for the creation, maintenance, and enforcement of the agreement under a "quick look" and/or rule of reason standard.

404.   Insofar as the rule of reason applies, there is and was no legitimate, non-pretextual, procompetitive justification for the agreement between Umami and Amerra that outweighs its harmful effect.  Even if there were some conceivable such justification, the agreement was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

405.   As a direct and proximate result of Umami and Amerra's agreement in restraint of trade, as alleged herein, competition in the Bluefin Tuna market was impaired, causing increased prices and reduced output, and causing Marnor and Servax harm, lost profits, and lost going concern value.

## PRAYER FOR RELIEF

WHEREFORE, Marnor and Servax respectfully request that this Court:

    a.  Enter judgment in their favor and against WBC, OPIC, Umami, Tashjian, and Amerra, jointly and severally;

    b.  Award them compensatory damages, trebled on the federal antitrust claims;

    c.  Award them punitive and exemplary damages on appropriate claims;

    d.  Award them costs, including reasonable attorneys' fees;

    e.  Award them pre- and post-judgment interest; and

    f.  Grant them such other and/or further relief as the Court deems appropriate.

## REQUEST FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b)(1), Marnor and Servax hereby demand a trial by jury on all issues so triable.

Dated: December 29, 2014

Respectfully submitted,

_ s/ Jacob C. Cohn_____
Jacob C. Cohn
Ilan Rosenberg (*Of Counsel*)
GORDON & REES LLP
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com

Peter Kohn (*Of Counsel*)
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770 (telephone)
(215) 277-5771 (facsimile)
pkohn@faruqilaw.com

*Attorneys for Plaintiffs Maricultura del Norte, S. de R.L. de C.V. and Servax Bleu, S. de R.L. de C.V.*