UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARICULTURA DEL NORTE, S. De R.L. De
C.V. and SERVAX BLUE, S. DE R.L. DE C.V.

                   Plaintiffs,

       v.

WORLDBUSINESS CAPITAL, INC.;
OVERSEAS PRIVATE INVESTMENT
CORPORATION; UMAMI SUSTAINABLE
SEAFOOD, INC.; CRAIG A. TASHJIAN; and
AMERRA CAPITAL MANAGEMENT, LLC,

                 Defendants.

Case No. 14-cv-10143 (CM) (KNF)

# DECLARATION OF STEVEN R. SELSBERG

Pursuant to 28 U.S.C. § 1746, STEVEN R. SELSBERG declares:

1.     I am an attorney admitted to practice in Texas and a partner of the law firm of Sidley Austin LLP ("Sidley") in the Houston office. I submit this declaration in connection with Defendants AMERRA Capital Management, LLC's ("AMERRA") and Craig A. Tashjian's opposition to Plaintiffs' motion to disqualify Sidley as their counsel in this action.

2.     Prior to becoming a partner of Sidley in February 2012, I was a partner of Mayer Brown LLP ("Mayer Brown"). In approximately 2004, while at Mayer Brown, I met and worked with Fernando Elías-Calles Romo who, before that time, sought my assistance to become a foreign associate at Mayer Brown. Mr. Elías-Calles and I remained in touch following his return to Mexico when his position with Mayer Brown terminated.

3.     Since that time, Mr. Elías-Calles and I have on occasion discussed potential referral of business to both me and/or the firms at which I worked and to him. Typically, Mr. Elías-Calles would contact me to let me know that he had a client or prospective client in Mexico

1

that had a matter potentially involving the U.S. for which it might need U.S. legal representation. Mr. Elías-Calles initially would briefly provide me with limited, often incomplete, background information regarding the prospective client and any adverse parties, so that I could determine whether my firm had any conflict of interest that would preclude us from taking on the potential matter. If conflicts did not present a problem, Mr. Elías-Calles typically would provide me additional background information about the matter, which would then lead to a discussion (almost exclusively through the exchange of emails) about my views concerning the matter. These preliminary discussions had two purposes. First, Mr. Elías-Calles would want to make a determination as to whether he should recommend to the prospective client that it retain my firm for the matter. And second, I needed a sufficient understanding of the facts to determine whether the matter was something that my firm was qualified to handle and, if so, whether my firm was interested from a business perspective in (i) representing the particular prospective client under discussion and (ii) being involved in the type of matter the potential representation would encompass.

4.     In my discussions with Mr. Elías-Calles regarding possible business referrals to me, he made it clear to me that I was competing with other U.S. firms to be retained by the prospective client. Thus, he led me to believe that he would be engaged in communications with other U.S. firms that were similar in nature to those he would have with me. Sometimes Mr. Elías-Calles would recommend to his clients or prospective clients that they retain my firm for the potential matter, but other times either he would not recommend us or the prospective client would choose a different firm.

5.     On the occasions when Mr. Elías-Calles did recommend me for a particular matter, other than in those instances in which Grupo Pegaso would be the client, I would then

ask him to put me in direct contact with the prospective client. I would then begin discussions with the prospective client regarding the potential engagement of my firm's services. In every such case, these discussions would include a formal conflicts check and the negotiation of an engagement letter agreement that my firm would require to be signed by an authorized representative of the prospective client before the engagement could begin.

6.     I have reviewed the Declaration of Mr. Elías-Calles submitted in connection with the motion to disqualify Sidley. In Paragraph 11 of that Declaration, Mr. Elías-Calles states that "[o]n those occasions when my clients retained Mr. Selsberg's services, I usually remained the client contact for Mr. Selsberg, collaborated with him and served as the conduit between Mr. Selsberg and our mutual client." This description of our customary practice is not correct. Mr. Elías-Calles would serve as the client contact only on those matters in which I was retained to represent Grupo Pegaso, the company at which he had served as General Counsel. On all the other matters for which he recommended me to be retained by a prospective Mexican client, I would deal directly with the client, not through Mr. Elías-Calles as a conduit -- although Mr. Elías-Calles might remain "in the loop" predominately in regard to Mexican law issues.

7.     In mid-January 2015, I was informed that Sidley's participation in the above-captioned matter was being challenged by Plaintiffs' counsel based on communications I purportedly had with Mr. Elías-Calles during February 2013. At the time I was informed of this challenge, I had no independent recollection of any discussions with Mr. Elías-Calles in February 2013 relating to Maricultura del Norte ("Marnor") or Servax Bleu, S. de R.L. de C.V. ("Servax"), the Plaintiffs in this action.

