IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARICULTURA DEL NORTE, S. DE R.L. DE C.V., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WORLDBUSINESS CAPITAL, INC., *et al.*,<br><br>Defendants. | Case No.  1:14-cv-10143-CM |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISQUALIFY SIDLEY AUSTIN, LLP FROM REPRESENTING DEFENDANTS AMERRA CAPITAL MANAGEMENT LLC AND CRAIG A. TASHJIAN**

**GORDON & REES LLP**
Jacob C. Cohn
Ilan Rosenberg
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com

**TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ................................................................................................................ 1

II. SUPPLEMENTAL FACTUAL HISTORY ......................................................................... 4

III. ARGUMENT ........................................................................................................................ 8

    A. Mr. Selsberg's Substantial Involvement in Consulting With and Advising Servax and Marnor Between October 2012 and February 2013 Established an Attorney-Client Relationship Under Applicable Texas Law ............................. 8

    B. Given Mr. Selsberg's Prior Representation of Servax and Marnor in Connection with the Events Directly Underlying this Lawsuit, Sidley's Disqualification Is Required ................................................................................ 12

IV. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Centerline Indus., Inc. v. Knize*
894 S.W.2d 874 (Tex. App. 1995) .................................................................................. 12, 13

*Clarke v. Ruffino*
819 S.W.2d 947 (Tex. App. 1991) .......................................................................................... 8

*E.F. Hutton & Company v. Brown*
305 F. Supp. 371 (S.D. Tex. 1969) ...................................................................................... 13

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*
409 F.3d 127 (2nd Cir. 2005) .......................................................................................... 13, 14

*Home Ins. Co. v. Marsh*
790 S.W.2d 749 (Tex. App. 1990) ........................................................................................ 13

*Hull v. Celanese Corp.*
513 F.2d 568 (2d Cir. 1975) ................................................................................................. 13

*In re American Airlines*
972 F.2d 605 (5th Cir. 1992) ................................................................................................ 13

*Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine*
2014 WL 6388402 (W.D. Tex. Nov. 14, 2014) ................................................................... 15

*Nolan v. Foreman*
665 F.2d 738 (5th Cir.1982) ............................................................................................... 8, 9

*Perez v. Kirk & Carrigan*
822 S.W.2d 261 (Tex. App. 1991) .......................................................................................... 8

*TufAmerica, Inc. v. Codigo Music LLC*
2013 WL 1903867 (S.D.N.Y. May 7, 2013) ........................................................................ 13

**Rules**

Texas Rules of Professional Conduct Rule 1.09(a)(3) .......................................................... 12, 13

**Other Authorities**

Restatement of the Law Governing Lawyers, § 14 ..................................................................... 11

I.     **INTRODUCTION**[1]

Plaintiffs Servax and Marnor submit this Reply Memorandum in further support of their motion to disqualify Sidley from acting as counsel for defendants Amerra and Craig Tashjian in this action. The basis for this motion is that Sidley partner Steven Selsberg had a prior attorney-client relationship with Servax and Marnor (and Servax's affiliate Altex) involving legal consultations and the provision of legal advice regarding the very events underlying plaintiffs' claims here, and that this prior, substantially-related representation precludes Sidley from now representing Amerra and Mr. Tashjian in this action. Because Sidley refuses to step aside voluntarily, an Order disqualifying Sidley is necessary.

In their opening brief, Servax and Marnor set out the applicable legal standards regarding the disqualification of lawyers based upon prior representation of an adverse party (which are the same in both Texas, where Mr. Selsberg is barred, practices, and rendered legal services to plaintiffs, and New York, where his partners now seek to represent plaintiffs' adversaries). In summary, a lawyer is prohibited from undertaking a representation that is adverse to a former client and that is substantially related to the subject matter of the prior representation of the former client. In such a situation, it is ***conclusively presumed*** that the attorney had or was likely to have had access to relevant privileged information gained through his prior representation of the former client. Moreover, where, as here, the lawyer was a partner at the same firm during both the prior representation and the challenged currently-adverse representation by his partners, the disqualifying conflict of interest is imputed to his partners and the other attorneys at his firm. As further explained in plaintiffs' opening brief, Rule 1.18, which addresses situations where

---

[1] For consistency and convenience, plaintiffs continue use of terms defined in their opening brief.

