**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARICULTURA DEL NORTE, S. DE R.L. DE C.V., *et al.*, | Case No.  1:14-cv-10143-CM |
| Plaintiffs, | |
| v. | |
| WORLDBUSINESS CAPITAL, INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS WORLDBUSINESS
CAPITAL, INC.'S AND UMAMI SUSTAINABLE SEAFOOD, INC.'S
MOTIONS TO DISMISS BASED ON JUDICIAL ESTOPPEL,
ABSTENTION AND COMITY, AND ON CHOICE OF LAW**

**GORDON & REES LLP**
Jacob C. Cohn
Ilan Rosenberg
Lee Henig-Elona
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com
lhenig-elona@gordonrees.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... I

INTRODUCTION AND BACKGROUND ....................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.  PLAINTIFFS ARE NOT JUDICIALLY ESTOPPED FROM PROSECUTING THIS ACTION ................................................................................................................ 2

II.  NEITHER ABSTENTION NOR COMITY WARRANT DISMISSAL .............................. 5

III.  THIS ENTIRE ACTION SHOULD BE GOVERNED BY NEW YORK LAW ................. 9

    A.  New York is at the Center of the Parties' Contractual Relationship ........................... 10

    B.  Defendants' Tortious Conduct Occurred Entirely Outside of Mexico ....................... 13

CONCLUSION ................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Babcock v. Jackson*,
   12 N.Y.2d 473 (1963) ........................................................................................................ 14

*BFI Group Divino Corp. v. JSC Russian Aluminum*,
   481 F.Supp.2d 274 (S.D.N.Y. 2007) .................................................................................. 13

*Ceferatti v. Boisvert*,
   137 Conn. 280, 77 A.2d 82 (1950) ..................................................................................... 18

*Colorado River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ........................................................................................................ 6, 7

*Commander Oil Corp. v. Advance Food Serv. Equip.*,
   991 F.2d 49 (2d Cir. 1993) ................................................................................................. 12

*Cooney v. Osgood Machinery*,
   81 N.Y.2d 66 (1993) ........................................................................................................... 15

*Davis v. Costa-Gavras*,
   580 F. Supp. 1082 (S.D.N.Y. 1984) ............................................................................. 14, 16

*DiNapoli v. Cooke*,
   43 Conn. App. 419, 428 A.2d 603,
   *cert. denied*, 239 Conn. 951, 686 A.2d 124 (1996) ........................................................... 15

*Dockter v. Slowik*,
   91 Conn.App. 448 (2005) .................................................................................................... 19

*General Investment Co. v. Lake Shore & M. S. R. Co.*,
   260 U. S. 261 (1922) ............................................................................................................. 8

*Grupo Televisa, S.A. v. Telemundo Communs. Group, Inc.*,
   485 F.3d 1233 (2007) .......................................................................................................... 17

*Hal David v. Showtime/The Movie Channel*,
   697 F.Supp. 752 (S.D.N.Y.1988) ......................................................................................... 3

*Hidden Brook Air Thabet Aviation Intern. Inc.*,
   241 F.Supp.2d 246 (S.D.N.Y. 2002) ............................................................................. 13, 16

*Hinman, Straub, Pigors & Manning, P.C.* v. *Broder*,
   124 A.D.2d 392 (N.Y. 1986) ................................................................................................. 4

*In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*,
   No. MDL 1448(RWS), 2006 WL 1288298 (S.D.N.Y. May 9, 2006) .............................. 14, 19

*Insurance Co. of N. Am. v. United States Fire Ins. Co.*,
   67 Misc. 2d 7, 10, 322 N.Y.S.2d 520 (Sup. Ct. N.Y. County 1971),
   *aff'd*, 42 App. Div. 2d 1056, 348 N.Y.S.2d 122 (2d Dep't 1973).......................... 10

*Kitaru Innovations Inc. v. Chandaria*,
   698 F. Supp. 2d 386 (S.D.N.Y. 2010).................................................................. 7

*LaSala v. UBS*,
   510 F. Supp. 2d 213 (S.D.N.Y. 2007).................................................................. 18

*Long Island Lighting Co. v. Transamerica Delaval, Inc*.,
   646 F.Supp. 1442 (S.D.N.Y.1986)...................................................................... 3

*Madeleine, L.L.C. v. Castlen*,
   950 F. Supp. 2d 685 (S.D.N.Y. 2013)................................................................. 12

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*,
   6 Cal.App.4th 603 (1992).................................................................................. 18

*Marrese v. American Academy of Orthopaedic Surgeons*,
   470 U.S. 373 (1985) .......................................................................................... 8

*Miller v. Miller*,
   22 N.Y.2d 12, 27, 237 N.E.2d 877, 886, 290 N.Y.S.2d 734, 747,
   *remittitur denied*, 22 N.Y.2d 722, 239 N.E.2d 204, 292 N.Y.S.2d 107 (1968) ...................... 10

*Moses H Cone Mem. Hosp. v. Mercury Const. Corp.,*
   460 U.S. 1 (1983) .............................................................................................. 7

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ........................................................................................ 3, 4

*Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.)*,
   486 B.R. 596, 616 (Bankr. S.D.N.Y. 2013),
   rev'd on other grounds by No. 13-2187, 2015 WL 252318 (2d Cir. Jan. 21, 2015).............. 11

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) .................................................................................... 15

*Padula v. Lilarn Props. Corp.*,
   84 N.Y.2d 519 (1994) ...................................................................................... 13

*Roddenberry v. Roddenberry*,
   44 Cal.App.4th 634 (1996)................................................................................ 18

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,*
    466 F.3d 88 (2d Cir.2006)................................................................................. 6, 7

*Skandia Am. Reins. Corp. v. Schenck,*
    441 F. Supp. 715 (S.D.N.Y. 1977)................................................................... 10

*Sperling v. United States,*
    692 F.2d 223 (2d Cir.1982) (Van Graafeiland, J., concurring),
    cert. denied, 462 U.S. 1131 (1983) .............................................................. 4, 5

*Sussman v. Bank of Israel,*
    801 F. Supp. 1068 (S.D.N.Y. 1992)............................................................... 18

*This Is Me, Inc. v. Taylor,*
    157 F.3d 139 (2d Cir. 1998)........................................................................... 12

*TVT Records v. Island Def Jam Music Group,*
    412 F.3d 82 (2d Cir. 2005)............................................................................. 12

*Universal City Studios, Inc. v. Nintendo Co.,*
    578 F.Supp. 911 (S.D.N.Y.1983), *aff'd,* 746 F.2d 112 (2d Cir.1984)....................................... 4

*Uzdavines v. Weeks Marine, Inc.*, 418 F. 3d 138 (2nd Cir. 2005) .................................................. 5

**Statutes**

N.Y. U.C.C. ʟᴀᴡ § 1-201 .......................................................................... 15

N.Y. U.C.C. ʟᴀᴡ § 1-304.......................................................................... 15

N.Y. U.C.C. ʟᴀᴡ § 9-301 ...................................................................... 11, 13

**Regulations**

6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 863:275 (3d ed.
    1970) ............................................................................................... 12

Restatement (Second) of Conflict of Laws § 145 .................................................. 13, 14

Restatement (Second) of Conflict of Laws § 6 ......................................................... 14

## INTRODUCTION AND BACKGROUND

Defendant WorldBusiness Capital LLC ("WBC") designed the Credit Agreement ("Agreement") so as to create a New York-centered legal relationship.  Declaration of Philippe Charat ("Charat Decl.") at ¶ 3. WBC selected New York – including this Court – as the preferred venue for litigation of any dispute (Compl. Ex. "A" at § 8.03(i)); required plaintiff Maricultura del Norte, S. de R.L. de C.V. ("Marnor") to designate an agent for service of process in New York (Compl. Ex. "A" at § 8.03(iii) and (v)); chose New York law to control the relationship (Compl. Ex. "A" at § 10.03); and required Marnor to effect all payments thereunder in New York.  *See* Declaration of Carlos Loperena ("Loperena Decl.") at Ex. A (requiring payment to be wired to JP Morgan Chase in New York).  Defendant Umami Sustainable Seafood, Inc. ("Umami") now stands in WBC's shoes.  There is no question that New York is at the heart of the parties' relationship and this dispute.

After plaintiffs, Marnor and Servax Bleu S. de R.L. de C.V. ("Servax"), filed suit here, WBC and Umami apparently no longer like their bargain.  WBC and Umami ask the Court to abstain, dismiss the case in favor of a Mexican action where none of the issues here were or can be raised, and urge for Mexican law to control causes of action that arise out of their conduct in the United States.  They cannot walk away from the fact that this is, at its core, a case that should be governed by New York law and adjudicated in a New York court.  Moreover, they ask the Court to find that plaintiffs are judicially estopped from stating the facts – that they were always ready, willing and able to repay Marnor's debt in full, but needed an accounting to make sure they would be able to buy their peace and resume operations.

WBC and Umami do not want the facts behind their scheme aired in public proceedings, and certainly do not want to be judged under domestic standards – even though all of their conduct took place here.  Their positions, however, are flawed.  As set forth below, WBC and

Umami's arguments concerning judicial estoppel, abstention and comity, and choice of law all fall short. Their motions should be denied.

## ARGUMENT

### I. PLAINTIFFS ARE NOT JUDICIALLY ESTOPPED FROM PROSECUTING THIS ACTION

WBC and Umami argue that plaintiffs should be judicially estopped from claiming that Marnor was ready, willing and able to repay its debt under the Agreement, contending that this is the exact opposite position taken in the foreclosure proceedings. But Marnor never took the legal position that it was not 'ready, willing and able to repay its debt' in the foreclosure proceedings – or anywhere else. It merely raised appropriate defenses which have yet to prove unsuccessful.

According to WBC and Umami, the equities support their argument – an affirmative defense that should not be addressed at the motion to dismiss stage – because, in their view, the prolonged proceedings have somehow inured to Marnor's benefit (ignoring altogether the fact that it has been deprived of its fleet for nearly three years). Of course, WBC and Umami are silent as to the fact that most of that delay is, in fact, attributable to WBC and Umami who, through counsel, moved to stay the appellate proceedings in order to challenge the authority of Marnor's counsel. While their challenge was unsuccessful, their delay tactics were successful. WBC and Umami, acting together, managed to obtain a stay and delay the proceedings for 15 months, further compounding the injury to Marnor and Servax's interests. Declaration of Alonso Vega ("Vega Decl."), at ¶¶ 29-43.

