**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARICULTURA DEL NORTE, S. DE R.L. DE C.V., *et al.*,<br><br>    Plaintiffs,<br><br>            v.<br><br>WORLDBUSINESS CAPITAL, INC., *et al.*,<br><br>        Defendants. | Case No.  1:14-cv-10143-CM |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS AMERRA CAPITAL
MANAGEMENT LLC'S AND CRAIG A. TASHJIAN'S MOTION TO DISMISS**

**GORDON & REES LLP**
Jacob C. Cohn
Ilan Rosenberg
Lee Henig-Elona
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com
lhenig-elona@gordonrees.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

ARGUMENT ..........................................................................................................................4

I.      RULE 12(B)(6) STANDARD ....................................................................................4

II.     AMERRA AND TASHJIAN BREACHED THE CONFIDENTIALITY AGREEMENT
        AND ENGAGED IN FRAUD ....................................................................................5

        A.      Servax Has Standing to Assert a Claim for Breach of the Confidentiality
                Agreement ......................................................................................................6

        B.      Amerra and Tashjian Were Contractually Bound to Confidentiality ..................6

        C.      Amerra and Tashjian Committed Fraud ............................................................8

III.    PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR ANTITRUST CLAIM ........10

        A.      Plaintiffs Have Sufficiently Alleged Antitrust Standing and Antitrust Injury .......11

        B.      Plaintiffs Claims Are Not Barred by the FTAIA ..................................................11

        C.      Amerra and Umami Are Capable of Conspiring in Restraint of Trade ................18

CONCLUSION .......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ............................................................................................................ passim

*American Vision Centers, Inc. v. Cohen*,
  711 F. Supp. 721 (E.D.N.Y. 1989) ........................................................................................ 20

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*,
  904 F. Supp. 2d 310 (E.D.N.Y. 2012) ............................................................................... 12, 18

*Arista Records LLC v. Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007) ................................................................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 4, 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 4, 5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................................. 11

*Cargo Partner AG v. Albatrans, Inc.*,
  352 F.3d 41 (2d Cir. 2003) ..................................................................................................... 5

*Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*,
  151 N.E.2d 833 (N.Y. 1958) ................................................................................................ 8, 9

*Chase v. Columbia Nat. Corp.*,
  832 F. Supp. 654 (S.D.N.Y. 1993) .......................................................................................... 8

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ....................................................................................................... passim

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) ..................................................................................................... 10

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
  502 N.E.2d 1003 (N.Y. 1986) ................................................................................................ 9

*Diesel Props S.r.l. v. Greystone Business Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) ..................................................................................................... 7

*DNAML Pty, Ltd. v. Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014) ..................................................................................... 11

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
    872 F. Supp. 81 (S.D.N.Y. 1995) ............................................................... 17

*F. Hoffmann-La Roche Ltd v. Empagran S.A.*,
    542 U.S. 155 (2004) .............................................................. 15, 16, 17

*Fishman v. Estate of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) ..................................................................... 20

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ................................................................... 21

*Gatt Commc'ns., Inc. v. PMC Assocs., LLC*
    711 F.3d 68 (2d Cir. 2013) ........................................................................ 11

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ......................... 20, 23, 24

*Kruman v. Christie's Int'l PLC*,
    284 F.3d 384 (2d Cir. 2002) ...................................................................... 17

*Lee v. Sony BMG Music Entertainment, Inc.*,
    557 F. Supp. 2d 418 (S.D.N.Y. 2008) ............................................................ 5

*Lehman v. Dow Jones & Co.*,
    783 F.2d 285 (2nd Cir. 1986) ...................................................................... 9

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2nd Cir. 2014) ........................................................... 12, 13, 14, 16

*Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Fur Chemische Industrie*,
    No. 13-1872-CV (L), 13-1934-CV (XAP), 2015 WL 1865645 (2d Cir. Apr. 10, 2015) ............ 7

*Lyman v. New York & Presbyterian Hosp.*,
    No. 11 Civ. 3889 (AJN) (JCF), 2012 WL 6135354 (S.D.N.Y. Dec. 11, 2012) ...................... 7

*Matter of White Plains Plaza Realty, LLC v. Cappelli Enters., Inc.*,
    970 N.Y.S.2d 47 (App. Div. 2013) ................................................................ 6

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2nd Cir. 2007) .................................................................... 8, 9

*Minn-Chem, Inc. v. Agrium Inc.*,
    683 F.3d 845 (7th Cir. 2012) ..................................................................... 18

*Municipal Consultants and Publishers, Inc. v. Town of Ramapo*,
    390 N.E.2d 1143 (N.Y. 1979) ...................................................................... 7

ii

*OTG Brands, LLC v. Walgreen Co.*,
  No. 1:13-cv-09066 (ALC), 2015 WL 1499559 (S.D.N.Y. March 31, 2015)........................... 7

*RKB Enters., Inc. v. Ernst & Young,*
  582 N.Y.S.2d 814 (App. Div. 1992) ........................................................................ 9

*Robertson v. Sea Pines Real Estate Cos.,*
  679 F.3d 278 (4th Cir. 2012) .................................................................................. 21

*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007) ................................................................................... 5

*Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.),*
  Nos. 13 Civ. 7789 (LGS), 13 Civ. 7953 (LGS), 14 Civ. 1364 (LGS), 2015 WL 363894
  (S.D.N.Y. Jan. 28, 2015) ......................................................................... 15, 16, 17

*Stewart v. Jackson & Nash,*
  976 F.2d 86 (2d Cir.1992) ...................................................................................... 9

*Subaru Distribs. Corp. v. Subaru of Am., Inc.,*
  425 F.3d 119 (2d Cir. 2005) ................................................................................... 7

*Terwilliger v. Terwilliger,*
  206 F.3d 240 (2d Cir. 2000) ................................................................................... 7

*United States v. Hui Hsiung*,
  778 F.3d 738 (9th Cir. 2015) ................................................................................ 12

*United States v. Sealy, Inc.,*
  388 U.S. 350 (1967) .............................................................................................. 21

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) .............................................................................................. 21

*Winston v. Mediafare Entertainment Corp.*,
  777 F.2d 78 (2d Cir. 1985) ..................................................................................... 7

*Wong v. CKX, Inc.*,
  890 F. Supp. 2d 411 (S.D.N.Y. 2012) ................................................................... 5

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007) .................................................................. 11

**Statutes**

15 U.S.C. § 6a .......................................................................................................... 12