8.     Subsequently, I was provided copies of a set of electronic communications ("emails") exchanged between me and Mr. Elías-Calles between February 22 and February 27,

2013, that I understand was provided to Sidley by Plaintiffs' counsel. Those emails are attached hereto as Exhibits E through Exhibit L.

9.     My review of the emails refreshes my recollection that Mr. Elías-Calles had contacted me in late February 2013 to discuss a potential matter involving Marnor, but that Sidley was never retained by Marnor or any other prospective client in regard to that potential matter. My review of Sidley's records confirmed to me, as well, that Marnor and Servax were never clients of Sidley. Sidley's records indicate that I never opened a new billing matter in regard to this potential matter, I never billed any time to this potential matter, there is no record of any engagement letter agreement regarding this potential matter, Sidley never issued any invoices in connection with this potential matter, and Sidley never received any fees from any prospective client in regard to this potential matter.

10.    In his Declaration, Mr. Elías-Calles states or implies that he had several lengthy telephone conversations with me regarding this matter, which would have been contrary to our typical practice of communicating almost entirely by email. To determine whether we in fact had engaged in a number of calls that I simply did not remember, I requested that my cell phone carrier, T-Mobile, provide me the records of all my cell phone calls during February 2013. Attached hereto as Exhibit A is the portion of those records that cover the period February 20 through February 28, 2013. Likewise, Sidley's administrative staff provided me my available office telephone records for the period February 20, 2013 through February 28, 2013. A copy of those records is attached as Exhibit B. My review of those records indicates that I received only two calls that could have come from Mr. Elías-Calles during that time period. The first call I received at the office that could have come from Mr. Elías-Calles was at 2:27 p.m. on February 22, 2013. That call lasted for a duration of 24 seconds, which indicates to me that we did not in

fact talk on that occasion. Although I have no recollection of that call, a 24 second call would have been consistent with Mr. Elías-Calles leaving me a message in an effort to arrange a call. The second call I received that could have come from Mr. Elías-Calles was at 11:19 a.m. on February 25, 2013. That call lasted a duration of 16 minutes and 54 seconds. Thus, consistent with our usual practice, virtually all of our communications regarding this potential matter were conducted through the exchange of emails.

11.     February 22, 2013. My review of our emails indicates that, on February 22, 2013, Mr. Elías-Calles wanted to set up a telephone call, but that we were not able to connect on that day. (*See* Exhibit E.) As noted above, my telephone records indicate that Mr. Elías-Calles likely called my office on that day, but the call lasted for only 24 seconds. In addition, in an email to me on February 25, Mr. Elías-Calles said that he had not called me back on Friday because he had gotten "tied up." (*See* Exhibit F at 2.) Thus, Mr. Elías-Calles' claim (Elías-Calles Decl. ¶¶ 29-30) that we had a relatively lengthy call on February 22, 2013 is incorrect. And, Mr. Elías-Calles' statement (*Id.* ¶ 33) that, during a call on February 22, 2013, I had agreed to advise his clients on certain issues is also not true. At that point, I had no information at all to determine whether Sidley could or would want to provide legal advice to any prospective client regarding this matter.

12.     February 25, 2013. Mr. Elías-Calles and I exchanged emails during the morning of February 25, 2013, and we arranged to set up a call for later that morning. (*See* Exhibit F.) According to my office telephone records, at 11:19 a.m. I received a call that likely came from Mr. Elías-Calles and lasted for approximately 17 minutes. During this brief call, consistent with our prior practice, I believe that Mr. Elías-Calles identified at least some of the parties involved in the potential matter and generally described the issues about which he would like my

preliminary views. I certainly was not retained by any prospective client during this call, as I still had virtually no information concerning the matter. After this telephone call, to the best of my knowledge, Mr. Elías-Calles and I communicated about this potential matter solely by email.

13.     At 5:10 on February 25, 2013, Mr. Elías-Calles sent me an email in which he briefed me on the background facts and attached to the email four documents to assist me in understanding the issues. (*See* Exhibit G.) In that email, Mr. Elías-Calles stated that his client was a third-party called Altex, which was entering into a transaction with Marnor to purchase its assets. (*See id.* at 2.) The information he provided to me, however, involved the potential claims that Marnor might have against various parties in regard to actions they had taken in connection with Marnor's default under a credit agreement and related transaction documents. (*See id.* at 1-2.) At the end of that email, Mr. Elías-Calles stated: "Please let me know your thoughts, if there would be something to do, and how fast." (*See id.* at 3.) By no means did I consider this statement to be an indication that Sidley had been retained by any client in regard to this matter. Consistent with our prior such discussions, and based on the fact that he had provided me a very limited amount of information at the time, I understood that Mr. Elías-Calles was seeking my "thoughts" as part of his consideration of whether to recommend to Marnor that Sidley be retained for this matter.