1

confidential information is provided to a lawyer by a prospective client, has no application in a situation where an *actual* attorney-client relationship in fact was formed with the former client.

As anticipated, the main thrust of the opposition of Amerra and Mr. Tashjian (whom we refer to herein as "Sidley" for convenience and, we submit, greater accuracy) is that Servax and Marnor were never more than "prospective" clients of Mr. Selsberg and Sidley, and therefore Sidley may now represent Amerra and Mr. Tashjian against these putative "prospective" clients so long as Sidley establishes and enforces an ethical screen.  As shown below, however, Sidley's premise is demonstrably incorrect – Servax and Marnor indeed had an actual, not prospective, attorney-client relationship with Mr. Selsberg and Sidley.

Seeking to turn sin into virtue, Sidley in effect seeks to wield its intentional (yet undescribed) e-mail destruction policy – but for which the supplemental information now provided would have been readily available to Sidley – as a weapon for denying the nature and extent of the attorney-client relationship between Mr. Selsberg/Sidley, on the one hand, and Servax, its affiliate Altex, and Marnor on the other.  For better or worse, Mr. Selsberg, who initially disclaimed *any* recollection of his communications with Mr. Elias-Calles concerning this dispute, undertook to challenge the credibility of Mr. Elias-Calles.  Mr. Selsberg submitted a lengthy declaration attacking numerous aspects of Mr. Elias-Calles's account, most crucially, in retrospect, by specifically asserting that Mr. Elias-Calles's claim of having had multiple discussions with Mr. Selsberg concerning this dispute could not be true in light of Mr. Selsberg's telephone records from late February 2013 – and strongly implying that Mr. Elias-Calles's declaration otherwise was mendacious in material respects.

Upon reviewing Mr. Selsberg's declaration and the attached telephone records, Mr. Elias-Calles began to have doubts – but *not* as to whether the communications he attested to had

2

occurred. He was certain that they had. Instead, Mr. Elias-Calles wondered whether he was incorrect in his recollection that these communications had all occurred in the February 2013 timeframe as he originally had declared. Since his firm, unlike Sidley, does not maintain an affirmative e-mail destruction policy, Mr. Elias-Calles searched and reviewed *all* of his e-mail correspondence with Mr. Selsberg between October 2012 and March 2013. That search turned up numerous additional e-mails demonstrating that Mr. Elias-Calles's initial recollection of the timing of his communications with Mr. Selsberg was incomplete. These e-mails, and Mr. Elias-Calles's further refreshed recollection, demonstrate that *Mr. Selsberg's involvement in consulting with and providing legal services to Servax and Marnor began much earlier and was far more extensive than Mr. Elias-Calles initially had recalled*.

As detailed in the supplemental factual recitation below, and as evidenced by the Supplemental Declaration of Fernando Elias-Calles accompanying this brief ("Supp. Elias-Calles Decl."), Mr. Selsberg first began consulting with Mr. Elias-Calles on this matter in October 2012, at which time Mr. Selsberg offered to help write a letter on behalf of Servax and Marnor to defendant WorldBusiness Capital ("WBC") ***"for free,"*** and included numerous telephone conversations and at least one in-person meeting in Mexico City in October 2012. There was never any "beauty contest" – the clients specifically wanted to hire Sidley because Sidley is a serious firm and they wanted to send a message to WBC, who would not even speak with them, much less provide a "payoff" number that would enable them to satisfy Marnor's debt and recover its fleet, that they needed to be taken seriously. Furthermore, regarding Sidley's assertion that Sidley never ran a conflict check regarding the plaintiffs, in November 2012, when Servax and Marnor were contemplating having one of Sidley's New York litigation partners accompany them to WBC's Connecticut headquarters, Mr. Selsberg was specifically asked by

3

Mr. Elias-Calles on November 13, 2012 to run a conflict check (which he represented he would do) of "Servax Bleu" and its affiliate, "Grupo Altex." Thus, there can be no serious dispute that, whether created explicitly by Mr. Selsberg's offer and provision of "free" legal services, or implicitly, by the time Servax, Altex, and Marnor sought Mr. Selsberg's and Sidley's further legal advice as to their U.S. legal rights and remedies in February 2013, an attorney-client relationship had been established as a matter of applicable Texas law.