Moreover, plaintiffs in this action are not challenging the propriety of the vessel's arrest in the foreclosure proceedings. What plaintiffs seek now is redress for WBC and Umami's breach of their contractual and statutory obligations under New York law to Marnor, and their

concerted effort to mislead plaintiffs into believing that they were dealing with a commercial

lender when, in fact, they were litigating against a competitor.  WBC agreed to act as a front for

Umami and facilitate interference with Marnor and Servax's relationship, all in an effort to

increase Umami's share in the Bluefin tuna market.  None of these issues are encompassed – nor

could have been contemplated when the pleadings were closed – in the foreclosure proceedings.

Declaration of Rodrigo Zamora ("Zamora Decl."), Doc 62, at ¶¶ 27-29; Declaration of Carlos

Loperena ("Loperena Decl."), at ¶ 37.

       WBC and Umami's legal argument is as flawed as their factual premises.  In general, the

judicial estoppel doctrine, where recognized, may prevent a party who benefits from the

assertion of a certain position, from subsequently adopting a contrary position.  *See*, *e.g.*, *Hal*

*David v. Showtime/The Movie Channel*, 697 F.Supp. 752, 762-63 (S.D.N.Y.1988); *Long Island*

*Lighting Co. v. Transamerica Delaval, Inc*., 646 F.Supp. 1442, 1447-48 (S.D.N.Y.1986).   The

Supreme Court has described the doctrine of judicial estoppel in the following terms:

> Where a party assumes a certain position in a legal proceeding,
> ***and succeeds*** in maintaining that position, he may not thereafter,
> simply because his interests have changed, assume a contrary
> position, ***especially if it be to the prejudice of the party who has***
> ***acquiesced in the position*** formerly taken by him. This rule,
> known as judicial estoppel, generally prevents a party from
> prevailing in one phase of a case on an argument and then relying
> on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (emphasis added; internal quotation marks,

brackets, and citation omitted).  "[C]ourts have uniformly recognized" that the purpose of the

doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately

changing positions according to the exigencies of the moment," and because judicial estoppel is

designed "to prevent improper use of judicial machinery," it is "an equitable doctrine invoked by

a court at its discretion." *Id*. at 749-50 (internal quotation marks omitted).

The circumstances under which the doctrine should be applied are far from clear.  *New Hampshire*, 532 U.S. at 750; *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 920-21 & n. 3 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (2d Cir.1984).  As explained by the Second Circuit, however, the key ingredient is reliance. *Sperling v. United States*, 692 F.2d 223, 227-29 (2d Cir.1982) (Van Graafeiland, J., concurring), cert. denied, 462 U.S. 1131 (1983).  In *Sperling*, the Second Circuit quoted from the parties' briefs, with approval, that "reliance on positions initially taken by an adversary is not well advised."  692 F.2d at 29.

First and foremost, there is no inconsistency in the positions taken by Marnor in the foreclosure proceedings and those advanced here.  Marnor always recognized the existence of a debt. Zamora Decl. at ¶ 28; Compl. at ¶ 64.  Marnor has always argued that its relationship with WBC is governed by New York law, and that the parties to the Agreement consented to litigating their disputes in New York.  Zamora Decl. at ¶ 27; Compl. at ¶ 10 and Ex. A.  Finally, Marnor has always challenged the accuracy of WBC's (and, we now know, Umami's) calculations of the sums due under the Agreement.  Zamora Decl. at ¶ 27; Compl. at ¶ 128.  Because Marnor has been consistent throughout, there is no basis for a finding of judicial estoppel.  Moreover, WBC and Umami have suffered no unfair disadvantage.

Additionally, two critical elements of judicial estoppel are absent here: "success" and "reliance."  First, as the Supreme Court explained in *New Hampshire*, judicial estoppel applies only when a party been successful in litigation.  Additionally, under New York law, a party may not appropriately assert the defense of judicial estoppel unless it is demonstrated that the party against whom the estoppel is sought actually procured judgment in his favor as a result of the inconsistent position taken by him in a prior proceeding. *Hinman, Straub, Pigors & Manning, P.C. v. Broder,* 124 A.D.2d 392, 393 (N.Y. 1986).  Marnor has not been successful in the

foreclosure proceedings.  Second, as the Second Circuit noted in *Sperling*, reliance by the opponent is critical.  WBC and Umami do not contend that they relied to their detriment on Marnor's position in the foreclosure proceedings.

In *Uzdavines v. Weeks Marine, Inc.*, 418 F. 3d 138, 148 (2nd Cir. 2005), the Second Circuit held that it "has consistently limited the application of judicial estoppel to situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced.  Moreover, we limit the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  (Citations and quotations omitted).  Marnor has acknowledged its debt under Agreement here.  There is therefore no risk of inconsistent substantive outcomes.  Indeed, regardless of who ultimately prevails in the foreclosure proceedings, the only impact on this case would concern the setoff to which Umami may be entitled.