**Rules**

Fed. R. Civ. P. 12 .................................................................................................................. 4, 5

Fed. R. Civ. P. 9 ...................................................................................................................... 10

## PRELIMINARY STATEMENT

Although the Complaint is long, the facts of this case are relatively simple.  Plaintiff

Servax Bleu S. de R.L. de C.V. ("Servax"), and its affiliate Grupo Altex ("Altex"), which intends

to join this action as a plaintiff, placed confidential and sensitive information concerning their

new venture to capture Bluefin Tuna for export in the hands of defendants Amerra Capital

Management LLC ("Amerra") and Craig A. Tashjian ("Tashjian").  This information included

the fact that plaintiff Maricultura del Norte, S. de R.L. de C.V. ("Marnor"), Altex and Servax's

partner in the joint venture, had defaulted on a secured credit agreement with defendant

WorldBusiness Capital LLC ("WBC") and, as a result, its fleet had been foreclosed on and

arrested.  Servax shared this confidential information based on Amerra and Tashjian's oral

commitment to protect those confidences in accordance with the terms of a Confidentiality

Agreement already in place for another Altex-backed venture.

Amerra and Tashjian betrayed Servax's confidences in breach of their agreement by

sharing them with defendant Umami Sustainable Seafood, Inc. ("Umami"), a debtor of Amerra

and plaintiffs' main competitor.  Amerra, Tashjian and Umami conspired to acquire WBC's

interests against Marnor and, in fact, acquired them approximately one month after Servax

supplied them the information.  At the time, Umami had drawn down its entire line of credit with

Amerra and was in default itself.  Amerra nevertheless offered to lend Umami the money to take

out the competition and corner the market for Bluefin Tuna.  They then recruited WBC who,

apparently, was willing to go along with them.  WBC's role was to be a façade – a commercial

lender to continue prosecuting the foreclosure proceedings on behalf of Umami and delay

plaintiffs' recovery of the fleet for as long as possible without apparent ulterior motives.  Their

plan succeeded thus far.  But plaintiffs, which have seen their joint venture frustrated and lost

millions as a result of defendants' wrongdoing, are unwilling to let defendants' wrongdoing go

unchecked.  As shown below, they should be allowed to proceed with their claims.

## FACTUAL BACKGROUND

In the late Spring of 2012, Marnor, a company engaged in aquaculture, began negotiations with Grupo Altex ("Altex") which blossomed into a joint venture for the development and expansion of Marnor's tuna operations through a new entity, Servax.  Servax, through its affiliation with Altex, brought with it capital, experience and expertise in exporting food products from Mexico to the United States.  Compl. at ¶¶ 29-31.  Under the joint venture, Servax would assist Marnor in freeing its assets of all liens, at which point Servax would acquire those assets.  Compl. at ¶ 32.

At the time, Marnor had outstanding debt to defendant WBC arising from a December 2005 Credit Agreement (the "Agreement") secured by two mortgages over Marnor's fleet.  Compl. at ¶¶ 60-61 and Exs. A-C.  Under its contractual relationship with WBC, Marnor had the right to cure and redeem its fleet – if seized – in the event of a default.  *Id*. at ¶ 62.  Although Marnor always kept current on its interest payments, as of March 2010 it was unable to pay down principal under the Agreement, placing it in default, and by 2012 owed WBC $5.28 million in principal.  Compl. at ¶¶ 63-64.  While Marnor and Servax's attempted to repay the debt to WBC and extinguish the liens on its fleet pursuant to the joint venture, WBC filed suit against Marnor and obtained an order for the arrest of Marnor's fleet, impeding Marnor's operations and preventing Marnor from performing its obligations under the joint venture.  Compl. at ¶¶ 67-83.

At the time, Altex had an unrelated joint venture with an entity named VFT Global.  The joint venture had a Confidentiality Agreement with Amerra to protect information disclosed in the course of underwriting potential financing for that venture.  Compl. at ¶ 266; Declaration of Robert J. Brot ("Brot Decl."), at ¶ 3; Servitje Decl. at ¶ 8-11.  In May of 2012, Tashjian met

with Altex under the auspices of the Confidentiality Agreement to discuss the VFT Global joint

venture.  Compl. at ¶¶ 51 and 266; Servitje Decl. at ¶ 12.  During the meeting, Tashjian and

Altex discussed the prospective tuna joint venture with Marnor.   Compl. at ¶¶ 51 and 266;

Servitje Decl. at ¶ 13.  Tashjian advised that Amerra had in-depth knowledge of the tuna

business and inquired whether Altex would be interested in financing the project through

Amerra.  Compl. at ¶¶ 52 and 267; Servitje Decl. at ¶ 14.  Although Altex had enough capital to

fund Servax at that stage, Mr. Servitje responded that Altex would consider Amerra as a

financier if it offered competitive terms.  Compl. at ¶¶ 354-357; Servitje Decl. at ¶ 15.

During the meeting, Mr. Servitje specifically advised Tashjian that Altex's willingness to

consider Amerra for the financing of the tuna venture was conditioned upon Amerra agreeing to

keep any information exchanged strictly confidential, in the same terms as the information

relating to the VFT Global/Grupo Altex venture.  Servitje Decl. at ¶ 16.   Tashjian expressly

agreed, on behalf of Amerra, to extend the terms of the VFT Global/Altex Confidentiality

Agreement to all tuna venture-related information.  Servitje Decl. at ¶ 17.

Over the course of the following months, Tashjian exchanged multiple calls and emails

with Altex concerning the tuna venture.  Compl. at ¶¶ 358-359; Servitje Decl. at ¶ 18.   During

several calls with Mr. Servitje, Tashjian confirmed that Amerra would hold all tuna-related

information in the strictest confidence.  Compl. at ¶¶ 51-58, 152, 211, 261-271, 359-363; Servitje

Decl. at ¶¶ 19-20.  On September 5, 2012, Servax made an in-person presentation in Amerra's

New York offices concerning the tuna venture, during which it disclosed confidential legal,

corporate, marketing, and financial information concerning the Marnor/Servax joint venture,

Marnor's liabilities and WBC's foreclosure action.  Compl. at ¶¶ 53, 360-61; Servitje Decl. at ¶¶

23.  None of this information was a matter of public record, but Servax disclosed it in reliance on

Tashjian's assurances of confidentiality.  Compl. at ¶¶ 54, 148 and 269; Servitje Decl. at ¶¶ 24-25.  The confidential nature of the process was confirmed in Amerra's proposed term to Servax.  Compl. at ¶¶ 57-58 and 364; Servitje Decl. at ¶¶ 27.   Servax considered, but after a few weeks rejected, Amerra's offer to finance the tuna project.  Compl. at ¶ 57.