14.     <u>February 26, 2013</u>. On February 26, 2013, I reviewed the information that Mr. Elías-Calles had sent to me the prior day. Between approximately 4:00 p.m. and 8:00 p.m., Mr. Elías-Calles and I exchanged a series of emails in which I asked Mr. Elías-Calles a few questions that had been prompted by my review of the materials; Mr. Elías-Calles responded to my questions and asked me for my thoughts regarding certain issues he had raised; and I provided my preliminary thoughts as to possible approaches to take in the event the prospective client

6

decided to retain Sidley for this potential matter. (*See* Exhibits H at 3-4, I at 3-4, J.)  At this point, it was absolutely clear to me that Sidley had not yet been retained by any prospective client in regard to this matter.  To the best of my knowledge, I had not yet even talked to anyone at the prospective client, Marnor.

15.     At this point in our discussion, I believed that I had enough information to determine that Sidley might be interested in taking on this matter, if the prospective client sought to retain us.  Thus, on February 26, 2013, at 8:16 pm, I sent an email to Mr. Elías-Calles in which I stated: "If the client wants we can move forward quickly." (*See* Exhibits H at 3, I at 3.)  By that email, I was specifically asking Mr. Elías-Calles to let me know whether the prospective client, Marnor, wanted to retain Sidley for this potential matter.

16.     February 27, 2013.  On February 27, 2013, Mr. Elías-Calles did not respond to my question about whether the client wanted to move forward. (*See* Exhibits H at 1-2, I at 1-2, K-L.)  Instead, Mr. Elías-Calles asked me a few more questions regarding the situation and I provided him some additional preliminary thoughts. (*See id.*)  To the best of my knowledge, our communications regarding this potential matter ended at that point.  I never received a response from either Mr. Elías-Calles or Marnor stating that he or it wanted to move forward with the retention of Sidley for this matter. (*See id.*)  To my knowledge, I never had any discussion with any officer, employee or authorized representative of Marnor, much less any discussions regarding an engagement letter agreement to cover this potential matter.  To the extent that I gave the matter any further thought at all, I must have presumed that Mr. Elías-Calles, who had told me that he represented Altex, had decided not to recommend that Marnor engage Sidley for this potential matter.

17.     In the almost two years since my email exchanges with Mr. Elías-Calles discussed

above, I had no other communications with Mr. Elías-Calles in regard to this matter until

recently when Mr. Elías-Calles contacted me. On January 15, 2015, Mr. Elías-Calles sent me an

email asking "[w]hat can you tell me about Steve Birman (sic) and Joel mitnick (sic). They are

representing a party that we just sued. In fact since my clients new (sic) that sidley (sic) was

their attorney I couldnt (sic) contact you to handle it." A copy of that email is attached hereto as

Exhibit C. I had no knowledge at all regarding the lawsuit to which Mr. Elías-Calles referred in

his email, and I simply gave Mr. Elías-Calles my views regarding the reputations of Mr. Bierman

and Mr. Mitnick. (*Id.*) A short while later on January 15, 2015, Mr. Elías-Calles sent me

another email stating: "We have an issue, that I need to talk with you. I just received an email

from the partner at Gordon Rees who is representing my clients and he topld (sic) me that he has

to ask sidley (sic) to withdrawl (sic) from the case because in the bulk of emails that he has from

my computer he noticed that I had sent you an email consulting the same matter." (Selsberg

Decl., Ex. C). I had no idea what Mr. Elías-Calles was referring to.

18.     The next day, on January 16, 2015, I made a call to Mr. Bierman, who was not

available, and I was then transferred to Mr. Mitnick, with whom I had never spoken before. I

told Mr. Mitnick that I had been contacted by Mr. Elías-Calles, who had informed me that

roughly two years prior, he had sent me an email on behalf of his clients in Mexico concerning

the issues involved in the lawsuit in which Mr. Mitnick and Mr. Bierman were representing

parties adverse to Mr. Elías-Calles's clients. I told Mr. Mitnick that Mr. Elías-Calles had

referred business to me on occasion over the years, but that I had no idea or knowledge about

what Mr. Elías-Calles was referring to with respect to this lawsuit.

19.     Other than my brief call to Mr. Mitnick, at no point have I had any conversations

with any of the Sidley attorneys or staff representing AMERRA and Mr. Tashjian in this action

regarding the substance of this matter, nor do I even have a recollection of any information that would be relevant to this action.  Later on January 16, 2015, I received an email from Sidley's Committee on Professional Responsibility informing me that Sidley had set up an ethical screen between me and everyone else at the firm who was assigned to work on this action.  A copy of that email is attached hereto as Exhibit D.  Specifically, I was instructed that I may not work on any matter related to this action and there may be no communications between me and the members of the team working on this action concerning this matter.  (*See* Exhibit D.)  I have, and will continue to, fully abide by the terms of this ethical screen.

20.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on February 23, 2015 in Houston, Texas.

Steven R. Selsberg