As this was no mere "prospective" relationship, once that fallacious premise is dispelled, there is no question that, under the circumstances, Sidley must be disqualified from representing Amerra and Mr. Tashjian in this case for the sake of the integrity of the judicial process. While Sidley argues feebly at the end of their brief that they should be permitted to remain as counsel even if an actual attorney-client relationship is found to have existed between Mr. Selsberg and Servax/Marnor, their arguments fly in the face of governing authority. The cases they cite to support this contention are off point and otherwise distinguishable. The Court should forthwith order Sidley's disqualification in this case.

## II.  SUPPLEMENTAL FACTUAL HISTORY

The additional evidence uncovered by Mr. Elias-Calles as he sought to rebut Mr. Selsberg's and Sidley's insinuations that he was lying is powerful and compelling. To summarize, Mr. Elias-Calles first contacted Mr. Selsberg on October 11, 2012, at a time when defendant WBC was stonewalling the efforts of Marnor, Servax, and Altex to satisfy in full Marnor's debt to defendant WBC in order to liberate Marnor's fleet and consummate the Servax/Marnor joint venture. Supp. Elias-Calles Decl. at ¶¶ 8-9. At that time, these clients were specifically looking to engage Sidley, a top-tier, "white-shoe" firm, in order to impress upon WBC that these Mexican companies were serious businesses operated by serious people, in the

hope that such a message would facilitate the clients' efforts to ascertain the amount of, and repay, the debt to WBC. It was never contemplated nor ever suggested to Mr. Selsberg that the clients might retain any other American law firm besides Sidley. *Id*. at ¶¶ 9.

Mr. Elias-Calles's initial e-mail sought Mr. Selsberg's "advice" and assistance in sending a letter to a "US Banck [*sic*]" regarding "possible interference in a contract." Within minutes, Mr. Selsberg responded: "No problem at all. ***I probably can do for you for free***." *Id.* at ¶¶ 10-11 and Ex. A thereto (emphasis added). Mr. Elias-Calles followed up to arrange a time to speak telephonically as well as to arrange an in-person meeting with Mr. Selsberg, who was traveling to Mexico City the following week, to discuss the WBC situation (among other matters). *Id*. at ¶ 12. Messrs. Selsberg and Elias-Calles thereafter spoke by telephone, discussed the matter during an in-person meeting in Mexico City on October 16, 2012, and further corresponded and spoke to discuss the status of the foreclosure proceedings and Marnor, Servax, and Altex's attempts to repay WBC on October 18-19, 2012. *Id*. at ¶ ¶ 13-14 and Exs. B, C, and D.

In early November 2012, as WBC continued to rebuff the clients' ongoing attempts to fully repay WBC, Mr. Elias-Calles continued his consultations with Mr. Selsberg. On November 8-9, 2012, Messrs. Selsberg and Elias-Calles corresponded, discussing detailed information on the dispute and as well as strategic considerations. *Id.* at ¶ 16.

Also on November 9, 2012, Mr. Elias-Calles wrote Mr. Selsberg an e-mail entitled "IMPORTANT" asking Mr. Selsberg, who was then busy preparing for a trial, to refer him to one of his litigation partners. Contrary to Sidley's and Mr. Selsberg's "beauty contest" contrivance, Mr. Elias-Calles' e-mail made clear that if something could be done in the United States "*we need[ed] to hire Sidley asap*." *Id*. at ¶ 17 and Ex. F (emphasis added). The two further scheduled a telephone conference for Saturday, November 10, 2012. *Id*.

5

On Monday, November 12, 2012, in a further exchange of e-mails, Mr. Elias-Calles advised that the clients wanted "to go [directly] to the offices of […] WBC, *accompanied by a Sidley lawyer* and give them notice of the letter […] (or pay [them]) and let them know that if they [don't] terminate the [M]exican procedure they will be liable for any and all expenses after such date." *Id*. at Ex. G (emphasis added). Mr. Selsberg offered to go to WBC himself, apparently believing that WBC was located in Los Angeles (where he was scheduled to be). When advised that WBC's offices are in Connecticut, Mr. Selsberg confirmed that a Sidley lawyer (presumably one of his New York litigation partners) could go in his place if his firm was retained to do so. *Id*. at ¶ 19 and Ex. G.