In sum, Marnor has not articulated inconsistent positions; has not succeeded in the foreclosure proceedings; WBC and Umami never relied, nor claim to have relied, on Marnor's positions; and there is no likelihood that the outcome of this case will be inconsistent with the substantive outcome of the Mexican case.  Accordingly, WBC and Umami's judicial estoppel argument fails.

## II.    NEITHER ABSTENTION NOR COMITY WARRANT DISMISSAL

WBC and Umami also ask the Court to dismiss this action in favor of the foreclosure proceedings on the grounds of abstention and comity.  The parties' relationship and defendants' wrongful acts are centered in New York.  The Agreement bound the parties to this state.  Compl., Ex. A at §§ 8.03 and 10.03.  Umami, now standing in the shoes of WBC, is bound by this choice. WBC and Umami do not challenge this Court's jurisdiction, either personal or subject matter.

Yet, when called to account in New York, as WBC and Umami should always have expected, they cry foul and argue that this case should heard in Mexico as part of the foreclosure proceedings, arguing that those proceedings have "progressed substantially."

The weakness in WBC and Umami's abstention and comity argument is most glaring by their failure to mention, much less discuss, the Second Circuit's opinion in *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,* 466 F.3d 88 (2d Cir. 2006).  In *Royal & Sun Alliance*, the Second Circuit held that "[g]enerally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict."  466 F.3d at 92.  Therefore, the "mere existence of parallel foreign proceedings does not negate the district courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  *Id.* (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)); *see also Colorado River,* 424 U.S. at 813 ("Abstention from the exercise of federal jurisdiction is the exception, not the rule.").  Unless exceptional circumstances exist that justify the surrender of a district court's jurisdiction, parallel proceedings "should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other."  *Royal & Sun Alliance,* 466 F.3d at 92-93 (citations omitted).

*Royal & Sun Alliance* holds that "[i]n the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency," but cautions that "***circumstances that routinely exist in connection with parallel litigation cannot reasonably be considered exceptional circumstances***, and therefore the mere existence of an adequate parallel action, by itself, does

not justify the dismissal of a case on grounds of international comity extension." *Id.* at 94-95 (emphasis added).

Accordingly, a district court should not abstain in deference to a previously filed foreign proceeding under circumstances that routinely exist in connection with parallel litigation, but should rather reserve abstention for situations in which "additional circumstances . . . outweigh the district court's general obligation to exercise its jurisdiction." *Id.* at 95; *see also, e.g., Kitaru Innovations Inc. v. Chandaria,* 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010) (refusing to abstain where the only circumstances cited in support of the request were "commonly present when a parallel proceeding is ongoing"). Thus, "[t]he task of the district court in evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." *Royal & Sun Alliance,* 466 F.3d at 93 (emphasis added) (citing *Moses H Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 25-26 (1983); *Colorado River,* 424 U.S. at 813).

WBC and Umami point to no such exceptional circumstances. First, WBC and Umami contend that this case and the foreclosure proceedings involve "substantially" the same parties. Plaintiffs dispute WBC and Umami's characterization. First, neither Servax nor soon-to-join plaintiff Grupo Altex are parties to the foreclosure action. Neither are Amerra and Tashjian. Additionally, WBC and Umami's position is clearly wrong in implying that the involvement of Amerra and Tashjian is "insubstantial." The Complaint, and the materials submitted by plaintiffs in response to the defendants' motions to dismiss, point to the opposite conclusion, i.e., that Amerra and Tashjian are key participants in causing plaintiffs' injuries. Nothing in Umami's

brief suggests, however, that Amerra and Tashjian are subject to jurisdiction in Mexico. Moreover, Amerra and Tashjian, did not object to this venue.[1]

Second, WBC and Umami's contention that both actions involve substantially the same claims is simply untrue. In fact, the foreclosure proceedings and this action, while related, are not parallel. There is no antitrust claim pending in Mexico, and Mexican courts do not have jurisdiction to hear Sherman Act claims. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373,379-80 (1985) (federal antitrust claims are within the exclusive jurisdiction of United States federal courts) (citing *General Investment Co. v. Lake Shore & M. S. R. Co.,* 260 U. S. 261, 286-288 (1922)). Defendants, through their own expert, acknowledge that plaintiffs' claims for breach of contract against WBC and Umami are not being considered in the foreclosure proceedings, and identifies no affirmative tort claims on the part of plaintiffs in Mexico – because there are none. Zamora Decl. at ¶ 29. Indeed, the pleadings in the Mexican proceedings closed long before the causes of action asserted here even arose – or, perhaps more precisely, came to light. Loperena Decl. at ¶ 37; Elias-Calles Decl. at ¶¶ 19-41. Furthermore, WBC and Umami argue that Mexico offers no redress to plaintiffs for the defendants' intentional torts based on conduct that took place in the United States – including New York, where all of the parties' relationships are centered. Regardless of whether or not Mexican law does provide a remedy, those claims are not currently pending in Mexico.