Within days of Servax's rejection, Umami had learned of and acquired WBC's rights and obligations vis-à-vis Marnor, and took control of Marnor's arrested fleet.  Declaration of Fernando Elias-Calles ("Elias-Calles Decl."), at ¶¶ 35-37.  The foreclosure proceedings were not a matter of public record, but Amerra, Umami's primary funder, knew of them and disclosed them to Umami.  Compl. at ¶¶ 142-148, 271.  Although, at the time, Umami had drawn down its entire line of credit with Amerra and was in default, Amerra offered to increase Umami's line of credit – an offer that made no economic sense but for an anticompetitive purpose: enabling Umami's acquisition of the Credit Agreement and Mortgages from WBC to eliminate the competition.  Compl. at ¶¶ 149-154.

Amerra breached its duty of confidentiality to Servax, and its conspiracy with Umami interfered with Marnor and Servax's participation and ability to conduct business freely in the market.  Amerra and Umami damaged Marnor and Servax's business and property, and their conspiratorial conduct caused of substantial harm to, and foreclosed competition in, the relevant United States Bluefin Tuna import market.   Compl. at ¶¶ 196-213.

## ARGUMENT

## I.    RULE 12(B)(6) STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

4

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

In deciding a motion to dismiss, the Court is required to read a complaint generously, construing all claims liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in favor of the plaintiff. *See Lee v. Sony BMG Music Entertainment, Inc.*, 557 F. Supp. 2d 418, 423 (S.D.N.Y. 2008); *Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 415 (S.D.N.Y. 2012). Although the Court is not bound to accept as true legal conclusions couched as a factual allegations, *Twombly,* 550 U.S. at 555, if the plaintiff's well-pleaded allegations "nudge[][its] claims across the line from conceivable to plausible," the complaint will not be dismissed. *See id.* at 570; *Iqbal,* 556 U.S. at 680.

## II. AMERRA AND TASHJIAN BREACHED THE CONFIDENTIALITY AGREEMENT AND ENGAGED IN FRAUD

Amerra and Tashjian argue, on the one hand, that plaintiffs' breach of contract claim fails because they were never contractually bound to maintain the secrecy of confidential information shared in the underwriting process. On the other, they claim that plaintiffs' fraud count fails because it duplicates claims brought in contract. *See* Doc. 67 at II and III. In other words, Amerra and Tashjian want to have their cake and eat it, too. But they cannot have it both ways.

### A.   Servax Has Standing to Assert a Claim for Breach of the Confidentiality Agreement

Amerra and Tashjian argue that plaintiffs lack standing to sue for breach of contract. Specifically, Amerra and Tashjian argue that the Confidentiality Agreement (signed by Altex's joint venturer VFT Global) does not identify either of the plaintiffs, or Altex for that matter, as parties.[1]  As alleged in the Complaint, however, upon learning of the Marnor joint venture, Amerra and Tashjian made multiple assurances to both Altex and Servax that information exchanged in connection with the Bluefin Tuna venture would be subject to the terms of the Confidentiality Agreement.  *See* Compl. at ¶¶ 51-58, 152, 211, 359-363; *see also* Servitje Decl. at ¶¶ 16-20.  Amerra and Tashjian's oral agreement to extend the terms of the Confidentiality Agreement to the Bluefin Tuna venture either (a) was an oral amendment to broaden the scope of the Confidentiality Agreement (which contained neither a merger nor a "no oral modifications" clause), or (b) created a new, valid agreement between the parties on the very same terms as the Confidentiality Agreement.

### B.   Amerra and Tashjian Were Contractually Bound to Confidentiality

Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document.  *Lyman v. New York & Presbyterian Hosp.,* No. 11 Civ. 3889 (AJN) (JCF),  2012 WL 6135354, at *7 (S.D.N.Y. Dec.

---

[1] Though irrelevant to Servax's standing, Altex's status as a beneficiary of the Confidentiality Agreement is confirmed by (a) the fact that Amerra knew from the outset that the Confidentiality Agreement related to the underwriting of a VFT Global/Altex joint venture (Brot Decl. at ¶ 3) and (b) the circumstances surrounding the transaction: Amerra regularly exchanged information with Altex concerning its underwriting of the VFT Global/Altex joint venture – including sharing correspondence from VFT Global with Altex.  Rosenberg Decl. at ¶ 3, Ex A.  By so doing, Amerra and Tashjian are estopped from denying that the Confidentiality Agreement benefitted Altex.  *See Matter of White Plains Plaza Realty, LLC v. Cappelli Enters., Inc.*, 970 N.Y.S.2d 47, 50 (App. Div. 2013) (where performance is rendered directly to a third party, it is presumed that the third party is an intended beneficiary of the contract); *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 249 (2d Cir. 2002) (same).

6

11, 2012); *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *Municipal Consultants and Publishers, Inc. v. Town of Ramapo*, 390 N.E.2d 1143, 1145 (N.Y. 1979).

To establish a breach of contract under New York law a plaintiff must plead (i) the existence of a contract; (ii) performance by one party; (iii) a breach by the other party; and (iv) damages resulting from the breach. *OTG Brands, LLC v. Walgreen Co*., No. 1:13-cv-09066 (ALC), 2015 WL 1499559 (S.D.N.Y. March 31, 2015) (*citing Diesel Props S.r.l. v. Greystone Business Credit II LLC,* 631 F.3d 42, 52 (2d Cir. 2011); s*ee also Terwilliger v. Terwilliger,* 206 F.3d 240, 245-46 (2d Cir. 2000.  On a motion to dismiss a breach of contract claim, the Court "should resolve any contractual ambiguities in favor of the plaintiff."  *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Fur Chemische Industrie*, No. 13-1872-CV (L), 13-1934-CV (XAP), 2015 WL 1865645, at *5 (2d Cir. Apr. 10, 2015)(citing *Subaru Distribs. Corp. v. Subaru of Am., Inc*., 425 F.3d 119, 122 (2d Cir. 2005)).