The plan to go to WBC's offices did not go forward, however, because that same day, November 13, Marnor received correspondence from WBC requesting that Marnor conduct payment negotiations with WBC's Mexican counsel. This gave Marnor, Servax, and Altex the impression that WBC was ready to accept payment and put an end to the dispute. *Id*. at ¶ 20 and Ex. H. It is apparent from the e-mail trail that there was at least one further discussion between Messrs. Elias-Calles and Selsberg regarding these developments between November 13 and November 15, 2012. *Id*. at Exs. I, J, K, and L.

Because WBC seemingly had appointed their Mexican counsel as agent for purposes of payment, the urgency to have one of Mr. Selsberg's New York partners accompany plaintiffs' representatives to Connecticut appeared to have subsided. Nevertheless, to ensure that no conflicts of interest would prevent Sidley from continuing to assist, and potentially expanding its representation of the clients, Mr. Elias-Calles asked Mr. Selsberg to run a conflict check, writing: "Client is Servax Bleu, A new company. The client eventually turns out to be Grupo Altex," i.e. that Servax is an affiliate of Altex. Within minutes, Mr. Selsberg advised he would perform the

6

requested conflict check. *Id*. at ¶ 21 and Ex. G.  Mr. Selsberg never informed Mr. Elias-Calles that, as Sidley now represents, the requested conflict check was never run and cleared.  *Id*.

As detailed in the Complaint, WBC and its purported Mexican counsel continued to delay and defer promised meetings with the clients and refused to state and accept payment of Marnor's debt.  After Marnor, Servax and Altex learned of WBC's assignment of the credit agreement and mortgages to its competitor, defendant Umami, in February 2013, Mr. Elias-Calles reached out to Mr. Selsberg, who from his extensive communications, discussions, and meetings with Mr. Elias-Calles in October and November 2012 already was familiar with the dispute, to seek his further legal counsel and services.  *Id*. at ¶ 23.  As per Mr. Elias-Calles' initial Declaration, the clients, Servax, Altex, and Marnor, were clearly of the understanding that Mr. Selsberg and Sidley were acting in an attorney-client capacity, soliciting and receiving confidential client information, analyzing and researching, and providing legal advice regarding potential legal rights and remedies in the United States.  Given that Mr. Selsberg had offered months earlier to do at least some preliminary work "for free" (and that Mr. Selsberg had been asked to, and represented that he would, clear conflicts), neither Mr. Elias-Calles nor the clients had any reason to believe that a signed retainer agreement was required to create an attorney-client relationship.  While they would have expected to start paying Mr. Selsberg and Sidley had the decision then been made to proceed with litigation in the United States, the decision not to proceed with litigation at that point was based upon privileged advice solicited by the clients and provided by Mr. Selsberg pursuant to the already-existing attorney-client relationship between Marnor, Servax, Altex, and Sidley.  *Id*. at ¶ 24.

### III. ARGUMENT

#### A. Mr. Selsberg's Substantial Involvement in Consulting With and Advising Servax and Marnor Between October 2012 and February 2013 Established an Attorney-Client Relationship Under Applicable Texas Law

Sidley does not really challenge the notion that the existence, *vel non*, of an attorney-client relationship between Servax/Marnor and Mr. Selsberg/Sidley should be evaluated under the substantive law of Texas, where Mr. Selsberg practices and where he was contacted by Mr. Elias-Calles. And, under applicable Texas law, it is ***not*** the case, as Sidley posits without citation (at 1), that "a party seeking to establish the formation of an attorney-client relationship must show, among other things, a clear and express agreement as to the nature of the work to be done and the compensation to be paid." Indeed, Sidley itself concedes the falsity of its own assertion six pages later where, quoting New York case law, it admits (at 7) that "the existence of the relationship is not dependent upon the payment of a fee or an explicit agreement," and quoting Texas authority (at 8), that the agreement to form an attorney-client relationship "may be implied from the parties' conduct."

Under Texas law, an attorney's gratuitous rendition of professional services, i.e., giving advice "for free," is sufficient to imply the formation of an attorney-client relationship. *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex. App. 1991). Once established, the attorney-client relationship is one of "most abundant good faith," requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception. *Id*. *See also Clarke v. Ruffino*, 819 S.W.2d 947, 949 (Tex. App. 1991) ("evaluating a client's affairs and reporting about them to the client or to others" may be sufficient to establish an attorney-client relationship). Indeed, the Fifth Circuit rejected an argument similar to one of Sidley's that no attorney-client relationship could arise before an agreement was reached on the amount of the attorney's fee. *See Nolan v. Foreman*, 665 F.2d 738 (5th Cir.1982). Observing that the parties

may manifest an intent to create an attorney-client relationship explicitly or by their conduct, the Fifth Circuit court found that, under Texas law, the attorney's fiduciary duties attached when he entered into a discussion of the client's legal problems "with a view toward undertaking representation." *Id.* at 739 n.3.