Third, and most importantly, when the foreclosure proceedings do come to an end, they will not have adjudicated any of the claims presently before this Court. At most, they will

---

[1] On a related note, WBC and Umami moved to strike plaintiffs' jury demand based on the Agreement's "Waiver of Jury Trial" provision. Marnor and Servax are aware of the terms of the Agreement. But this case involves both issues and parties altogether unrelated to the Agreement. As to those, Marnor and Servax are entitled to a jury trial. Plaintiffs therefore demanded a trial by jury only "on all issues so triable." Accordingly, there is no reason to strike their demand.

determine the amount of the setoff to which Umami – and only Umami, as the current creditor

under the Agreement – may be entitled.  WBC and Umami need not litigate those issues anew

because plaintiffs have stipulated to the existence of the debt throughout their own Complaint.

Finally, plaintiffs are not attempting to use these proceedings to collaterally attack or

derail the foreclosure proceedings, as WBC and Umami suggest.  Plaintiffs do not ask the Court

to order WBC or Umami to drop their action in Mexico, or otherwise undermine the orders of its

Mexican counterpart.  Plaintiffs only seek to have WBC, Umami, Amerra and Tashjian held to

account for their breaches of contract and tortious and unlawful conduct – and have withdrawn

their claims for breach of fiduciary duty and conversion to make the point crystal clear.

In the end, there are no "exceptional circumstances" sufficient to overcome the Court's

"virtually unflagging obligation" to exercise its Article III jurisdiction over this case. WBC and

Umami's request to dismiss this case on grounds of abstention and comity should be denied.

## III.    THIS ENTIRE ACTION SHOULD BE GOVERNED BY NEW YORK LAW

WBC designed and drafted the secured Credit Agreement (the "Agreement") to create a

New York-centric business relationship.  Through contracts of its own design, WBC intended to

bind, and did bind itself and Marnor to New York law and the courts in New York.  Umami

accepted the application of New York law when it acquired WBC's rights and obligations under

the Agreement.  Now, in retrospect, WBC and Umami apparently regret the decision.  Although

Amerra and Tashjian are strangers to the Agreement, they actually argue for the application of

the laws of New York – the place where Amerra is headquartered, where Tashjian works, where

they received confidential information from the plaintiffs, and where plaintiffs claim Amerra and

Tashjian improperly shared that information and conspired with Umami.

As for plaintiffs' business tort claims, they all arise from defendants' decisions and

actions in the United States.  Indeed, not one of the defendants contends that any of the acts

9

attributed directly to them took place in Mexico.  And, undoubtedly, the conduct of WBC and Umami's Mexican counsel was based on decisions made and instructions given by WBC and Umami in the places they call home – all in the United States.  While it may be the case that some of WBC's actions are governed by the laws of Connecticut, or that Umami's are governed by California (which are not materially in conflict with the laws of New York), neither defendant invokes the laws of the place of their home as controlling. They want Mexico because it is a jurisdiction that their expert says does not provide Marnor and Servax with a remedy.

### A.     New York is at the Center of the Parties' Contractual Relationship

In a contract dispute, the key issue is ascertaining and giving effect to the intent and reasonable expectations of the parties.  *See Skandia Am. Reins. Corp. v. Schenck*, 441 F. Supp. 715, 723-24 (S.D.N.Y. 1977); *Miller v. Miller*, 22 N.Y.2d 12, 27, 237 N.E.2d 877, 886, 290 N.Y.S.2d 734, 747, *remittitur denied,* 22 N.Y.2d 722, 239 N.E.2d 204, 292 N.Y.S.2d 107 (1968); *Insurance Co. of N. Am. v. United States Fire Ins. Co.*, 67 Misc. 2d 7, 10, 322 N.Y.S.2d 520, 523 (Sup. Ct. N.Y. County 1971), *aff'd,* 42 App. Div. 2d 1056, 348 N.Y.S.2d 122 (2d Dep't 1973).

As set forth in the Complaint, on or about December 16, 2005, Marnor and WBC entered into a secured Credit Agreement whereby WBC agreed to lend Marnor up to $9.9 million to expand and operate its aquaculture business.  Compl. at ¶ 60 and Ex. A thereto.  The Agreement and all additional agreements and documents referred to therein were drafted by WBC.  Charat Decl. at ¶ 3.  The Agreement contains a choice of law provision whereby the parties agreed that "THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA."  Compl. Ex. A, at § 10.03.

There is no dispute that the Agreement is subject to New York law.  The parties disagree, however, as to what law governs the Mortgages that secured the transaction.  Although WBC –

10

the author of the Agreement and the Mortgages – knew full well how to write a choice of law provision into a contract, it chose to not include one in the Mortgages, allowing defendants to raise the question of what law, or laws, govern those particular agreements.  Loperena Decl. at ¶¶ 58-59.

Citing to § 1, paragraph 4 of each of the Mortgages, the defendants contend they are to be governed in their entirety by the laws of Mexico.  The Mortgage provisions to which defendants cite refer to articles 92 of the General Law of Communications of the United Mexican States; 1, 14 paragraph II, 90-94 of the Navigation Law of the United Mexican States (then in effect); and Article 2893 of the Civil Code for the Federal District (Mexico City) of the United Mexican States.  These provisions of Mexican law relate exclusively to the perfection, effect of perfection or non-perfection, and priority of a security interest in collateral.  Loperena Decl. at ¶¶ 60-70.