Amerra and Tashjian expressly and repeatedly agreed to maintain and not share or use for their own benefit the confidential business information that Altex and Servax provided regarding their business arrangements with Marnor.  Compl. at ¶¶ 53-58, 261-271; Servitje Decl. at ¶¶ 16-20.  Rather than keeping with their word, i.e., honoring their contract, Amerra and Tashjian committed a breach through their misuse of the confidential information by sharing it with Umami – plaintiffs' main competitor and an entity in which Amerra had invested millions of dollars.  *See* Complaint at ¶¶ 272-278, 347-372.

Plaintiffs have certainly pleaded the elements of their cause of action, and have provided herewith confirmatory evidence to buttress their claims.  If Amerra and Tashjian contend that there was no such agreement, they can plead it as an affirmative defense.  They cannot, however, defeat plaintiffs' claims on a motion to dismiss.  The existence of the oral agreement between the

parties is a question of fact.  Plaintiffs have pleaded the existence of that agreement (including

through the oral representations and agreements of the parties), and Amerra and Tashjian's

argument goes far beyond plaintiffs factual allegations, which at this stage must be treated as

true.  Amerra and Tashjian's motion should therefore be denied.

### C.      Amerra and Tashjian Committed Fraud

Amerra and Tashjian then urge for dismissal of the fraud claim as duplicative of

plaintiffs' breach of contract claim.  Amerra and Tashjian's position, however, defies logic: on

the one hand, they claim there is no contract, and on the other they argue that the fraud claim

should be dismissed because plaintiffs' recovery should be based, if at all, on contract.  To be

clear, if Amerra and Tashjian contend there is no contract, then their assurances of

confidentiality – as pleaded – were false, material, intended to deceive, induced reasonable

reliance and damaged plaintiffs.  Compl. at ¶¶ 348-372.  Amerra and Tashjian's conflicting

positions support, at least at this stage, plaintiffs' right to plead these claims in the alternative.

More importantly, even when there is a contract, New York law allows plaintiffs to seek

redress for fraudulent representations in the inducement.  To maintain such an action, whether it

be for the rescission or tort damages, as is the case here, it is sufficient to show that the defendant

knowingly uttered a falsehood intending to deprive the plaintiff of a benefit, and that the plaintiff

was thereby deceived and damaged. *Chase v. Columbia Nat. Corp.*, 832 F. Supp. 654, 660

(S.D.N.Y. 1993)  (quoting *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 151 N.E.2d 833,

835 (N.Y. 1958)).

New York distinguishes between a promissory statement of what will be done in the

future, which gives rise only to a breach of contract cause of action, and a misrepresentation of a

present fact that gives rise to a separate cause of action for fraudulent inducement.  *Merrill Lynch

& Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2nd Cir. 2007) (citing *Stewart v.*

8

*Jackson & Nash,* 976 F.2d 86, 88-89 (2d Cir.1992)).  Therefore, a claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law.  *Id.* (citing also *RKB Enters., Inc. v. Ernst & Young,* 582 N.Y.S.2d 814, 816 (App. Div. 1992).

One who fraudulently makes a misrepresentation of intention for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable for the harm caused by the other's justifiable reliance upon the misrepresentation.  *Channel Master*, 151 N.E.2d at 835.  The Court of Appeals has long recognized that a person's intent or state of mind is capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action.  *Id.*; *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.,* 502 N.E.2d 1003, 1004 (N.Y. 1986) (a promise made with a preconceived and undisclosed intention of not performing constitutes a misrepresentation actionable in tort that is not duplicative of a contract claim nor barred by an integration clause).

In *Lehman v. Dow Jones & Co.,* 783 F.2d 285 (2nd Cir. 1986), the Court of Appeals faced a similar situation.  There, plaintiff alleged that the defendant had made fraudulent misrepresentations as to its intent to perform.  The *Lehman* Court explained that "New York law is clear that an action for fraud will lie when a defendant makes a promise that he has no present intention of performing." *Id*. at 295-96.  The Second Circuit then found that plaintiffs' allegations sufficiently pleaded a representation of a material existing fact, falsity of the statement, scienter, and deception.  *Id.*  While the *Lehman* Court found that plaintiff had not pleaded special damages, plaintiffs' complaint here certainly does.  Tashjian and Amerra's actions resulted not only in damages traditional expected upon disclosure of confidential information, but in the loss of plaintiffs' tools of the trade to their competitor.

9

As for Fed. R. Civ. P. 9(b), to satisfy the particularity requirement a complaint must – when read generously, and with all inferences drawn in favor of the pleader – adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *See Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).  Plaintiffs' allegations here meet the pleading standards of Rule 9(b).  They identify the speaker: Tashjian, on behalf of Amerra (Compl. at ¶¶ 46-57, 366-368); the substance of the statements: express and implied assurances of confidentiality (Compl. at ¶¶ 54, 359; Servitje Decl. at ¶¶ 16-20); the materiality and falsehood of Tashjian and Amerra's statements, and intent to deceive (Compl. at ¶¶ 362-370);  and plaintiffs' special injuries (Compl. at ¶¶ 371-372).

In the end, the allegations of the Complaint satisfy the elements for pleading fraud and do not duplicate their breach of contract claim – particularly in light of Amerra and Tashjian's denial of the existence of a contract.  Amerra and Tashjian's motion to dismiss should be denied, and plaintiffs' allowed to proceed with their causes of action.

## III.    PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR ANTITRUST CLAIM

Finally, Amerra and Tashjian, joined by Umami, move to dismiss plaintiffs' antitrust claims on three grounds: (1) plaintiffs fail to allege antitrust injury and standing; (2) plaintiffs' Sherman Act claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"); and (3) plaintiffs' complaint should be read to allege that  Amerra and Umami should be deemed as a unified entity incapable of conspiring under the *Copperweld/American Needle* doctrine. Amerra, Tashjian and Umami are wrong.

### A.   Plaintiffs Have Sufficiently Alleged Antitrust Standing and Antitrust Injury

Plaintiffs sufficiently allege antitrust injury, and therefore have standing to bring their case.  In order to establish antitrust injury, a plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).  By alleging exclusion from competition, lost profits, lowered output, and increased prices, Plaintiffs have sufficiently alleged injuries that the antitrust laws were intended to prevent. (Compl. ¶¶ 206-213).  These injuries flow directly from defendants' unlawful conspiracy in restraint of trade, and accordingly Plaintiffs have standing.