Having itself destroyed the extensive correspondence record between Messrs. Selsberg and Elias-Calles, Sidley's entire argument proceeds from a heavily-lawyered Declaration from Mr. Selsberg, who previously disclaimed any recollection of this entire situation, and instead attempts to build an evidentiary record based on generalities about the way that he and Mr. Elias-Calles allegedly had conducted business in the past with respect to other, unrelated clients of Mr. Elias-Calles.[2] Mr. Selsberg's Declaration, however, is completely discredited by the now-recovered e-mail trail dating back to October 2012 and Mr. Elias-Calles's Supplemental Declaration.

Sidley's contention that there was only a single telephone conversation in February 2013 and a few e-mail exchanges is obviously untrue. Likewise, Sidley's assertion that the communications were mere "preliminary discussions" and that no legal services were contemplated is obliterated by the very first e-mail exchange in which Mr. Elias-Calles asked Mr. Selsberg to help write a letter to WBC, and Mr. Selsberg volunteered to do so "for free." Likewise, Sidley's assertion that Mr. Elias-Calles should have known that Sidley would never start rendering legal services without a signed retainer letter with the clients is completely inconsistent with what demonstrably occurred here. Mr. Selsberg was more than happy to begin

---

[2] Because responding to such allegations would involve revealing confidential information of clients of Mr. Elias-Calles that are unrelated to his representation of Servax, Altex, and Marnor, the clients at issue here, Mr. Elias-Calles does not address these allegations, much of which he disputes, in his Supplemental Declaration. To the extent that the Court believes that these issues remain relevant to the disposition of this motion, Mr. Elias-Calles is prepared to offer testimony and documentary evidence *in camera* to rebut these aspects of the Selsberg Declaration.

providing legal services immediately, and *gratis* at least at the start (presumably in the hope that it would turn into a lucrative litigation engagement). And he did so without any of the warnings, disclaimers or waivers that Sidley knows – from its experience in *Bridge Prods*. and otherwise – should have been given or obtained if Sidley wished to avoid entering into an attorney-client relationship. Furthermore, Mr. Selsberg's willingness to start working "for free" negates any inference that Sidley seeks (at 3) to have the Court draw from the facts that Sidley lawyers never recorded any time, never sent a bill and never received a payment – that is not what lawyers who are working "for free" would do.

Moreover, we now know that Sidley's claim (at 12) that in February 2013 Mr. Selsberg "had virtually no information at all about the potential matter upon which Sidley could make any judgment regarding whether it would even have an interest in taking on such a matter" is a fabrication that, to reiterate, could only have been made because Sidley itself previously destroyed the e-mails (and perhaps other ESI) that prove the opposite to be true. Furthermore, the e-mail trail and Supplemental Elias-Calles Declaration dispel any notion that the clients were "shopping around." They specifically wanted Sidley, and they wanted Sidley in order to make a statement to WBC that these were serious companies who had serious American lawyers and needed to be taken seriously by WBC.

With regard to Mr. Selsberg's claim that he only understood the representation to involve plaintiff Servax's affiliate, Altex, again, the e-mail trail contradicts him. Mr. Elias-Calles asked Mr. Selsberg in November 2012 to clear a conflict for "Servax Bleu" and Mr. Selsberg well understood from his extensive conversations and meetings with Mr. Elias-Calles that Servax's joint venture partner that owned the vessels was Marnor, the other plaintiff in this action (whose name was all over the transactional documents that were supplied to Mr. Selsberg). Remarkably,

Sidley (at 3) points to the absence of any record of Servax or Marnor having been "entered into Sidley's conflicts database as a client" as objective evidence of the lack of an attorney-client relationship. Of course, since we now know that Mr. Selsberg was asked to and promised to run a conflict check in November 2012 that at a minimum included Servax and Altex, their absence from that database evidences either (a) that Mr. Selsberg failed to keep his promise to Mr. Elias-Calles to run such a check or (b) that Sidley's internal controls systems are unreliable.