The fact that the Mortgages refer to Mexican law as governing these particular issues in no way displaces the application of New York law to all other aspects of the parties' contractual relationship – including the remaining provisions of the Mortgages, particularly with respect to substantive rights related to the Agreement.  On the contrary, New York expressly provides that when collateral is located in a particular jurisdiction outside of New York, the law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in that collateral.  N.Y. U.C.C. LAW § 9-301 (Consol. 2015).  The remainder of the parties' contractual relationship continues to be governed by New York law.  *Id.*; *see also Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.)*, 486 B.R. 596, 616 (Bankr. S.D.N.Y. 2013), rev'd on other grounds by No. 13-2187, 2015 WL 252318 (2d Cir. Jan. 21, 2015).  Put differently, the inclusion of those provisions of Mexican law to ensure that the security interest embodied in the Mortgages is perfected and adequately prioritized is entirely

11

consistent with the notion that New York law otherwise governs the parties' contractual relationship.

Moreover, in the absence of a choice of law clause governing the Mortgages, applying New York law to issues other than perfection and priority of the security interest in Marnor's fleet is most consistent with the parties' intent at the time of signing. Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *accord Madeleine, L.L.C. v. Castlen*, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013). Contracts "should be interpreted together if 'the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) (quoting 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 863:275 (3d ed. 1970)).

Whether multiple documents should be read as constituting a single agreement depends on the intent of the parties. *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005); *accord Commander Oil*, 991 F.2d at 52-53; *Madeleine*, 950 F. Supp. 2d at 696. While the intent of the parties is "typically a question of fact for the jury, ... if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *TVT Records*, 412 F.3d at 89 (citation omitted). Under the totality of circumstances surrounding the parties' relationship, New York is at the heart of the Marnor/WBC/Umami relationship by WBC's own design. And the parties' intent to apply New

York law to the Mortgages (including UCC § 9-301) is clear and apparent from the Agreement's express choice of law provision and its integration clause:

> This Agreement and the agreements referred to herein embody the entire understanding of the parties and supersede all prior negotiations, understandings, and agreements between them with respect to the subject matter hereof. The provisions of this Agreement may be waived, supplemented, or amended only by an instrument in writing signed by the parties hereto, subject to OPIC's consent.

Compl. Ex. A, at § 10.06.

In light of the totality of circumstances, the Mortgages should be construed pursuant to New York law particularly because of (a) the absence of a choice of law clause in the Mortgages and (b) the fact that the key matter at issue here – the right to cure under the Mortgages – relates to obligations undisputedly created under New York law and the means to discharge those New York obligations; not the perfection or priority of a security interest.

### B. Defendants' Tortious Conduct Occurred Entirely Outside of Mexico

When the purpose of the competing laws is to regulate conduct, as is the case of the torts at issue here, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders. *See Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994); *Hidden Brook Air Thabet Aviation Intern. Inc.*, 241 F.Supp.2d 246, 277 (S.D.N.Y. 2002) ("As tortious interference with contractual relations is conduct-regulating, I must look to the locus of the tort to determine which jurisdiction's law should apply."). "Additionally, New York courts look for guidance to the contacts listed in section 145 of the Restatement of the Law (2nd) Conflict of Laws." *BFI Group Divino Corp. v. JSC Russian Aluminum*, 481 F.Supp.2d 274, 285 (S.D.N.Y. 2007) (collecting cases). These include (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of

13

business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *See* Restatement (Second) of Conflict of Laws § 145.

Section 145 of the Restatement warns that the contacts should not merely be enumerated, but must be evaluated according to their relative importance with respect to the particular issues. *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984) (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963)). In fact, New York courts were among the first to recognize that choice of law does not operate in a vacuum, but must also seek to advance policies such as those highlighted in section 6 of the Restatement: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. *Id.*

Pursuant to the Restatement, each issue is to receive separate consideration if it is one which would be resolved differently under the local law of two or more of the potentially interested jurisdictions. *See* Restatement (Second) of Conflict of Laws § 145 cmt. d; *Babcock*, 12 N.Y.2d at 484 ("there is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction. Where the issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling but the disposition of other issues must turn, as does the issue of the standard of conduct itself, on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented."); *In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448(RWS), 2006 WL 1288298 at * 23 (S.D.N.Y. May 9, 2006) (recognizing the principle of "depeçage", i.e.

14

"that in a single action different states may have different degrees of interests with respect to different operative facts and elements of a claim or defense.")

Here, the parties' relationship, by express choice, is centered in New York.  Plaintiffs recognize that they suffered injuries in Mexico (though they also experienced them in the United States as a result of the disruption of their export operations).  But defendants' conduct, particularly the decision to mislead and frustrate plaintiffs' contractual relationship, which is what the law is intended to redress and deter, took place entirely in the United States.  In fact, defendants orchestrated a scheme to mislead Marnor into believing that it was dealing with a bank –a non-competitor statutorily obligated to act in good faith, i.e., with honesty in fact and the observance of reasonable commercial standards of fair dealing (N.Y. U.C.C. LAW §§ 1-201(20) and 1-304) – when in fact WBC had conspired with Umami in the United States to act as a front the foreclosure proceedings.  Elias-Calles Decl. at ¶¶ 33-41.