Defendants rely on *Gatt Commc'ns., Inc. v. PMC Assocs., LLC,* 711 F.3d 68 (2d Cir. 2013), to argue that Plaintiffs' injuries do not "stem" from harm to the marketplace, and that lost revenue does not constitute antitrust injury.  Defendants' reliance on *Gatt* is misplaced.  This Court has specifically held that a claim for lost profits constitutes a "cognizable antitrust injury." *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014) ("*Gatt* does not stand for the broad proposition that…lost profits…do not constitute antitrust injury.").  By unlawfully intruding upon plaintiffs' ability to compete and survive in the marketplace, defendants have inflicted an injury that the antitrust laws were intended to prevent.  *Id*; *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 573 (S.D.N.Y. 2007); *see also Xerox Corp. v. Media Scis. Int'l, Inc*., 511 F. Supp. 2d 372, 381 (S.D.N.Y. 2007) (threatened injury of direct exclusion from the marketplace is exactly the type that antitrust laws were designed to prevent and flows from the competition-reducing aspect of defendant's conduct).

### B.   Plaintiffs Claims Are Not Barred by the FTAIA

Pursuant to the FTAIA, the Sherman Act shall not apply to conduct involving trade or

commerce *(other than import trade or import commerce)* with foreign nations unless:

> (1)  such conduct has a direct, substantial, and reasonably foreseeable effect--
>
> (A)  on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
> (B)  on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2)  such effect gives rise to a claim under the provisions of this Act [15 USCS §§ 1 et seq., other than this section.

15 U.S.C. § 6a (emphasis added).  Two distinct types of Sherman Act claims fall outside the scope of the FTAIA.  The first is the "import trade or commerce" parenthetical which provides that the FTAIA does not apply – and therefore the Sherman Act does apply – to conduct involving "import trade or import commerce with foreign nations."  Courts within this Circuit have referred to this as the "import exception."  *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 904 F. Supp. 2d 310, 316 (E.D.N.Y. 2012).  The second exception, which defendants erroneously seek to apply here, is known as the "the domestic effects exception."  This provision "brings back within the reach of the Sherman Act conduct involving *nonimport* trade or *nonimport* commerce when that conduct (1) has a direct, substantial, and foreseeable effect on import trade or import commerce, and (2) the Sherman Act claim arises out of that effect."  *Id.* at 317.

Defendants rely primarily on *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2nd Cir. 2014), suggesting that the Court should view this case as one dealing with the "domestic effects exception."  This action, however, falls under the "import exception;" rendering analysis of the "domestic effects exception" unnecessary.  *United States v. Hui Hsiung*, 778 F.3d 738, 742 (9th Cir. 2015) ("[I]import trade, as referenced in [FTAIA's] parenthetical

statement, does not fall within the FTAIA at all.  It falls within the Sherman Act without further clarification or pleading.").

The facts in *Lotes* are easily distinguishable from those at issue here.  First and foremost, the plaintiff in *Lotes* was not a direct exporter of goods into the Unites States, and therefore the case did not involve import commerce.  Instead, the plaintiff in *Lotes* transacted business entirely within Asia. The trial court opinion in *Lotes*, which defendants ignore, makes the point:

> Despite Plaintiff's desperate attempt to connect foreign conduct and effects to the United States, the fact remains that the alleged conduct…is connected to the United States only through a long and convoluted series of transactions and manufacturing steps: Plaintiff and other USB 3.0 connector manufacturers supply the USB 3.0 connector products to various manufacturers of motherboards *in China*, which incorporate the connectors into their motherboards *in China*. These motherboards are sold to original design manufacturers ("ODM") *in China* that manufacture the finished goods for brands such as Dell and HP in China. Only then are these finished goods shipped to the United States for distribution.  Such "ripple effects" on markets in the United States are insufficient to allow application of the Sherman Act under the standards articulated in the FTAIA.
>
> There is, therefore, a disconnect between the relevant (foreign) market as defined by plaintiff (USB 3.0 connectors) — the market which defendants are allegedly attempting to monopolize — and the U.S. market supposedly affected by defendants' attempted monopolization (notebooks, desktop computers, servers, etc.). Accordingly, any effects on the U.S. market for finished computer goods are not effects linked to the relevant market of USB 3.0 connectors manufactured and sold in China.

*Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12 Civ. 7465 (SAS), 2013 WL 2099227 (S.D.N.Y. May 14, 2013)(emphasis in original).

The court in *Lotes* applied only the "domestic effects exception" without addressing the "import exception" because the case did not involve import commerce.  The monopolistic action in *Lotes* concerned a dispute over the enforcement of *Chinese* patents through infringement suits initiated in *China*, in an attempt to block a Taiwan-based plaintiff from selling its products to

*Chinese* manufacturers.  The plaintiff in *Lotes* did not export goods into the United States: the entire scope of its business dealings started and ended in Asia.  The finished product was only introduced into the United States by actors further down the supply chain.  Without a direct tie to United States import commerce, the *Lotes* plaintiff had to show that its claim fell within the "domestic effects exception" to bring the foreign actions within the purview of the Sherman Act.

Here, there is no such "disconnect" with United States import commerce.  Whereas in *Lotes* neither party was alleged to directly sell any USB 3.0 connectors in the United States (2013 WL 2099227, at *8), in this action *both* competitors are alleged to be directly engaged in United States import commerce (i.e. the export of Bluefin Tuna into the United States).  A visual depiction of the supply chains in the respective cases underscores this distinction:

> Lotes manufactures USB connectors in China → the USBs are sold to Chinese motherboard manufacturers → Original Design Manufacturers (ODMs) manufacture the finished good *in China* → third parties ship the finished product to the United States.

> Marnor and Servax capture/farm tuna in Mexico → Marnor and Servax sell to customers in the United States.

Unlike in *Lotes*, plaintiffs here sell (i.e., export) directly to United States customers who import the products.  The defendants' anticompetitive conduct thus directly disrupts Marnor and Servax's ability to engage in import commerce, and causes *domestic injury*.  Based on the facts – which defendants do not even mention, much less discuss – *Lotes* is inapposite.[2]  Without *Lotes*, defendants' argument is doomed.

The only other cases they cite – *F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S.

---

[2] Defendants instead describe the plaintiff in *Lotes* as "a foreign manufacturer of components for notebook computers that were sold worldwide."  At first blush, this sentence could suggest that Lotes exported its components worldwide (i.e. sold them to U.S. customers directly).  However, it was not Lotes' products, but rather the *finished notebook computers* into which they were ultimately incorporated by others, that were eventually sold worldwide by actors farther down the supply chain, and only once Lotes was removed from the process.