Further, Sidley's continued reliance (at 2 and 14) on the "move forward quickly" snippet from Mr. Selsberg's February 26, 2013 e-mail as evidence that there was nothing more than a mere "prospective" attorney-client relationship is entirely misplaced. To reiterate, the decision not to "move forward" with U.S. litigation in February 2013 was made on the very basis of the attorney-client privileged advice provided by Mr. Selsberg during the February consultations – all of which were a continuation of the extensive attorney-client interactions that now are proven to have occurred in October-November 2012.

Returning to basics, per the Restatement of the Law Governing Lawyers, § 14, an attorney-client relationship arises when a person seeks performance of legal services and an attorney manifests consent to do so. That happened in the very first e-mail exchange on October 11, 2012. Plaintiffs, through Mr. Elias-Calles, continued to seek legal advice, which Mr. Selsberg continued to provide through telephone calls, e-mails, and face-to-face meetings during October and November 2012, and then again in February 2013. Likewise, an attorney-client relationship arises when an attorney fails to disclaim the existence of a relationship when the lawyer knows or should know that a person is reasonably relying on the lawyer to provide legal services. Even if Mr. Selsberg's initial manifestation of consent – "No problem at all. I probably can do for you for free" – were not sufficient, and clearly it was, Mr. Selsberg's and

11

Sidley's failure, for nearly five months, to disclaim the creation of an attorney-client relationship confirms that such a relationship indeed was established. The fact that Mr. Selsberg initially – and explicitly – was providing free legal services in hopes of landing a lucrative litigation engagement does nothing to undermine the conclusion that Mr. Selsberg entered into an attorney-client relationship with the plaintiffs as a matter of Texas law, and that he did so with eyes wide open.

The clients might have known that Mr. Selsberg was giving away free legal advice "on spec," but they had no idea that he was doing it "off the books." Mr. Selsberg and Sidley were "the one[s] that knew of the ethics rules." Had they adhered to their own rules and procedures, and avoided destruction of important attorney-client communications, they would have recognized their conflict of interest at the outset and disqualified themselves instead of now requiring this Court to so by formal order.

### B. Given Mr. Selsberg's Prior Representation of Servax and Marnor in Connection with the Events Directly Underlying this Lawsuit, Sidley's Disqualification Is Required

For a scant three paragraphs, Sidley (at 19-20) tries to convince the Court that an ethical screen will suffice even if Mr. Selsberg is found to have represented Servax and Marnor in a substantially related matter, as he did. But that is not the law. Certainly, the law of Texas demands no less of Mr. Selsberg and his firm than disqualification, especially here, where in light of Mr. Selsberg's prior involvement in advising the Servax, Altex, and Marnor about their legal rights against WBC and Umami in what has ripened into this lawsuit, Sidley in effect is "switching sides" in the same case. *See* Texas Rules of Professional Conduct Rule 1.09(a)(3).

In *Centerline Indus., Inc. v. Knize,* 894 S.W.2d 874 (Tex. App. 1995), a Texas appellate court, granting a writ of mandamus, rejected a lawyer's argument that he need not be disqualified because the information he received from his former client had been publicly disclosed:

12

> Because . . . the substantial relationship test is concerned with both a lawyer's duty of confidentiality and his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, *whether or not he has gained confidences*. . . . [I]f two matters are substantially related so that Rule 1.09(a)(3) is brought into play, it should make no difference whether the lawyer gained no confidences or whether all the confidences gained have been publicly disclosed.

*Id.* at 876 (citing *In re American Airlines*, 972 F.2d 605, 618-19 (5th Cir. 1992), emphasis in original); *cf. Home Ins. Co. v. Marsh,* 790 S.W.2d 749, 754 (Tex. App. 1990) ("Once the [substantial-relationship test] is met by the movant, there exists an irrebuttable, conclusive presumption that disqualification is mandated.  The opponent may not then invite . . . a credibility assessment by the trial judge of any counter-assertion that despite any genuine threat of disclosure, there are in fact no relevant confidences to breach."); s*ee also E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 395 (S.D. Tex. 1969) ("If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself – a relationship which must be one of trust and reliance – they can only undermine the public's confidence in the legal system as a means for adjudicating disputes.")