Plaintiffs submit that Mexico has no interest in the manner in which WBC, Umami, Amerra or Tashjian – all United States residents – conduct themselves in the United States.  And although Mexico may have an interest in seeing the plaintiffs adequately compensated – an issue as to which there is no conflict with New York law, because Mexico allows for the recovery of actual losses and expected profits (Zamora Decl., Doc 62, at ¶ 113) – WBC, Umami, Amerra and Tashjian's standard of conduct should be governed by the laws of the place where that conduct occurred (and continues to occur).[2]  *Cooney v. Osgood Machinery*, 81 N.Y.2d 66, 72 (1993) (under New York's interest analysis, the law of the jurisdiction where the tort occurred will

---

[2] There is no meaningful difference between the laws of tortious interference in Connecticut (where WBC resides), California (where Umami resides) and New York.  *See DiNapoli v. Cooke*, 43 Conn. App. 419, 428, 682 A.2d 603, *cert. denied*, 239 Conn. 951, 686 A.2d 124 (1996); *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990).  In the absence of a conflict, the Court should apply New York law.

generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders).

Plaintiffs are fully aware that in *Hidden Brook*, a tortious interference case, this Court found that the place of residence of the plaintiff (there, New York) was where the effects of the tort were felt and, therefore, where the last event necessary to make the actor liable occurred, ruling that New York would apply to the case. But the fact of the matter is that applying New York law in *Hidden Brook* – a jurisdiction that expressly recognizes tortious interference as a cause of action – did not frustrate the purposes underlying the law by allowing a party to commit a tort with impunity. *See Davis*, *supra.*, 580 F. Supp. at 1093 (identifying the basic policies underlying tort law as compensation for injury and deterrence of tortious conduct, and noting that, in conduct-regulating torts, strong policy reasons exist for deciding issues whose major impact is on the behavior of defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place). Frustrating these purposes is precisely what defendants seek to do here, asking the Court to apply Mexican law on tortious interference which they, in a nutshell, summarize as affording plaintiffs no recovery. [3]

---

[3] Plaintiffs do not concede that Mexican law applies to the defendants' tortious conduct. Even if it did, however, New York law would still provide the standard for determining whether the defendants acted illegally. Indeed, although defendants' expert states that tortious interference is not recognized as an independent tort by Mexican law (Zamora Decl. at ¶ 133), he does not state that a cause of action for tortious interference conflicts with Mexican policy or is barred in Mexico. In fact, Mr. Zamora acknowledges that, as a matter of general Mexican tort law, "[one] who acting illegally or against good custom causes damage to another, is obligated to repair it, unless he proves that the damage occurred as a consequence of the fault or inexcusable negligence of the victim." Zamora Decl. at ¶ 133. Mr. Zamora does not argue that the illegal act giving rise to liability must occur in Mexico, or be illegal under Mexican law (if he did, it would be tantamount to a concession that New York, Connecticut or California are the only jurisdictions interested in having their laws applied here). If tortious interference is "illegal" in the place where the conduct occurred – and, as explained herein, those places are either New York, Connecticut or California – there is neither a conflict nor a basis to contend that plaintiffs'

The Eleventh Circuit was confronted with this very situation in *Grupo Televisa, S.A. v. Telemundo Communs. Group, Inc.*, 485 F.3d 1233 (2007), a case involving tortious interference by a U.S. company in a contract between two Mexican parties.  In *Grupo Televisa*, the Court of Appeals underscored that in intentional tort cases generally, and tortious interference specifically, the place of injury should not play an important role.  Rather, informed by the commentary to the Restatement, *Grupo Televisa* holds that in conduct-regulating torts ***the principal location of a defendant's conduct is the single most important contact***.  *Id.* at 1241. While the underlying frustrated contract in *Grupo Televisa* – like the joint venture here – was governed by Mexican law, the Court of Appeals explained

> Televisa is not seeking to enforce its contract rights against [the other contracting party] under Florida contract law, however. And, the Florida law that Televisa is seeking to impose will do nothing to effect its rights and liabilities under the [underlying] contract. Televisa is seeking to apply Florida tort law that will compensate it for the losses caused by a third party's interference in the […] contract. That third party is a corporate domiciliary of Florida and it allegedly used Florida as the venue for its tortious acts.

*Id.* at 1244.  The court then held that it is hard to envision a situation where any Mexican policy choices can be advanced by "denying Televisa the right to obtain redress in Florida when a third party commits tortious acts in Florida that interfere with Televisa's Mexican contract."  *Id.* at 1246.  So, too, here there is no reason to find that the laws of Mexico should govern the actions of United States resident companies with respect to tortious conduct committed in the United States simply because some of the consequences of their intentional wrongs are felt in Mexico – particularly when, as suggested by the defendants, that choice would frustrate domestic policy by allowing United States companies to commit torts with impunity.