155 (2004) and *Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*, Nos. 13 Civ. 7789 (LGS), 13 Civ. 7953 (LGS), 14 Civ. 1364 (LGS), 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) – are equally unavailing.

*Empagran* concerned a class action on behalf of foreign and domestic purchasers of vitamins under the Sherman Act.  The complaint alleged that the petitioners – foreign and domestic manufacturers – had engaged in a price fixing conspiracy.  The petitioners moved to dismiss the suit as to the *foreign* purchasers – five vitamin distributors located abroad – each of which bought vitamins from petitioners ***for delivery outside of the United States***.  The Court characterized the transactions as "wholly foreign" because the Respondents never asserted that they purchased any vitamins in the United States or in transactions in United States commerce. The question presented for the Court assumed "that the relevant transactions occurred entirely outside U.S. commerce."  *Empagran*, 542 U.S. at 160 (internal quotation marks omitted).

In essence, the *Empagran* Court had to decide whether a wholly foreign injury could be redressed through American antitrust laws.  The Court held it could not, noting "the FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements…however anticompetitive, as long as those arrangements ***adversely affect only foreign markets***."  *Id*. at 161 (emphasis added).  The Supreme Court found that the Sherman Act does apply to commercial activities taking place abroad, however, if they "adversely affect domestic commerce, ***imports to the United States***, or exporting activities of one engaged in such activities within the United States." *Id.* (emphasis added).  Here, the defendants' conduct adversely affect United States imports.

Even assuming that the "domestic effect" exception were relevant, *Empagram* is distinguishable.  In *Empagram*, the Court held that the FTAIA exception did not apply, and

hence the Sherman Act did apply, because it found "[t]he price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect." *Id.* at 164. Because the foreign purchasers' claims in *Empagran* were based solely on an adverse foreign effect, the Court dismissed the case.  Here, the adverse foreign effect is not "independent" of any adverse domestic effect.  To the contrary, the effects are one and the same: the foreign anticompetitive conduct is <u>directly</u> causing a domestic injury, in the form of lost exports to United States customers.  *Empagram* actually supports plaintiffs' case here, as the Supreme Court noted that "our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress ***domestic*** antitrust injury that foreign anticompetitive conduct has caused." *Id.* at 165.

Finally, like *Lotes* and *Empagran*, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2015 WL 363894 ("*FX*") did not involve import commerce.  *FX* instead involved a conspiracy amongst domestic and foreign banks to fix benchmark rates in the foreign exchange market.  The "primary action" concerned U.S.-based plaintiffs while the "Foreign Actions" were initiated on behalf of those who traded foreign currency in South Korea and Norway.  In *FX*, the court dismissed the Foreign Actions, but not the claims of U.S.-based plaintiffs, because they "implicate[d] exclusively foreign activity that [did] not sufficiently affect American commerce." 2015 WL 363894, at *13.

The Foreign Plaintiffs in *FX* sought redress for wholly foreign injuries arising out of FX transactions in South Korea and Norway.  The court noted "[t]he Foreign Complaints seek to apply American antitrust laws to Defendants' foreign conduct for harm suffered outside the

16

United States." *Id.*  In contrast, the plaintiffs here are not suffering a wholly independent foreign injury, but a domestic one: being restrained from transacting business with U.S. customers.

The *FX* Court noted that in order to satisfy the import commerce exception, plaintiffs would have to "plausibly show that the conduct by the defendants…was directed at an import market." *Id.* at *14 (citing *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by Empagran*, 542 U.S. 155).  The Foreign Plaintiffs in *FX* did not allege that the defendants' conduct was specifically directed at an import market of the United States.  On the contrary, as the court noted "both complaints allege that their respective Plaintiffs suffered harm outside the United States while participating in what the Larsen Complaint calls a large 'global decentralized' market and the Simmtech Complaint calls a 'worldwide competitive market.'"  *Id.*  The court held that FTAIA's "import commerce" exception did not apply because the conduct was directed at extraterritorial transactions.  *Id.*

Here, the facts most closely resemble *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81 (S.D.N.Y. 1995), where this Court found that foreign anticompetitive conduct that prevents an exporter from selling goods in the United States sufficiently triggers the "import exception," foreclosing analysis of the "domestic effects exception."  As this Court explained,

> The implication that the Sherman Act provisions continue to apply to import trade and import commerce is unmistakable.  ***Plaintiff contends that defendants' actions have precluded it from exporting goods into the United States. Consequently, plaintiff's pleading alleges an impact on import trade and import commerce into the United States***.
>
> Rather than the FTAIA's "direct, substantial and reasonably foreseeable" standard, the Court must determine whether the challenged conduct has, or is intended to have, any anti-competitive effect upon United States commerce.

*Eskofot*, 872 F. Supp. at 85 (emphasis added).

Plaintiffs' position here is also supported by *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d

845 (7th Cir. 2012), a straightforward price fixing dispute between domestic plaintiff-purchasers of potash and international producers.  In *Minn-Chem*, the Seventh Circuit found that transactions directly between United States purchasers and foreign producers are import commerce, and thus the FTAIA did not apply.

Finally, the viability of plaintiffs' Sherman Act import commerce claims is buttressed by the this District's broad construction of what qualifies as "import commerce."  As noted in *Animal Science Prods.*, "the FTAIA makes clear that not only import commerce, but conduct *involving* import commerce, is never removed from the reach of the Sherman Act."  904 F. Supp. 2d at 317.  "[T]he relevant inquiry is whether the defendants' alleged anticompetitive behavior was directed at an import market."  *Id*.

Plaintiffs' Complaint contains sufficient factual averments to support application of the import commerce exception: it avers that Umami and Amerra's conspiratorial conduct has interfered with the Plaintiffs' "ability to conduct business freely *in the United States Bluefin Tuna market*;"  Compl. at ¶ 206, and that defendants' "agreements have materially limited Marnor and Servax's ability to capture, farm, *and export Bluefin Tuna into the United States.*"  Compl. at ¶ 209.  Indeed, the Complaint contains numerous allegations supporting the impact of defendants' actions on the domestic import market and/or plaintiffs' ability to export goods into the United States.  *See*, *e.g.*, Compl. at  ¶¶ 211, 213, 379, 380, 393, 395, 398).  Ultimately, by directly targeting an exporter of goods into the United States, the defendants have targeted the domestic import market, rendering the FTAIA inapplicable.