As demonstrated by the precedents cited in plaintiffs' opening brief (8-9), Texas law is also consistent with the law of this District and Circuit, which holds that once the moving party demonstrates the existence of a prior representation on a substantially related matter, "any doubt is to be resolved in favor of disqualification." *TufAmerica, Inc. v. Codigo Music LLC,* 2013 WL 1903867, at *11 (S.D.N.Y. May 7, 2013) (quoting *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975)).

Neither of the cases cited as support for Sidley's position supports, much less compels, a contrary outcome in this situation.  Sidley cites *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127 (2d Cir. 2005), for the alleged proposition that the Second Circuit has

13

joined a "strong trend" of courts allowing the presumption of confidence sharing to be rebutted among attorneys within a firm. But that case is easily distinguishable, and has no applicability where, as here, the prior representation is substantially related, indeed the very same dispute, as the current, adverse representation. In the first place, *Hempstead Video* dealt with imputation of knowledge by an "of counsel" attorney to lawyers within the firm where that lawyer represented the client in his individual capacity, and not within the scope of his limited affiliation with a firm, and the firm never had access to the attorney's files. In this context, the Second Circuit explained that while conflicts are imputed to attorneys within the same firm, "attorneys with limited links to a firm [such as attorneys affiliated as of counsel] are not always considered to be 'associated' with the firm for purposes of conflict imputation." Here, of course, we are dealing only with Sidley partners, one of whom, using Sidley's computer and communications systems, received all of the plaintiffs' confidential information, exchanged correspondence, and dispensed legal advice to the plaintiffs.

Further unlike the current situation, the prior representation was not "substantially related" to the issues in litigation. The dispute at issue there involved breach of a settlement agreement for violation of a zoning ordinance, while the "of counsel" attorney had represented the party seeking disqualification only in labor and employment matters and, critically, had joined the firm after the settlement agreement dispute was underway and nearing final disposition – and his affiliation was only for the purpose of transitioning certain files to this new firm to enable his "semi-retirement." *Id*. at 129-30. In other words, in the ***absence*** of any substantial relationship between the prior representation and the case at issue, the *Hempstead Video* court saw no reason to apply any sort of presumption. Here, however, there is no dispute

14

that the matters are substantially related, and in such a case, the irrebutable presumption of confidence-sharing continues to be the law of the Second Circuit.

Similarly, Sidley's reliance on *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine*, 2014 WL 6388402 (W.D. Tex. Nov. 14, 2014) is misplaced. Sidley quotes from a portion of the opinion that addresses only an irrebutable presumption that a lawyer shares acquired confidences with other lawyers at his firm. *Id*. at *9. In fact, the *Nat'l Oilwell* court made clear that, under the circumstances at issue here, it remains settled Fifth Circuit law that "[o]nce it is established that the prior matters are substantially related to the present case, 'the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation.'" *Id*.

## IV. CONCLUSION

Mr. Selsberg and Sidley protested too much, and as a result the full extent of Sidley's prior attorney-client relationship with Servax and Marnor now has been revealed. This substantially-related prior representation is disqualifying and the Court should so order. In the alternative, to the extent that any doubt remains in the Court's mind on the issue of whether an attorney-client relationship was formed between plaintiffs and Mr. Selsberg, plaintiffs request that the Court conduct a sealed evidentiary hearing on the issue.

Dated: February 24, 2015

Respectfully submitted,

/s/Jacob C. Cohn
Jacob C. Cohn
Ilan Rosenberg
GORDON & REES LLP
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103

15

(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com

## CERTIFICATION OF SERVICE

The undersigned certifies that the within Reply Memorandum of Law and supporting declaration were contemporaneously served on all counsel of record by ECF, and by First Class Mail upon all other parties to the following addresses:

Bruce W. Bieber
Zimmet Bieber LLP
437 Madison Avenue, 40th Floor
New York, NY 10022
*Counsel for Umami Sustainable Seafood, Inc.*

Brian A. Katz
Morgan, Lewis & Bockius LLP
399 Park Avenue
New York, NY  10022-4689
*Counsel for WorldBusiness Capital, Inc.*

Alan M. Unger
Steven M. Bierman
Joel M. Mitnick
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
*Counsel for Craig A. Tashjian and*
*Amerra Capital Management, LLC*

By: /s/ Jacob C. Cohn