---

claims are anything but viable, even under Mexican law, and that a United States jurisdiction will govern the standard of conduct.

Like tortious interference, fraud (in its many iterations) is a conduct-regulating tort. Under New York choice of law rules, the law applicable to fraud is the law of the jurisdiction with the greatest interest in the litigation. While, generally, the location of the injury resulting from the fraudulent conduct is the determinative consideration, the test in each instance is which state has the greatest interest, and if the grouping of all contacts indicates a state other than the state where the injury was sustained has the greater interest, then that state's laws may apply. *See, e.g., LaSala v. UBS*, 510 F. Supp. 2d 213, 230-232 (S.D.N.Y. 2007) (collecting cases standing for the proposition that, notwithstanding that injury resulting from fraudulent conduct occurred in the U.S., foreign country had greater interest in regulating fraudulent conduct of actors located within its borders); *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1075 (S.D.N.Y. 1992) ("[T]his Court has regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated").

Here, as explained above, the defendants' conduct – whether by communicating (or, to be more precise, miscommunicating) directly with plaintiffs or, in certain instances, by instructing their Mexican counsel to communicate or miscommunicate with plaintiffs – took place somewhere in the United States.[4]

---

[4] A cause of action for nondisclosure under California law, where Umami is headquartered, arises when the defendant makes certain representations but fails to disclose additional facts which materially qualify the facts disclosed, or which render the disclosure likely to mislead. *Roddenberry v. Roddenberry*, 44 Cal.App.4th 634, 666 (1996).  The cause of action does not require that the defendant have an affirmative duty to speak.  *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603, 613 (1992).  In Connecticut, the jurisdiction of WBC's headquarters, fraud by non-disclosure or suppression exists when "there is a failure to disclose known facts and, as well, a request or an occasion or circumstance which imposes a duty to speak." *Ceferatti v. Boisvert*, 137 Conn. 280, 281, 77 A.2d 82 (1950).  Although mere non-disclosure is usually not actionable, it may amount to fraud when there is a failure to disclose known facts under circumstances that impose a duty to speak.  *Dockter v. Slowik*, 91 Conn.App.

Finally, as to both tortious interference and fraud, the fact that New York tort law should apply is further buttressed by the fact that plaintiffs are not seeking only compensatory damages, but also the imposition of measures to punish defendants for their tortious conduct in the United States, and deter similar conduct in the future.  "Since punitive damages serve a completely different purpose than compensatory damages, it is only logical that courts have determined that the issue of punitive damages is distinct from the issue of compensatory damages and, therefore, the application of different laws to these different issues may be appropriate." *In re Air Crash at Belle Harbor*, 2006 WL 1288298 at * 23.

---

448, 458 (2005).  In addition, like California, once one undertakes to speak on a subject, one must then make a full and fair disclosure as to that subject.  *Id.*  Although New York imposes the additional requirement that a defendant be under a duty to speak, that requirement is plainly satisfied here – as set forth in plaintiffs' Opposition to WBC and Umami's Motion to Dismiss under Rule 12(b)(6).

## CONCLUSION

As outlined above, there are no grounds whatsoever to support WBC and Umami's request that plaintiffs be judicially estopped from asserting the truth: they wanted to pay off Marnor's debt, recover its fleet, and get on with their business.  Moreover, this case does not lend itself to dismissal on grounds of abstention or comity.  The issues in the Mexican foreclosure proceedings are narrow, and that case, which is in its final stages, does not involve any of plaintiffs' claims here.  The actions, while related, are certainly not parallel, and WBC and Umami cannot articulate a single "exceptional circumstance" to justify excusing the Court from its "virtually unflagging obligation" to exercise jurisdiction.  Finally, Mexico's interest in the parties' dispute is tenuous, at best.  There is no reason why Mexican law should control here.  Accordingly, WBC and Umami's motions should be denied.

Dated: May 22, 2015

Respectfully submitted,

 /s/Ilan Rosenberg
Jacob C. Cohn
Ilan Rosenberg
Lee Henig-Elona
GORDON & REES LLP
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com
lhenig-elona@gordonrees.com

## <u>CERTIFICATION OF SERVICE</u>

The undersigned certifies that the within Opposition to Defendants WorldBusiness Capital,

Inc.'s and Umami Sustainable Seafood, Inc.'s Motion to Dismiss based on Judicial Estoppel,

Abstention and Comity, and on Choice of Law was contemporaneously served on all counsel of

record by ECF as follows:

Bruce W. Bieber
Zimmet Bieber LLP
437 Madison Avenue, 40th Floor
New York, NY 10022
and
Martin S. Siegel
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022
*Counsel for Umami Sustainable Seafood, Inc.*

Andrew J. Gallo
Brian A. Katz
Morgan, Lewis & Bockius LLP
399 Park Avenue
New York, NY  10022-4689
*Counsel for WorldBusiness Capital, Inc.*

Steven M. Bierman
Joel M. Mitnick
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
*Counsel for Craig A. Tashjian and*
*Amerra Capital Management, LLC*

By: /s/ Ilan Rosenberg