### C.     Amerra and Umami Are Capable of Conspiring in Restraint of Trade

Finally, defendants rely on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) and *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) to argue that Amerra, Umami, and Tashjian are incapable of conspiring with each other as a matter of law.

18

Their theory is that defendants cannot be deemed "independent centers of decisionmaking." Neither opinion supports dismissal here – certainly not at the pleadings stage.

In *Copperweld*, a case that ultimately reached the Supreme Court after full discovery and a jury trial, the Supreme Court determined that Section 1 of the Sherman Act did not apply to agreements between a corporation and its wholly owned subsidiary.  The Court found that the parent corporation and subsidiary shared a "complete unity of interest" because the parent could assert full control over the subsidiary at any time.  467 U.S. at 771.  Therefore, the Court explained that the parent/subsidiary collusion in that particular case did not deprive "the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 769.  Rather, the Court found that the two were more properly "viewed as a single economic unit" and, thus, could not conspire with each other.  *Id.* at 772.

In *American Needle*, the National Football League was sued after its member-teams decided to collectively and exclusively license their trademarks to a single hat manufacturer, Reebok, through an association they created to exploit their intellectual property called the NFLP.  As a result of this exclusive license, the plaintiff, American Needle, lost its ability to manufacture football hats and alleged that the NFL and its teams conspired in violation of Section 1 of the Sherman Act.  After discovery, the NFL moved for summary judgment arguing that the league and its teams collectively constituted a single entity, and thus could not conspire with each other.  In contrast to *Copperweld*, the Supreme Court in *American Needle* ruled for the plaintiff and held that the NFL clubs lacked "the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action" and were thus capable of conspiring under Section 1.  *See* 560 U.S. at 196.

The facts alleged here do not fit within *Copperweld* or *American Needle*.  *Copperweld*

19

dealt only with the relationship between a parent and its ***wholly owned*** subsidiary.  The Supreme

Court expressly declined to consider the single entity status of less-than-wholly-owned

subsidiaries, or other potential business relationships.  *Copperweld Corp.,* 467 U.S. at 767  ("We

do not consider under what circumstances, if any, a parent may be liable for conspiring with an

affiliated corporation it does not completely own.")

Recently, this Court has confirmed the Supreme Court's characterization of the ruling of

*Copperweld* as "limited," and expressed doubt as to whether its holding is of any import outside

of the wholly-owned subsidiary context.  *See In re Credit Default Swaps Antitrust Litig.*, No.

13md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ("*CDS*").  Similarly, the Eastern

District of New York has concluded that collective ownership of 54% of a corporation did not

preclude three director-defendants from conspiring with each other against the corporation.  *See*

*American Vision Centers, Inc. v. Cohen*, 711 F. Supp. 721, 723 (E.D.N.Y. 1989) ("While

the *Copperweld* opinion declined to consider the circumstances under which a parent and an

affiliate not completely owned could be liable, the court's reasoning makes it clear that the

[defendants]  may not escape liability merely because they owned 54% of the American Vision

stock and acted as its directors and officers."); *see also Fishman v. Estate of Wirtz*, 807 F.2d 520,

541 n.19 (7th Cir. 1986) (*Copperweld* "should not be extended to shelter independent actors" that

have acquired interests as shareholders).

Concededly, plaintiffs here have alleged that Amerra holds a secured interest in Umami's

Mexican operations, and acquired an equity interest in Umami or one of its subsidiary

operations.  Plaintiffs, however, are unaware of the extent of Amerra's ownership interest in

Umami or its subsidiaries.  Plaintiffs also allege that Amerra exercises financial oversight and

control over Umami.  The Complaint does not allege, and defendants' briefs do not declare, that

Umami is a wholly owned subsidiary of Amerra.  The likelihood of this being the case is extremely unlikely because Umami is a publicly traded company.  Compl. at ¶ 6.  Accordingly, *Copperweld*'s bright line rule – indeed, its entire analysis – does not apply here.  In any event, plaintiffs are entitled to discovery before any such determination can be made.

As for *American Needle*, the core of the Supreme Court's holding is that in order for there to be concerted action under Section 1, the agreement must join together "independent centers of decisionmaking."  *See* 560 U.S. at 196.   In other words, courts should look to whether the conspiracy brings together "separate economic actors pursuing separate economic interests."  *Id*. at 197.

On this score, numerous federal courts have held that a firm, venture, or association is capable of conspiring with its members or shareholders for antitrust purposes. *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278, 285-88 (4th Cir. 2012) (incorporated joint venture capable of conspiring with members who sat on its board); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1149-50 (9th Cir. 2003) (corporation was capable of conspiring with its shareholders, who lacked common ownership and did not share profits).  The Supreme Court has also repeatedly found firms liable for conspiring with shareholders (including those whose shares collectively were controlling) to restrain competition.  In *United States v. Sealy, Inc.*, for example, Sealy (the licensor of mattresses) was held liable for conspiring with its licensees (mattress manufacturers) that were in fact Sealy's shareholders who sat on its board and exercised "control" of its "day-to-day business." 388 U.S. 350, 352-53 (1967); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608-09 (1972) (holding that a conspiracy among grocery store association and its grocery store stockholders, which also sat on the association's board and controlled its operations, could violate Section 1).

21

Amerra and Umami are, without a doubt, separate entities with separate and, in many ways, divergent economic interests.  As alleged in the Complaint, Amerra and Umami stand in a creditor-debtor relationship: a directly *adversarial* relationship in that they are counterparties in a financial transaction.  Compl. at ¶ 142.  Creditors' and debtors' business interests are not always aligned.  In fact, many times they are directly antagonistic, particularly in circumstances where the debtor is in default or unable to pay.  Compl. at ¶ 147.  A creditor may be concerned with the success of a debtor's business insofar as it seeks to be repaid, but this mutual interest does not transform a creditor-debtor relationship into a "single economic unit" such that a conspiracy is impossible.  In *American Needle* itself, the Supreme Court stated that the fact that co-conspirators may have some common interests that "coincide" does not automatically render them a single entity, because "commonality of interests exists in every cartel."  560 U.S. at 201.  Accordingly, even though Amerra may have an interest in seeing Umami's business succeed so Umami can repay its debt, the fact still remains that the two entities are separate economic actors with separate economic interests, not a single aggregation of economic power.

Although defendants point to language in the Complaint suggesting that Amerra had significant control over Umami, as a matter of public record Amerra was only allowed to appoint one director to the board of Baja Aqua Farms, a subsidiary of Umami.[3]  While the appointment may have conferred upon Amerra veto power over Umami's or its subsidiaries' expenditures, as plaintiffs allege, Amerra did not have complete "decisionmaking authority" over Umami in all respects.  In fact, based on their adversarial position in light of the creditor/debtor relationship, Amerra's economic veto power certainly suggests that Amerra and Umami's economic interests

---

[3] *See  Umami Sustainable Seafood and Baja Aqua Farms Enter into a $64 Million Credit Facility* (June 26, 2013) <http://www.businesswire.com/news/home/20130626006586/en/Umami-Sustainable-Seafood-Baja-Aqua-Farms-Enter#.VUJaA_lVhHx>.

are not always aligned – an implication which must be viewed as true at the motion to dismiss stage.  Indeed, their divergent economic interests are logical: Amerra, as creditor, wants to curb expenditures in order to maximize the likelihood of repayment, while Umami would want to spend liberally in order to maximize potential revenue.

*CDS*, *supra*, supports plaintiffs' position.  In *CDS*, the plaintiffs brought an antitrust action on behalf of all persons who purchased credit default swaps from, or sold credit default swaps to, certain major banks known as the "Dealer Defendants."  The International Swaps and Derivatives Association ("ISDA"), and both Markit Group Holdings and its subsidiary Markit Group Ltd. were named as defendants.  The plaintiffs in *CDS* alleged that the Dealer Defendants conspired among themselves and with defendants ISDA (an industry trade association) and Markit (a private company that owned rights to important CDS indices) to prevent the emergence of exchange trading for credit default swaps.  Electronic exchange platforms would have standardized credit default swaps and diminished the Dealer Defendants' dominance in the market.  As a result of the conspiracy, the plaintiffs alleged the Dealer Defendants agreed they would boycott exchange trading ventures and that ISDA and Markit would deny those ventures intellectual property licenses that were necessary for them to operate, thereby excluding the exchanges from coming to market.

Like Amerra and Umami here, the Dealer Defendants in *CDS* held seats on both ISDA's and Markit's boards of directors, yet this Court found that "despite the fact that Dealer-Defendants held ownership interests and board positions in Markit, the agreement challenged in the Complaint is one between independent centers of decisionmaking."  *CDS, supra.,* 2014 WL 4379112  at *12.  The *CDS* Court held that crossover board membership did not sufficiently create a "unity of interest" under *Copperweld*, such that the defendants were precluded from

conspiring together under Section 1. *Id.* In relevant part, *CDS* found as follows:

> Plaintiffs simply do not allege that Dealer-Defendants so dominated Markit as to create a unity of interest. <u>Indeed, part of plaintiffs' theory is that Markit had interests independent of Dealer-Defendant's, but acted against those interests as a result of its agreement with Dealer-Defendants.</u> Plaintiffs allege that Dealer-Defendants got Markit to join the conspiracy by exerting influence not just in their capacity as part-owners and board members, but also in their role as Markit's largest customers. The reasoning of *Copperweld* does not extend naturally to these facts.

*Id.* (emphasis added).

Plaintiffs' Complaint here similarly alleges that Amerra took steps contrary to its independent self-interest in order to pursue a concerted course of action – demonstrating that Amerra and Umami had separate economic interests prior to the conspiracy, and are thus "independent centers of decisionmaking." For instance, plaintiffs here allege that Amerra increased Umami's line of credit "despite Umami's default and acknowledged inability to repay," so that Umami could acquire WBC's rights against Marnor. Compl. at ¶ 154. Furthermore, the Complaint alleges that this was "a step in furtherance of their illegal conspiracy that ***made no economic sense*** except that it served the goal of excluding Marnor and Servax from the relevant market." *Id.*

In other words, as alleged in paragraph 154 of the Complaint, plaintiffs contend that Amerra and Umami had separate economic interests, yet Amerra acted against its independent interest in order to pursue a conspiracy with Umami. Thus, the market was deprived of "independent centers of decisionmaking." The fact that Amerra granted Umami a questionable line of credit that was against its independent interest and "made no economic sense" supports plaintiffs' conspiracy's plausibility because Amerra's actions only make sense within the context of a concerted effort.

In the end, when viewed in the light most favorable to the plaintiffs, the Complaint here

sets forth the requisite factual basis to make their count under the Sherman Act plausible and deny defendants' motion to dismiss.  Therefore, plaintiffs respectfully request that the Court deny Amerra, Tashjian and Umami's motions and allow them to proceed to discovery on their Section 1 claim.

<b><u>CONCLUSION</u></b>

As detailed above, plaintiffs Marnor and Servax have adequately pleaded their claims against Amerra and Tashjian for breach of contract and fraud and, along with coconspirator Umami, for violation of the Sherman Act.  Defendants' motion to dismiss should therefore be denied and plaintiffs allowed to proceed to discovery on their claims.

Dated: May 22, 2015

Respectfully submitted,

 /s/Ilan Rosenberg
Jacob C. Cohn
Ilan Rosenberg
Lee Henig-Elona
GORDON & REES LLP
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 561-2300 (telephone)
(215) 693-6650 (facsimile)
jcohn@gordonrees.com
irosenberg@gordonrees.com
lhenig-elona@gordonrees.com

**<u>CERTIFICATION OF SERVICE</u>**

The undersigned certifies that the within Opposition to Defendants Amerra Capital

Management, LLC's and Craig A. Tashjian's Motion to Dismiss was contemporaneously served

on all counsel of record by ECF as follows:

Bruce W. Bieber
Zimmet Bieber LLP
437 Madison Avenue, 40th Floor
New York, NY 10022
and
Martin S. Siegel
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022
*Counsel for Umami Sustainable Seafood, Inc.*

Andrew J. Gallo
Brian A. Katz
Morgan, Lewis & Bockius LLP
399 Park Avenue
New York, NY  10022-4689
*Counsel for WorldBusiness Capital, Inc.*

Steven M. Bierman
Joel M. Mitnick
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
*Counsel for Craig A. Tashjian and
Amerra Capital Management, LLC*

By: /s/ Ilan Rosenberg